# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

———————————

**No. ACM 39387**

———————————

**UNITED STATES**
*Appellee*

**v.**

**Charles A. WILSON, III**
Airman First Class (E-3), U.S. Air Force, *Appellant*

———————————

Appeal from the United States Air Force Trial Judiciary

Decided 10 June 2021

———————————

*Military Judge:* Vance H. Spath.

*Approved sentence:* Dishonorable discharge, confinement for life without the possibility of parole, forfeiture of all pay and allowances, reduction to E-1, and a reprimand. Sentence adjudged 22 February 2017 by GCM convened at the Houston County Courthouse in Perry, Georgia.

*For Appellant:* Captain Brian L. Mizer, USN; Lieutenant Colonel Anthony D. Ortiz, USAF; Mark C. Bruegger, Esquire.

*For Appellee:* Lieutenant Colonel Joseph J. Kubler, USAF; Lieutenant Colonel Matthew J. Neil, USAF; Major Morgan R. Christie, USAF; Major Anne M. Delmare, USAF; Major Peter F. Kellett, USAF; Captain Allison R. Barbo, USAF; Mary Ellen Payne, Esquire.

Before JOHNSON, POSCH, and KEY, *Appellate Military Judges*.

Chief Judge JOHNSON delivered the opinion of the court, in which Senior Judge POSCH and Judge KEY joined. Senior Judge POSCH filed a separate concurring opinion.

———————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

———————————

JOHNSON, Chief Judge:

A general court-martial composed of officer and enlisted members convicted Appellant, contrary to his pleas, of one specification of premeditated murder in violation of Article 118, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 918, and one specification of intentionally causing the death of an unborn child in violation of Article 119a, UCMJ, 10 U.S.C. § 919a.[1] The court-martial sentenced Appellant to a dishonorable discharge, confinement for life without eligibility for parole, forfeiture of all pay and allowances, reduction to the grade of E-1, and a reprimand. The convening authority approved the adjudged sentence.

Appellant raises 26 issues for our consideration on appeal: (1) whether Appellant's convictions are legally and factually sufficient; (2) whether the military judge was disqualified by his undisclosed application for employment with the Executive Office of Immigration Review; (3) whether Appellant was subjected to illegal pretrial punishment in violation of Article 13, UCMJ, 10 U.S.C. § 813, when the Government placed him in maximum custody; (4) whether the military judge erred by denying a defense challenge for cause against a court member; (5) whether the military judge erred by excluding evidence of the victim's "swinging" lifestyle; (6) whether the military judge erred by failing to reconsider his ruling with respect to evidence of the victim's "swinging lifestyle;" (7) whether trial defense counsel were ineffective for failing to renew their request to admit evidence of the victim's "swinging lifestyle;" (8) whether the military judge erred by failing to suppress evidence from the search of Appellant's home; (9) whether the military judge erred by allowing the Government to introduce evidence of an Internal Revenue Service (IRS) deficiency against Appellant; (10) whether the military judge erred by admitting a post-mortem paternity test indicating Appellant was the probable father of the victim's unborn child; (11) whether the military judge erred by failing to suppress a letter allegedly sent by Appellant while he was in pretrial confinement; (12) whether the military judge's instructions on findings were erroneous; (13) whether the Government's sentencing argument was improper; (14) whether the confinement order erroneously omits Appellant's 1,271 days of confinement credit for his pretrial confinement; (15) whether Appellant is entitled to sentence relief for unreasonable post-trial delay; (16) whether the Government improperly interfered with Appellant's attorney-client relationships; (17) whether the Government improperly denied Appellant's individual military defense counsel

---

[1] Unless otherwise indicated, all references to the punitive articles of the UCMJ are to the *Manual for Courts-Martial, United States* (2012 ed.), and all other references to the UCMJ and Rules for Courts-Martial and Military Rules of Evidence are to the *Manual for Courts-Martial, United States* (2016 ed.).

(IMDC) request; (18) whether the military judge erred by allowing the Government to introduce improper evidence under Military Rule of Evidence 404(b); (19) whether the military judge erred by allowing a hearsay statement by the victim that she purchased a firearm for Appellant; (20) whether trial defense counsel were ineffective for failing to request an expert in geology; (21) whether the military judge erred by failing to grant a mistrial due to a government discovery violation; (22) whether the Government improperly shifted the burden of proof during findings argument; (23) whether the military judge erred by failing to rule on the Defense's motion to remove the mandatory minimum sentence of confinement for life for violation of the Article 55, UCMJ, 10 U.S.C. § 855, which prohibits cruel or unusual punishments; (24) whether the Government failed to provide Appellant the opportunity to respond to "new matter" in the addendum to the staff judge advocate's recommendation (SJAR) to the convening authority; (25) whether the convening authority failed to meaningfully consider Appellant's clemency submission; and (26) whether the cumulative effect of errors in Appellant's case denied him a fair trial.[2]

We have carefully considered issues (14), (18), (23), (24), and (25), and we find they warrant neither further discussion nor relief. *See United States v. Matias*, 25 M.J. 356, 361 (C.M.A. 1987). As to the remaining issues, we find no error that materially prejudiced Appellant's substantial rights, and we affirm the findings and sentence.

## I. BACKGROUND

### A. Appellant and TF

During the relevant periods of time, Appellant was stationed at Robins Air Force Base, Georgia. The off-base house in Byron, Georgia, where he lived alone was equipped with several security cameras that recorded the areas around his home. In addition to being an active duty Airman, Appellant was an active member and held a leadership position in the "Outcast" Motorcycle Club. Appellant was unmarried and had a son by a prior relationship.

Around the end of 2010 or beginning of 2011, Appellant met TF at a party held by motorcycle club members. TF attended the party with her cousin MB, who was a member of a female motorcycle club. TF, who was unmarried, lived with her single brother in a house in Dawson, Georgia, approximately 96 miles from Appellant's house. TF had recently completed nursing school and went to

---

[2] We have slightly reordered the assignments of error in Appellant's brief to this court. Appellant personally asserts issues (1) and (17) through (25) pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982).

the party with MB to celebrate. After meeting at the party, Appellant and TF began a sexual relationship.

On 9 November 2012, at Appellant's request, TF bought a Walther P-22 .22 caliber handgun which she gave to Appellant.

TF became pregnant, and was expected to give birth in early September 2013. She was excited about the pregnancy and told various friends and relatives that Appellant was the father. TF's obstetrician testified at the trial that TF's pregnancy had no identified complications or risk factors.

On 23 April 2013, TF obtained an insurance policy from Metropolitan Life Insurance Company (MetLife) with a benefit amount of $1 million that listed Appellant as the sole beneficiary. In addition, TF made Appellant the beneficiary of a $42,000.00 life insurance policy through her employer that went into effect on 1 August 2013. Appellant falsely told TF that he had made her the beneficiary of his Servicemembers' Group Life Insurance (SGLI) provided through the Air Force.

On 10 August 2013, TF's friends and relatives held a baby shower for her in Dawson. TF expected Appellant to attend, but he did not. Nevertheless, TF continued plans to move into Appellant's house after the child was born. On 23 August 2013, TF drove to Appellant house to bring baby-related items in preparation for the move. She departed his house after approximately 30 minutes.

## B. IV

IV was a civilian who lived in Warner Robins, Georgia, and member of a female motorcycle club when she met Appellant in August 2010. IV and Appellant began dating within a couple of months. Appellant's motorcycle club, the Outcasts, was an all-male club, and women were not permitted to join. However, as IV explained at trial, a woman could be associated with the Outcasts through a male club member; such women "didn't have full rights" and were considered an "extension" of the male club member, and were referred to as "property." Being Outcast "property" involved a particular code of conduct, which included *inter alia* performing tasks and following instructions from the Outcast member without question, and not talking to outsiders about the club.

Being "property" of an Outcast member did not necessarily involve a romantic or sexual relationship, but IV was Appellant's "property" as well as his girlfriend. IV had Appellant's "riding name," or Outcast nickname, "BON3Z," tattooed on her body.

IV, who was unaware of Appellant's relationship with TF, dated Appellant "off and on" until approximately March 2013, when she began dating someone else who was not affiliated with the Outcasts. However, she remained Appel-

lant's "property" and continued to meet him and "do stuff" for him. On 26 August 2013, Appellant asked IV in person to rent a car for him. He told her to put it on her credit card and he would pay her in cash. Appellant subsequently told her it was to be a one-day rental for in-state use. IV made a reservation and went to the rental agency on the afternoon of 28 August 2013. While she was there, Appellant called her to ask what was taking so long. IV rented a black Ford Focus and did not note any damage on the car when she and an employee inspected it.

In accordance with Appellant's instructions, IV drove the rental car to pick Appellant up on a street one block away from his residence. Appellant then drove her back to the car rental agency to pick up IV's car. IV got into her car and departed. IV did not ask why Appellant wanted her to rent a car or why she was to pick him up on the street a block away from his house.

### C. TB

TB, another civilian woman, met Appellant in April 2012 at a motorcycle club party. At that point she was already the "property" of another member of the Outcasts. At trial, TB testified that she and Appellant were dating in late August 2013, although they were having "complications." At approximately 1855 on 28 August 2013, TB arrived at Appellant's residence in her pickup truck. TB testified that after she arrived she did some cleaning, took a bath, prepared dinner, ate with Appellant, and then watched television with him in his bedroom until she fell asleep around 2230. TB testified that she fell asleep lying on Appellant's chest.

TB testified that when she awoke to an alarm at 0515 the following day, 29 August 2013, Appellant was in the bed. At approximately 0545 they left the house together. TB drove Appellant to where the rental car was parked, then followed him to the rental car agency. After Appellant dropped off the car there, TB and Appellant went to breakfast at a restaurant.

### D. Death of TF

On the night of 28 August 2013, the night TB spent at Appellant's house, TF and her brother CF watched television at the home of their mother, AT, who lived in a house neighboring theirs in Dawson. TF said she was tired and returned to the house she shared with CF to go to bed. At approximately 2300, CF also returned to their house, locking the door behind him. He checked on TF, who was sleeping in her bedroom with the television on. CF then went to his own room, where he watched television for approximately another hour before going to sleep.

In the early morning hours of 29 August 2013, CF was awakened by a noise. CF "jump[ed]" up and opened the door to his bedroom. Appellant stood in the doorway of the bathroom across the hall approximately three feet away, facing

CF and looking directly at him. Appellant was wearing black jeans and a black hooded sweatshirt. CF had never met Appellant before, but he immediately recognized Appellant from pictures TF had showed him. TF had not said anything to CF about Appellant coming to the house, and CF felt something was wrong. CF asked Appellant why he was there. Appellant responded by asking if CF was looking for TF, to which CF replied "yeah," and asked again why Appellant was there. Appellant went into the bathroom and closed the door without saying anything further.

Alarmed, CF returned to his bedroom to get his .38 caliber handgun. As CF reached for the weapon, he heard the bathroom door open and Appellant run out of the house through the side door. CF grabbed his handgun, returned to the hallway, and looked into TF's bedroom, where he saw "blood from [her] face." CF loaded the handgun and then pursued Appellant outside, where Appellant was driving away in a car. CF fired at the car until his handgun was empty, but the car drove off without stopping. A neighbor, DJ, happened to be awake at the time; she heard three gunshots and a car speeding away.

After reloading his pistol in case Appellant returned, CF went to TF's bedroom again. He found her lying in blood and not breathing. CF called the police and then went to the house of his mother, AT, who was also a nurse. AT later testified that when CF woke her up, he was "very frantic." CF told her that TF had "blood coming out of her nose" and would not "wake up," and that TF's boyfriend had been in the house and had done something to her. AT went to TF's house and found TF was bloody and not breathing.

Paramedics arrived at TF's residence at 0331 on 29 August 2013. They determined that TF was not breathing and had no pulse, and that nothing could be done to save her life or that of the unborn child. The Terrell County coroner pronounced TF dead at 0400 that morning. Later examination determined TF had five gunshot wounds in the back of her head and one gunshot wound in her back. TF's death directly led to the death of the unborn child shortly thereafter due to lack of oxygen.

## E. Investigation

WS, a deputy with the Terrell County Sheriff's Office, was dispatched to TF's residence at 0318 and arrived shortly before the paramedics. He found CF standing by the road at the end of the driveway. According to WS, CF was "calm" as he told WS his sister was in a bedroom with "blood coming from her." WS called for paramedics and then went into the house, which he found "kind of dark" with visibility of "[p]robably 10 to 12 feet." After the paramedics found TF had no vital signs, WS had everyone leave the house in order to secure the scene. WS then spoke to CF, who disclosed that he had a handgun which he

surrendered at WS's direction. CF told WS what had happened and identified the intruder as his "sister's boyfriend from Robins, his name is Charlie Wilson."

The Sheriff's Office contacted the Georgia Bureau of Investigation (GBI), which assumed responsibility for the investigation. The first GBI agents arrived at the residence at approximately 0600 on 29 August 2013. As the agents processed the scene, they identified and gathered numerous items of evidence. This evidence included, *inter alia*, .38 caliber shell casings from CF's pistol both inside and outside the house; .22 caliber shell casings in TF's bedroom; a pillow in TF's bedroom that had multiple bullet holes in it; and TF's cell phone. The agents attempted to dust for fingerprints in TF's bedroom and the bathroom, but were not able to obtain any usable fingerprints inside the house.

Special Agent (SA) JS was present that morning and became the case agent for the GBI investigation. SA JS spoke with several witnesses in the vicinity of the residence, including the neighbor DJ, TF's mother AT, and TF's cousin MB. However, SA JS delayed speaking with CF until he could interview him in a "more controlled environment" at the local police department after gathering additional background information, because CF was initially considered a "person of interest" in relation to the homicide. When SA JS conducted the interview, CF appeared "[d]istraught, upset, [and] very sad." CF described what had happened, including identifying Appellant by name and describing his clothing.[3] CF acknowledged owning a .22 caliber firearm, but it was a single-shot rifle that the agents deemed unlikely to have fired the multiple gunshots that killed TF. Nevertheless, the agents seized the rifle.

With the evidence pointing toward Appellant as the likely suspect, SA JS coordinated with the Air Force Office of Special Investigations (AFOSI) to identify Appellant's residence and obtain a "no-knock" search warrant. The warrant was executed the same day by SA JS with three other GBI agents, several AFOSI agents, and the Houston County Sheriff's Office Special Response Team. The Special Response Team found Appellant with IV in an upstairs bedroom and removed them from the house.

GBI agents collected numerous significant items of evidence from Appellant's residence, including *inter alia*: a round of .22 caliber ammunition under a piece of furniture in the living room; the box for the Walther P-22 handgun that TF had purchased for Appellant in November 2012, which contained a

---

[3] CF later identified Appellant as the intruder from a photo lineup that included Appellant and five other individuals with a similar general appearance.

sealed "test fire cartridge;"[4] two pairs of black pants, a black hooded sweat-shirt, a black t-shirt, and a pair of black boots; multiple cell phones; a copy of TF's MetLife life insurance policy designating Appellant the sole beneficiary; a notice of deficiency from the IRS indicating Appellant owed the Government $10,802.17 (IRS notice); Appellant's surveillance cameras; and the baby items TF had brought a few days earlier.

After Appellant was removed from the house, the GBI agents initially detained him, but released him after a short interview.[5] SA JS also interviewed IV, who told him about renting a car for Appellant the previous day. In the early morning hours of 30 August 2013, SA JS went to the rental car agency where he found a black Ford Focus matching the description given by IV. Inspecting the exterior of the vehicle, SA JS noted there appeared to be a bullet ricochet mark on the driver's side window and damage to the molding of the driver's side door, the two marks in "like a horizontal line going from the rear to the front." SA JS remained with the car until the rental agency employees arrived later that morning, when SA JS was able to confirm this was the car IV had rented. SA JS was also able to obtain security camera video recordings from the rental agency that appeared to depict Appellant returning the black Ford Focus on the morning of 29 August 2013.

In the meantime, after Appellant was released, he met IV at her house. IV confronted Appellant regarding what she had learned from the police about the death of TF, a pregnant woman she did not know. Appellant told IV "[i]t was not [his] baby. F[**]k her." Appellant also told IV that he was about to get "kicked out" of the military, but he would be "straight" because "there was a policy."

On 30 August 2013, the GBI agents obtained an arrest warrant for Appellant. Appellant was arrested the following day, 31 August 2013, driving southbound on an interstate highway approximately 80 miles south of Warner Robins, Georgia. Appellant was placed in pretrial confinement where he remained until the conclusion of his court-martial.

As the investigation continued, the GBI agents learned that the day before TF purchased the Walther P-22 at Appellant's direction, Appellant bought a Walther P-22 thread adapter. At trial, an expert witness in the field of firearms

---

[4] At trial, SA JS gave the following explanation of a "test-fire cartridge": "When you buy a new handgun there will be, typically be a little sleeve like you see there, that contains a shell casing that has been fired from the gun that was purchased and it can be used for matching purposes."

[5] Appellant's statements during this interview were subsequently suppressed by the military judge and are not relevant to our analysis.

explained that the Walther P-22 is designed to accept a thread adapter that allows a "suppressor," also known as a "silencer," to be attached to the barrel.

SA JS determined that the distance of one round trip from Appellant's residence to TF's house in Dawson, coupled with two round trips between the car rental agency and Appellant's residence, would have totaled approximately 215 miles. He further determined that the black Ford Focus IV rented had been driven approximately 217 miles from the time it was rented until its return.

SA JS tested how long it would take to drive between TF's home and Appellant's residence. One night, he departed TF's home at 0300 and arrived at Appellant's residence at 0418, indicating a travel time of one hour and 18 minutes.[6]

SA JS also reviewed the recordings from Appellant's security cameras. These depicted TB's arrival at Appellant's house on the evening of 28 August 2013, and Appellant and TB both departing the house at approximately 0545 on 29 August 2013. In the recordings, no one appeared to enter or exit the house between those two points in time. However, SA JS determined that there was a "blind spot" in the security cameras, whereby someone could enter or exit through a particular ground floor window without appearing in the recordings. Moreover, the window was not covered by a screen, and it appeared a table had been moved away from the interior of the window as if to provide access to it.

GBI agents obtained phone records of text messages between Appellant and TF. Notably, in the days leading up to TF's death, Appellant inquired about the daily routines of TF and her brother CF, including their sleeping habits. Investigators also obtained text messages between Appellant and IV, including the following exchange on 24 August 2013:

> [Appellant:] Man I can't let you go. I love you too f[**]king much
>
> [Appellant:] I am willing to do whatever it takes
>
> [IV:] You always say that and then you do it again. You told me you can't stop.
>
> [Appellant:] Everything is about to change. I told you what's about to go down. You couldn't stick around for that?

---

[6] On another occasion, "[i]n the middle of the day," SA JS drove from Appellant's residence to TF's home and back, with each leg taking approximately one hour and 45 or 50 minutes.

. . . .

> [Appellant:] Why don't you move in wi[t]h me. Then we will be together always[7]

GBI ballistics analysis revealed the six .22 caliber bullets recovered from TF's body had been fired from the same weapon. Examination of the four .22 caliber shell casings recovered from TF's home revealed they matched the .22 caliber test-fire shell casing in the Walther P-22 box seized from Appellant's residence. In addition, investigators were able to positively eliminate CF's .22 caliber rifle as having fired the fatal rounds.

Examination of the ricochet mark on the window and damaged window molding from the rental car revealed traces "typical of a lead projectile."

The GBI agents performed gunshot residue (GSR) analysis on the items of clothing seized from Appellant's house. This analysis detected a small number of particles "associated" with GSR—specifically lead barium and lead antimony—on the sweatshirt, shirt, and both pairs of pants seized from Appellant's residence. However, no blood was found on the clothing. Particles "characteristic" of GSR were also found on a washcloth recovered from the floor of TF's bathroom.[8]

GBI analysis of clothing fibers identified the presence of fibers matching the sweatshirt, t-shirt, and both pairs of pants recovered from Appellant's residence both in the rental car and on the bedding in TF's bedroom. In addition, a single head hair matching Appellant was found on TF's bedding.

Analysis of soil found on the boots seized from Appellant's residence found that soil was similar to the soil found in TF's front yard. However, the soil was also similar to the soil in a portion of Appellant's backyard, although it was dissimilar to the soil in Appellant's front yard and part of the backyard.

Analysis of TF's phone revealed that TF received calls at 0221 and 0222 on 29 August 2013, shortly before her death, and that both calls were answered. The calls lasted 10 seconds and 2 minutes and 36 seconds, respectively, and came from a number that had not been used to call TF's phone before.

DNA analysis performed by the GBI determined a 99.9999 percent probability that Appellant was the father of the deceased unborn child.

---

[7] Unless otherwise marked, texts quoted in the opinion are presented verbatim without correction.

[8] At trial, an expert in ballistics explained that particles "characteristic" of GSR contain three elements—lead, barium, and antimony—whereas particles "associated" with GSR contain some combination of two of those elements.

**F. Court-Martial Proceedings**

The charges and specifications that are the subject of the instant appeal were referred for trial by a general court-martial on 9 October 2014. These charges and specifications were originally referred together with several other charges and specifications arising from other incidents in 2011, 2012, and 2013 which were unrelated to TF. The convening authority referred the case as capital. In the course of the extended pretrial motion practice, the Defense successfully moved to sever the alleged offenses which were not related to the killing of TF. Ultimately, Appellant was tried by three courts-martial; the court-martial presently under review was the last of the three, and the only capital proceeding.

Appellant's court-martial was conducted at the Houston County Courthouse in Perry, Georgia. The court-martial took place over an extended period of time, beginning with Appellant's arraignment on 22 October 2014 and concluding with the announcement of the sentence on 22 February 2017. Several factors contributed to the delays, including *inter alia* the replacement at one point of all Appellant's trial defense counsel, as well as the severance of the charges and specifications into three separate courts-martial.

## II. DISCUSSION

### A. Legal and Factual Sufficiency

#### 1. Law

We review issues of legal and factual sufficiency de novo. *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002) (citation omitted). Our assessment of legal and factual sufficiency is limited to the evidence produced at trial. *United States v. Dykes*, 38 M.J. 270, 272 (C.M.A. 1993) (citations omitted).

"The test for legal sufficiency is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Robinson*, 77 M.J. 294, 297–98 (C.A.A.F. 2018) (citation omitted). "[I]n resolving questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted). As a result, "[t]he standard for legal sufficiency involves a very low threshold to sustain a conviction." *United States v. King*, 78 M.J. 218, 221 (C.A.A.F. 2019) (alteration in original) (citation omitted).

The test for factual sufficiency is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we are ourselves] convinced of the [appellant]'s guilt beyond a

reasonable doubt." *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987). "In conducting this unique appellate role, we take 'a fresh, impartial look at the evidence,' applying 'neither a presumption of innocence nor a presumption of guilt' to 'make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt.'" *United States v. Wheeler*, 76 M.J. 564, 568 (A.F. Ct. Crim. App. 2017) (alteration in original) (quoting *Washington*, 57 M.J. at 399), *aff'd*, 77 M.J. 289 (C.A.A.F. 2018)).

In order to convict Appellant of the specification of premeditated murder in violation of Article 118, UCMJ, as charged in this case, the Government was required to prove: (1) that TF is dead; (2) that the death resulted from the act or omission of Appellant; (3) that the killing was unlawful; and (4) that, at the time of the killing, Appellant had a premeditated design to kill. *See Manual for Courts-Martial, United States* (2012 ed.) (*MCM*), pt. IV, ¶ 43.b.(1). "Premeditated murder is murder committed after the formation of a specific intent to kill someone and consideration of the act intended." *MCM*, pt. IV, ¶ 43.c.(2)(a).

In order to convict Appellant of the specification of killing an unborn child in violation of Article 119a, UCMJ, as charged in this case, the Government was required to prove: (1) that Appellant engaged in the murder of TF; (2) that TF was then pregnant; and (3) that Appellant thereby caused the death of TF's unborn child. *MCM*, pt. IV, ¶ 44a.b.(2).

**2. Analysis**

The Government introduced compelling evidence of Appellant's guilt of both specifications. The evidence clearly indicated TF, who was over eight months pregnant at the time, died in her bedroom in the early morning hours of 29 August 2013, as a result of being shot multiple times in the back of her head with a .22 caliber firearm. There is no substantial question that her death was unlawful and premeditated. Additionally, there is no substantial question that TF's otherwise healthy unborn child died as a result of TF's killing.

The primary contested issue during the findings portion of the case was whether it was Appellant who committed the killing. The Government adduced a plethora of convincing evidence that it was. It is impractical and unnecessary to thoroughly recount the evidence from over eight days of trial on the merits and over 130 prosecution exhibits. However, below we summarize some of the most significant evidence supporting the Government's case.

### a. CF's Identification of Appellant

CF testified that after he was awakened by a noise, he unexpectedly discovered Appellant in the hallway of the house he shared with TF, evidently shortly after she had been shot. CF had never met Appellant before, but he

recognized Appellant from pictures TF had shown him. To be sure, CF's testimony was subject to challenge in certain respects. In addition to the fact CF had not met Appellant before, the lighting in the hallway was evidently relatively dim. Furthermore, CF had undergone brain surgery approximately a year and a half earlier, and there was conflicting evidence as to the extent to which this surgery would have affected CF's perception and memory. On the other hand, in the hours following the murder CF repeatedly stated that it was Appellant he saw in the house; he later picked Appellant's picture out of a six-photograph lineup identification; and he testified unambiguously that it was Appellant that he had seen.

### b. Ballistics Evidence

Markings on the bullets recovered from TF's body matched those on the test round recovered from the Walther P-22 box seized from Appellant's residence, indicating they had been fired from the same weapon. This evidence clearly supported the inference that the handgun Appellant possessed was used to kill TF. The Government also introduced evidence that, close in time to when he had TF buy the handgun for him, Appellant purchased a thread adapter that would enable a silencer to be attached to a Walther P-22. CF's .22 rifle was excluded as the murder weapon.

### c. Rental Car

Evidence linked Appellant to the rental car which had a similar general description to the one in which CF saw the intruder flee. CF fired at it multiple times. The car was undamaged when IV rented it at Appellant's direction on 28 August 2013. However, after Appellant returned it the following day, the driver's window had a bullet ricochet mark and the molding was damaged.

SA JS determined the distance the rental car had been driven from the time it was rented until it was returned was nearly the same and only slightly greater than the driving distance of a round trip from Appellant's house to TF's house added to two trips between Appellant's house and the rental agency. This evidence reinforced the inference that Appellant drove the rental car to TF's home in Dawson and back on the night of her murder.

### d. Other Forensic Evidence

CF described the intruder as wearing black pants and a black hooded sweatshirt. Similar clothing was recovered from Appellant's residence. Forensic analysis matched fibers from Appellant's clothing with fibers recovered from the rental car and from TF's bedding following the murder. Additional testing identified particles associated with gunshot residue on the clothing recovered from Appellant's residence and from the washcloth recovered from the floor of the bathroom of TF's house, where the intruder had been.

### e. Opportunity

SA JS determined it was possible to drive from TF's house to Appellant's house in one hour and 18 minutes. In addition, there was a blind spot in the security cameras at Appellant's house, such that it was possible to exit and enter through a first-floor window without being recorded. Therefore, even taking at face value TB's testimony that Appellant was present at his residence when she fell asleep at approximately 2230 on 28 August 2013 and awoke at 0515 on 29 August 2013, Appellant had adequate time to exit the house through the window, drive to TF's house, commit the murder at approximately 0300, drive home, and reenter the house before TB awoke.

### f. Motive and Intent

At Appellant's request, TF made him the sole beneficiary of the $1 million MetLife life insurance policy. Appellant was also the beneficiary of a smaller life insurance policy TF had through her employer. In contrast, Appellant lied to TF that he had made her the beneficiary of his SGLI. In addition, Appellant was in debt to the Government for $10,802.17.

TF drove to Appellant's home less than one week before the murder to deliver baby items and supplies, in anticipation of moving in with him after their daughter was born. However, the following day Appellant professed his love for IV and urged her to move in with him, which suggested he did not expect TF to be living with him.

The day before the murder, Appellant sent text messages to TF specifically asking about her sleeping habits and those of her brother, CF. This information would have been useful to make contact with TF on the night of the murder without CF's knowledge.

Rather than rent the car himself, Appellant directed his "property" IV to rent it for him, knowing she would ask no questions. Rather than parking the car at his residence, Appellant arranged to park it on the street where it would not be recorded on his security cameras.

When Appellant spoke with IV after the murder, he displayed a remarkably callous attitude toward the death of TF and her unborn child, saying "[i]t was not [his] baby. F[**]k her." He went on to indicate he was not concerned about being "kicked out" of the Air Force because "there was a policy," which could easily be understood to refer to his status as TF's life insurance beneficiary.

### g. Debunking the Alibi Defense

The centerpiece of Appellant's defense was TB's testimony regarding his supposed alibi—that she was with him at his residence throughout the night of 28 August 2013 and early morning of 29 August 2013, and therefore he could

not have committed the murder. As stated above, even if one accepts this testimony at face value, the Government proved it was possible for Appellant to have departed, committed the murder, and returned while TB was asleep.

Although TB opined that she believed she would have awoken if Appellant had left the bed, the Government effectively attacked TB's credibility on multiple fronts. To begin with, she was an ex-girlfriend of Appellant's who purported to be in a then-current dating relationship with him. TB was further affiliated with the Outcasts, of whom Appellant was a leader, by virtue of being the "property" of another Outcast member. On cross-examination, TB admitted that when she was interviewed by the GBI agents she did not initially disclose that she had helped Appellant return the rental car before going to breakfast with him. The Government also introduced texts between Appellant and TB in which TB agreed to help Appellant "handle" some unspecified "business" after she got off work on 28 August 2013. Afterwards, TB withdrew a total of $500.00 in three separate transactions from a bank account owned by Appellant. When questioned about these withdrawals at trial, TB claimed that this was a joint account they had together; however, the Government introduced documentary evidence indicating it was solely Appellant's account. Regardless of whether TB knew about Appellant's specific plan to murder TF, a reasonable factfinder could conclude Appellant paid TB to provide a false alibi for him.

### h. Appellant's Arguments

On appeal, Appellant draws our attention to five areas. First, he suggests CF's brain surgery, the fact that CF never met Appellant before, and CF's possible resentment of Appellant's prior treatment of his sister made his identification of Appellant unreliable. We have considered these factors, but do not find them persuasive. In conjunction with the abundance of other inculpatory evidence, CF's identification of Appellant was powerfully incriminating.

Second, Appellant calls attention to the fact that the car rental agency employees did not note the damage to the window and molding when the car was initially returned and then sent the vehicle to a vendor for maintenance for much of the day on 29 August 2013. Appellant further argues that, assuming the damage was caused by a bullet, expert testimony introduced by the Government could not "conclusively connect" the damage to a bullet from CF's gun. We have considered these points. However, that the car happened to be damaged by a bullet while in the custody of a vendor performing maintenance the same day Appellant returned it, rather than being damaged by a bullet fired by CF, would be a remarkable coincidence. We find the evidentiary implications of the damaged window to be significant.

15

Third, Appellant suggests the single hair matching his that was found on TF's bedding was insignificant because it "could have gotten there in any number of different manners." Although the hair somewhat corroborates the other evidence, we have not significantly relied on this evidence in our analysis.

Fourth, Appellant argues the fibers found at the crime scene and in the rental car that were consistent with his clothes were "fairly common" and could have come from other people. We have considered this. However, in conjunction with the rest of the evidence, we find the fiber evidence was significant.

Fifth, Appellant notes the murder weapon was never recovered, and Appellant's DNA was not found on the box recovered from his residence. We find these points to be of very limited significance. Disposing of the murder weapon in some location where it would not be found would have been an obvious move for any perpetrator, including Appellant. Testimony regarding TF's statements about buying the handgun for Appellant, coupled with documentation of the sale, Appellant's purchase of the thread adapter, and the presence of the box at his residence would lead a reasonable factfinder to believe he possessed the Walther P-22. Indeed, its unexplained absence is itself suspicious. Whether or not Appellant's DNA was recovered from the box, the ballistics evidence matching the fatal bullets to the test round in Appellant's possession was powerfully incriminating evidence.

### i. Conclusion as to Legal and Factual Sufficiency

Drawing every reasonable inference from the evidence of record in favor of the Government, we conclude the evidence was legally sufficient to support Appellant's convictions. *See Robinson*, 77 M.J. at 297–98. Additionally, having weighed the evidence in the record of trial and having made allowances for not having personally observed the witnesses, we are convinced of Appellant's guilt beyond a reasonable doubt. *See Turner*, 25 M.J. at 325.

## B. Apparent and Actual Bias of the Military Judge

### 1. Additional Background

Appellant was arraigned on 22 October 2014; the charges included capital premeditated murder. Judge Spath, who at the time was the Chief Trial Judge of the Air Force, presided at the arraignment and at every session of Appellant's court-martial. At the beginning of the arraignment, trial defense counsel conducted voir dire of Judge Spath and inquired, among other topics, how Judge Spath came to be detailed to Appellant's court-martial. Judge Spath explained that he detailed himself to the case based primarily on his level of experience, including experience with capital litigation, and the relative unavailability of the other most senior Air Force trial judges.

The next sessions of the court-martial consisted of motion hearings on 15–16 December 2014. On 15 January 2015, the Defense moved to disqualify Judge Spath, contending that his service as a judge in the Military Commissions Trial Judiciary made him unavailable to serve as the military judge in Appellant's court-martial. After hearing argument on the motion at the next court-martial session on 18 February 2015, Judge Spath orally denied the motion. Additional hearings in Appellant's court-martial took place on 9–10 March 2015, 19 May 2015, and 21 September 2015.

On 19 November 2015, Judge Spath applied for a position as an immigration judge with the Executive Office of Immigration Review (EOIR) within the Department of Justice (DOJ). Judge Spath's application referred to his five years of experience as a trial judge and 15 years of prosecution and defense litigation experience. Although he did not mention Appellant's case by name, he stated that his judicial experience included presiding over capital murder cases, and that he was "currently presiding" over two such cases. Elsewhere in the application he alluded to his role as the presiding judge in Appellant's case by reference to the current capital murder trial of an Air Force member.

Additional sessions of Appellant's court-martial occurred on 8–9 February 2016 and 14–15 September 2016. In September 2016, Judge Spath accepted a conditional appointment as an immigration judge. The appointment was conditioned on, *inter alia*, satisfactory completion of a background investigation.

After a final motions hearing on 10 December 2016, Appellant's trial was held between 9 January 2017 and 22 February 2017, when Appellant was sentenced. At no time during the proceedings did Judge Spath bring his EOIR application or conditional appointment to the attention of the parties.

On 20 March 2017, Judge Spath received a temporary appointment as an immigration judge. Judge Spath negotiated his salary and start date in a series of emails between late March 2017 and early July 2017. His appointment was made permanent on 18 May 2018.

**2. Law**

"An accused has a constitutional right to an impartial judge." *United States v. Butcher*, 56 M.J. 87, 90 (C.A.A.F. 2001) (quoting *United States v. Wright*, 52 M.J. 136, 140 (C.A.A.F. 1999)). R.C.M. 902 governs disqualification of the military judge. R.C.M. 902(b) sets forth specific circumstances in which a "military judge shall [ ] disqualify himself or herself," including when the military judge "[i]s known . . . to have an interest, financial or otherwise, that could be substantially affected by the outcome of the proceeding." R.C.M. 902(b)(5)(B). In addition, R.C.M. 902(a) requires disqualification "in any proceeding in which th[e] military judge's impartiality might reasonably be questioned." Disqualification pursuant to R.C.M. 902(a) is determined by applying an objective

standard of "whether a reasonable person knowing all the circumstances would conclude that the military judge's impartiality might reasonably be questioned." *United States v. Sullivan*, 74 M.J. 448, 453 (C.A.A.F. 2015) (citing *Hasan v. Gross*, 71 M.J. 416, 418 (C.A.A.F. 2012)). "'[T]he test is whether, taken as a whole in the context of this trial, a court-martial's legality, fairness, and impartiality were put into doubt' by the military judge's actions." *United States v. Martinez*, 70 M.J. 154, 157 (C.A.A.F. 2011) (quoting *United States v. Burton*, 52 M.J. 223, 226 (C.A.A.F. 2000)).

"There is a strong presumption that a judge is impartial, and a party seeking to demonstrate bias must overcome a high hurdle . . . ." *United States v. Quintanilla*, 56 M.J. 37, 44 (C.A.A.F. 2001) (citation omitted). "Although a military judge is to 'broadly construe' the grounds for challenge, he should not leave the case 'unnecessarily.'" *Sullivan*, 74 M.J. at 454 (quoting R.C.M. 902(d)(1), Discussion). "Of course, '[a] . . . judge has as much obligation not to . . . [disqualify] himself when there is no reason to do so as he does to . . . [disqualify] himself when the converse is true.'" *United States v. Kincheloe*, 14 M.J. 40, 50 n.14 (C.M.A. 1982) (alterations and omissions in original) (citations omitted).

When the issue of disqualification is raised for the first time on appeal, we apply the plain error standard of review. *Martinez*, 70 M.J. at 157 (citation omitted). "Plain error occurs when (1) there is error, (2) the error is plain or obvious, and (3) the error results in material prejudice." *Id.* (citation omitted).

**3. Analysis**

Appellant contends Judge Spath's pending application to the EOIR for a position as an immigration judge disqualified him as the military judge in Appellant's court-martial.[9] Appellant argues Judge Spath's application gave him a personal interest that could be substantially affected by the outcome of the trial. *See* R.C.M. 902(b)(5)(B). In addition, Appellant contends the application would cause a reasonable person to question Judge Spath's impartiality. Appellant cites Judge Spath's references to his experience in capital cases, including Appellant's case (albeit not by name), which he argues Judge Spath relied on to compensate for his lack of experience in immigration law. He further cites Judge Spath's denial of numerous defense motions aimed at dismissing the charges or preventing imposition of the death penalty. Appellant contends that because Judge Spath was disqualified, this court should set aside the findings and sentence.

---

[9] On appeal, Appellant does not renew the claim in his pretrial motion that Judge Spath's service in the Military Commissions Trial Judiciary disqualified him in Appellant's court-martial.

This court considered a very similar argument related to Judge Spath in *United States v. Snyder*, No. ACM 39470, 2020 CCA LEXIS 117, at \*55–63 (A.F. Ct. Crim. App. 15 Apr. 2020) (unpub. op.), *rev. den'd*, 80 M.J. 399 (C.A.A.F. 2020). In *Snyder*, the appellant had been convicted of sexual assault by a general court-martial composed of officers where Judge Spath presided over the trial. *Id.* at \*1, \*4. This court noted Judge Spath's DOJ application included the assertions that he had "tried over 100 sexual assault cases" and "presided over close to 100 sexual assault trials." *Id.* at \*56. At the time of the appellant's trial, the terms of Judge Spath's job offer and employment by the DOJ were still pending. *Id.* at \*57. As in the instant case, evidently Judge Spath did not disclose his pending employment with the DOJ to the parties. However, this court concluded that "[a]n objective observer knowing all of the facts would not question Judge Spath's impartiality, and there is no evidence in the trial or appellate record that Judge Spath had an interest that could be substantially affected by the outcome of the proceeding." *Id.* at \*62. We reach a similar conclusion in Appellant's case.

Appellant relies heavily on the decision by the United States Court of Appeals for the District of Columbia Circuit in *In re Al-Nashiri*, 921 F.3d 224 (D.C. Cir. 2019). In his capacity as a member of the Military Commissions Trial Judiciary, between July 2014 and February 2018, Judge Spath presided over Al-Nashiri's capital prosecution before a military commission. *Id.* at 227–31. In *Al-Nashiri*, the court found Judge Spath's application to the DOJ "cast an intolerable cloud of partiality over his subsequent judicial conduct," granted the petition for a writ of mandamus, and vacated all orders Judge Spath had issued after he submitted his employment application. *Id.* at 226, 237. However, Appellant's case, like *Snyder*, is fundamentally different from *Al-Nashiri* in a critical respect. The core problem in *Al-Nashiri* was that Judge Spath sought employment with the DOJ when the DOJ was directly involved in the ongoing *Al-Nashiri* prosecution—in other words, he was adjudicating a case involving his prospective employer. *See id.* at 235. The court explained that one of Al-Nashiri's prosecutors was a detailed DOJ attorney, and that the Attorney General himself "was a participant in Al-Nashiri's case from start to finish." *Id.* at 236. Therefore, "the average, informed observer would consider [Judge] Spath to have presided over a case in which his potential employer appeared." *Id.*

In contrast, the DOJ was not a party or participant in Appellant's court-martial, as it was not in Snyder's, and it had no discernible interest in the outcome. *See Snyder*, unpub. op. at \*60. Therefore, Judge Spath was not "challenge[d] . . . to treat the [DOJ] with neutral disinterest in his courtroom while communicating significant personal interest in his job application," as had been the case with Al-Nashiri. *Al-Nashiri*, 921 F.3d at 236.

Having distinguished *Al-Nashiri*, we consider whether Judge Spath was disqualified in Appellant's case under the applicable plain error standard. We conclude Judge Spath's application to the DOJ for employment as an immigration judge was not a disqualifying personal interest that could be substantially affected by the outcome of the trial. The DOJ had no involvement or interest in Appellant's trial. It is true that Judge Spath cited his judicial experience, including his experience in capital cases, in his application; however, nothing he included in the application implied he would be biased with respect to the outcome of Appellant's trial. His application did not report the results of any trial over which he presided or imply any bias. Regardless of the outcome of Appellant's trial and regardless of whether the death penalty remained a potential sentence, it would remain true that he had presided over capital proceedings in Appellant's case. The insubstantial connection between Appellant's trial and Judge Spath's application was far too slight to overcome the "strong presumption" of judicial impartiality. *Quintanilla*, 56 M.J. at 44.

Similarly, we are convinced that no objective, reasonable, fully informed observer would believe Judge Spath's impartiality in Appellant's court-martial might reasonably be questioned. Judge Spath's application materials conveyed relevant judicial and prosecution and defense litigation experience to a prospective employer. Such an observer would not perceive any implied bias against Appellant in particular or defendants in general. Moreover, such an observer would recognize that the DOJ was not a participant in Appellant's court-martial and had no interest in the outcome.

Accordingly, we find no error, much less plain or obvious error, with respect to Judge Spath's alleged disqualification pursuant to R.C.M. 902(a) and R.C.M. 902(b)(5)(B).

## C. Pretrial Confinement

### 1. Additional Background[10]

Appellant was ultimately charged with a total of 17 specifications.[11] In addition to the allegation of the premeditated murder of TF and of intentionally killing her unborn child, other alleged offenses included *inter alia* that Appellant had pointed a loaded firearm at a different woman, struck her with his hands and feet, dragged her by her hair, and threatened to kill her.

---

[10] The following additional background information is drawn primarily upon the military judge's findings of fact, which we find to be supported by the record and not clearly erroneous.

[11] The military judge dismissed three of the specifications in February 2016.

On 18 February 2014, after Appellant was placed in pretrial confinement but before he was arraigned, Appellant was transferred to the Naval Consolidated Brig (Brig) located at Joint Base Charleston, South Carolina.[12] The "Initial Custody Classification" form completed following Appellant's arrival recommended he be classified as a maximum security pretrial confinee due to "offense severity, multiple pending charges [and] possible length of sentence." The Brig periodically reviewed Appellant's classification status, but he remained a maximum security confinee throughout his pretrial confinement. Based on the point system the Brig used to determine security classifications and the number and nature of the offenses alleged against Appellant, there was essentially no chance that Appellant's status would be changed to medium custody.

Appellant was housed alone in a cell approximately 12 feet long and 6 feet wide. He was able to speak with other confinees housed nearby by speaking through a small opening in his door, as well as with confinement personnel. As a maximum security confinee, Appellant was afforded one hour per day outside his cell for recreation alone with access to a basketball court and television. Appellant also exited his cell to shower and for a daily inspection. Whenever Appellant was outside his cell, his hands were cuffed to his belt. Medium security confinees were afforded considerably more freedom, including *inter alia* being outside their cells between approximately 0530 and 2200 each day.

Appellant's behavior in confinement was generally good. He occasionally complained to confinement personnel about conditions in the Brig. In February 2015 confinement staff found an unauthorized razor blade in Appellant's cell, but this incident did not result in any disciplinary action.

Over time, at the direction of the Brig's commanding officer, in recognition of his "unique" status Appellant was afforded a number of additional privileges beyond those normally afforded a maximum security pretrial confinee. He was given an additional 30 minutes per day of recreation time. He was given a video game system to use in his cell. He was allowed to visit the Brig's library once per week. Although Appellant's request to attend religious services was denied, he was allowed to receive visits from clergy.

On 15 January 2016, the Defense submitted a motion alleging the conditions of Appellant's confinement at the Brig violated Article 13, UCMJ. The Defense asserted his custody level was "attributable entirely to the allegations against him," unsupported by any allegations of serious misconduct or escape attempts while in custody. Essentially, the Defense asserted the conditions of his confinement were more rigorous than necessary to ensure his presence at

---

[12] Appellant was initially held in several civilian confinement facilities following his arrest on 31 August 2013.

trial. The Defense requested the military judge "eliminate the conditions of [Appellant]'s custody beyond those necessary to meet the purposes of Article 13[, UCMJ]." The Government opposed the motion.

On 9 February 2016, the military judge received additional evidence and argument from counsel on the motion. The Defense called two witnesses, the noncommissioned officer in charge of the Brig's Special Quarters section and the Brig's commanding officer, Commander (CDR) JC.

The military judge denied the defense motion in a written ruling dated 25 February 2016. The military judge noted Article 13, UCMJ, prohibited two things: the intentional imposition of pretrial punishment and confinement conditions that are more rigorous than necessary to ensure Appellant's presence at trial. The military judge found no evidence of an intent to punish Appellant. With regard to the necessity of the conditions, the military judge explained:

> [T]he witnesses made clear that the nature of the charges were the main, if not by far the, leading factor in keeping this accused classified as a maximum security pretrial confinee. However, there were other reasons; including a history of violence, protection of the staff, protection of the other prisoners, etc., that were mentioned in the supporting documents and in the testimony. Again, the Brig is clearly balancing its' [sic] concern for security with a demonstrated and true desire to make accommodations for this accused.

The military judge further found the specific conditions of Appellant's confinement were not such that they would give rise to a presumption of an intent to punish, or that the Brig's security determinations were arbitrary or capricious.

After findings but before sentencing, the Defense sought additional confinement credit for the alleged violation of Article 13, UCMJ. The military judge declined to grant relief beyond the day-for-day credit for pretrial confinement required by *United States v. Allen*, 17 M.J. 126, 128 (C.M.A. 1984).

**2. Law**

Whether an appellant is entitled to relief for a violation of Article 13, UCMJ, is a mixed question of fact and law. *United States v. Crawford*, 62 M.J. 411, 414 (C.A.A.F. 2006) (citations omitted). "[T]he military judge's findings of fact will not be overturned unless they are clearly erroneous." *United States v. Fischer*, 41 M.J. 415, 418 (C.A.A.F. 2005) (citation omitted). "Whether the facts amount to a violation of Article 13, UCMJ, is a matter of law the court reviews de novo." *Crawford*, 62 M.J. at 414 (citation omitted). The appellant bears the burden to demonstrate a violation of Article 13, UCMJ. *Id.* (citation omitted).

"Article 13, UCMJ, prohibits two things: (1) the imposition of punishment prior to trial, and (2) conditions of arrest or pretrial confinement that are more rigorous than necessary to ensure the accused's presence for trial." *United States v. King*, 61 M.J. 225, 227 (C.A.A.F. 2005). "The first prohibition involves . . . a purpose or intent to punish, determined by examining the intent of detention officials or by examining the purposes served by the restriction or condition, and whether such purposes are 'reasonably related to a legitimate governmental objective.'" *Id.* (quoting *Bell v. Wolfish*, 441 U.S. 520, 539 (1979)) (additional citation omitted). "The second prohibition . . . prevents imposing unduly rigorous circumstances during pretrial detention." *Id.*

Military appellate courts "are reluctant to second-guess the security determinations of confinement officials." *Crawford*, 62 M.J. at 414 (citing *Bell*, 441 U.S. at 540 n.23 ("[M]aintaining security and order and operating the institution in a manageable fashion . . . 'are peculiarly within the province and professional expertise of corrections officials, and, in the absence of *substantial evidence* in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters.'") (quoting *Pell v. Procunier*, 417 U.S. 817, 827 (1974))) (additional citations omitted). Where the conditions of an appellant's "confinement relate to both ensuring his presence for trial and the security needs of the confinement facility," the appellant "bears the burden of showing that the conditions were unreasonable or arbitrary in relation to both purposes." *Id.* (citations omitted).

### 3. Analysis

Appellant contends the Brig improperly based his security classification solely on the charged offenses rather than "a reasonable evaluation of all the facts and circumstances." *See Crawford*, 62 M.J. at 416. He asserts the military judge's finding that the Brig also based its determination on safety and security concerns to be "contradicted by the evidence" and erroneous. Appellant notes there was no evidence of threats or substantial misbehavior on his part during his confinement, and he discounts CDR JC's testimony regarding safety concerns by noting CDR JC acknowledged "the fundamental driving reason" for Appellant's classification was the severity of the charges.

In response, the Government acknowledges Appellant's security classification was "in large part" based on the severity of the charges; however, it contends Appellant has failed to demonstrate the Brig's classification was unreasonable or arbitrary in the circumstances of Appellant's case. The Government compares Appellant's case to the factors the United States Court of Appeals for the Armed Forces (CAAF) cited in *Crawford* as supporting a maximum security classification, including the seriousness of the charges, the potential for lengthy confinement, the appellant's prior threats and apparent ability to carry

out his threats, his apparent access to weapons, and his professed willingness to resort to violent means. *See id.* at 416. The Government contends the "institutional objective" furthered by his classification was, in fact, safety and security. In addition, the Government emphasizes that the actual conditions of Appellant's confinement amounted to an "informal downgrade" from maximum custody in light of the special accommodations provided due to his unique circumstances.

We conclude Appellant has failed to meet his burden to demonstrate a violation of Article 13, UCMJ. As an initial matter, we agree with the military judge the evidence does not support any finding of an intent to punish. To the contrary, as described above, the Brig provided Appellant several specific accommodations to lessen the rigor of his maximum security classification.

We further conclude Appellant has failed to demonstrate the conditions of his pretrial confinement were unreasonable or arbitrary in light of the Brig's legitimate interest in maintaining safety and security. Contrary to Appellant's argument, the military judge's finding that the reasons for his classification included a "history of violence" as well as "protection of the staff" and "protection of the other prisoners" was supported by CDR JC's testimony and was not clearly erroneous. The Brig was not obliged to ignore the logical inference that substantial evidence supported the specific charges against Appellant, which at the time of the Defense's motion included—among others—premeditated murder by firearm, intentionally killing an unborn child, other violent offenses, and communicating a threat to kill. Appellant focuses on his behavior in confinement, but we agree with the Government that his history of threats and violence prior to his confinement were relevant to his high-risk classification. *See id.*

In addition, the charged premeditated murder was eligible for the death penalty, and on 9 October 2014 the convening authority had referred the charges as a capital case. The Brig used the maximum imposable sentence as one of the factors to determine security classification. The dire nature of Appellant's legal peril was also a legitimate consideration in assessing the level of risk involved in his pretrial confinement.

Furthermore, we note the actual conditions of Appellant's confinement were evidently less onerous than those the appellant endured in *Crawford*, where the CAAF found no Article 13, UCMJ, violation. *See id.* at 416 (noting the appellant "has not provided specific allegations he was treated differently from other maximum security prisoners"). As described above, the Brig intentionally provided Appellant more freedom and privileges than it normally afforded maximum security confinees.

Accordingly, in light of the deference we afford confinement officials to determine the security requirements of the facility, we conclude Appellant has failed to demonstrate the conditions of his confinement violated Article 13, UCMJ.

## D. Military Judge's Denial of Challenge for Cause

### 1. Additional Background

The convening authority selected Colonel (Col) SM as a potential court member for Appellant's court-martial. Like the other selectees, Col SM completed a written questionnaire approved by the military judge to aid in the screening of prospective court members. With respect to the applicable burden of proof, Col SM indicated that he understood that the burden was on the Prosecution to "provide proof of wrongdoing;" that he agreed with the "beyond a reasonable doubt" standard; that the accused was presumed "innocent until proven guilty;" that the accused had the right to remain silent, which would "not be held against" him; and that he did not believe an accused's decision to remain silent was an indication of guilt. However, in response to the question, "do you believe a person accused of a crime should try to prove his or her innocence," Col SM indicated "yes," and explained, "[i]f there is information that could prove your innocence I would use it for that purpose."

With respect to the death penalty, Col SM indicated, *inter alia*, that he "somewhat supported" the death penalty, and that he was "ok with the death penalty if the crime warrants the punishment." In response to the question, "What is your opinion of the death penalty as the only appropriate punishment for a person who is found guilty of premeditated murder," Col SM responded "Probably the appropriate punishment, but maybe not the only punishment." Similarly, in response to the question, "Do you personally believe that death (and not confinement for life either with or without the possibility of parole) is the only appropriate punishment for a person who" intentionally killed another human, intentionally killed a pregnant woman and her unborn child, intentionally killed someone for monetary gain, or did "all of the above," Col SM indicated "no," and explained, "I believe that's probably the correct punishment, but it may not be the only punishment." (Underscore in original.)

Col SM was asked additional questions regarding the burden of proof and death penalty during voir dire. With regard to the burden of proof, during group voir dire Col SM agreed Appellant was innocent until proven guilty beyond a reasonable doubt, that the burden of proof rested solely on the Government, and that the Defense had no obligation to present evidence or disprove any element of the offenses. During individual voir dire, the senior trial counsel asked Col SM about his questionnaire response that he would "use" infor-

mation that "could prove [his] innocence." Col SM explained he thought he understood the burden of proof "completely" and could apply it, although he thought "if [he were] accused of something and [he had] evidence that could prove [his] innocence that [he] would want to do all [he] could to do that." However, Col SM affirmed that if the Defense did not present any evidence, he would not hold that against Appellant, and he would hold the Government to its burden of proof.

With regard to the death penalty, Col SM indicated that he would "consider all evidence presented by the defense in extenuation and mitigation if called upon to do so." When senior trial counsel asked Col SM about his responses on the questionnaire, Col SM stated that for premeditated murder he did "feel that [the death penalty] is probably the most appropriate punishment to give," but agreed "it's not the only punishment and [he] could be open to considering all of the options and the range of sentences in sentencing" and he had not "prejudged what sentence must be imposed if the accused is found guilty." When trial defense counsel asked Col SM to elaborate further on his questionnaire responses, Col SM explained:

> [W]hat I said earlier was invariably there are extenuating circumstances that usually would come up that would prevent [the death penalty] from happening. So, that's why I did not say it is the only punishment because there may be some reason why that that's not the case. But in general, I would say my feelings are for premeditated murder that that would be the appropriate punishment, is my view.

Trial defense counsel then asked, "It's fair to say that would be your starting point for an appropriate punishment?" Col SM responded, "For premeditated murder, yes." The military judge subsequently attempted to further clarify Col SM's thoughts with regard to the death penalty, resulting in the following exchanges:

> [Military Judge]: If what you are saying is, "I don't care about any of that other stuff, if you are convicted of premeditated murder, this is the sentence. That other stuff just will not enter my head. It's an automatic." That's not a wrong view. It's just that's an inelastic view of sentencing that makes it such that you are not going to be a good court member.
>
> However, if what you are saying is, "Look, that's a pretty serious offense, planning ahead of time to take somebody's life with premeditation. And so, as a general scenario, without knowing any of the background, without knowing anything, just in a vacuum, if I was sitting at home and someone said, [']What do you think

the appropriate punishment is for premeditated murder?['] My answer likely would be, [']I think the death penalty would be the answer but I'm open to hearing more if I ever sat on a panel to go through this evidence.[']" Is that –

[Col SM]: That is exactly, I think, what I'm trying to say.

. . . .

[Military Judge]: If I gave you an instruction that you had to provide consideration for somebody's upbringing and past as part of his extenuation and mitigation, I don't want to know where it would fall on your list, alls [sic] I need to know is, if I said you have to consider it, and then again, make a choice in your mind one way or the other as to whether or not that helps you in these decisions, are you going to follow my instruction and consider it?

[Col SM]: Yes. As I mentioned, I think I could consider anything that was asked of me to consider.

The Defense challenged Col SM for cause on two bases. First, the Defense argued Col SM's questionnaire response that an accused should try to prove his innocence would lead to a presumption that, if the Defense did not present evidence, there was no exculpatory evidence, resulting in a shifting of the burden of proof. Second, the Defense argued Col SM should be removed because his "starting position" was that the death penalty would be the appropriate punishment for premeditated murder, which also effectively created an inappropriate burden for the Defense in sentencing. The Government opposed the challenge against Col SM.

The military judge denied the challenge and explained his reasoning on the record, relying on the CAAF's decision in *United States v. Akbar*, 74 M.J. 364 (C.A.A.F. 2015). The military judge emphasized he watched Col SM carefully to determine whether Col SM would follow the instructions he was given. With respect to shifting the burden of proof, the military judge found Col SM's explanation that, if he were accused, he would want to put on evidence of his innocence was a "human, normal response to that question." However, the military judge found Col SM would follow the military judge's instruction "about what is beyond a reasonable doubt and what is the law." With regard to the death penalty, the military judge found Col SM "very engaging" when asked "an open-ended question," and paraphrased Col SM's response as "I feel [the death penalty] is probably the most appropriate punishment . . . but I am open to considering an entire range. I believe I can give meaningful consideration for everything." With respect to public perception, the military judge commented on "the members of the audience who sat in and watched the entire

exchange with him and watched his demeanor and watched his thoughtful answers to the questions and his ability to give true, meaningful consideration to what's presented to him." Taking into account the liberal grant mandate, the military judge concluded by finding no actual bias or implied bias.

The Defense exercised its peremptory challenge on another court member. Col SM served on the court-martial panel that convicted and sentenced Appellant.

**2. Law**

"Courts generally recognize two forms of bias that subject a juror to a challenge for cause: actual bias and implied bias." *United States v. Hennis*, 79 M.J. 370, 384 (C.A.A.F. 2020) (citation omitted), *cert. denied*, 141 S. Ct. 1052 (2021). "Actual bias is personal bias which will not yield to the military judge's instructions and the evidence presented at trial." *United States v. Nash*, 71 M.J. 83, 88 (C.A.A.F. 2012) (citation omitted). We review a military judge's ruling on a claim of actual bias for an abuse of discretion. *Hennis*, 79 M.J. at 384 (citation omitted). Implied bias, in contrast, is measured by an objective standard, whereby we "determine[ ] 'whether the risk that the public will perceive that the accused received something less than a court of fair, impartial members is too high.'" *United States v. Bagstad*, 68 M.J. 460, 462 (C.A.A.F. 2010) (citation omitted). We assess implied bias based on the totality of the circumstances, assuming the hypothetical "public" is familiar with the military justice system. *Id.* (citations omitted). We review the military judge's ruling on a claim of implied bias "pursuant to a standard that is 'less deferential than abuse of discretion, but more deferential than de novo review.'" *United States v. Dockery*, 76 M.J. 91, 96 (C.A.A.F. 2017) (quoting *United States v. Peters*, 74 M.J. 31, 33 (C.A.A.F. 2015)).

"A member shall be excused for cause whenever it appears that the member . . . [s]hould not sit as a member in the interest of having the court-martial free from substantial doubt as to legality, fairness, and impartiality." R.C.M. 912(f)(1)(N). "The two purposes of R.C.M. 912(f)(1)(N) are to protect the actual fairness of the court-martial and to bolster the appearance of fairness of the military justice system in the eyes of the public." *United States v. Leonard*, 63 M.J. 398, 402 (C.A.A.F. 2006) (citation omitted). The CAAF "has repeatedly emphasized the need for a military judge to follow a 'liberal grant' mandate in ruling on challenges for cause." *Id.* (citation omitted). In other words, "[t]he military judge is . . . mandated to err on the side of granting a challenge." *Peters*, 74 M.J. at 34. Appellate courts afford greater deference to a military judge's ruling on a challenge for implied bias where the military judge puts his analysis on the record and provides a "clear signal" he applied the correct law. *United States v. Rogers*, 75 M.J. 270, 273 (C.A.A.F. 2016) (citations omitted).

"An accused enjoys the right to an impartial and unbiased panel." *Nash*, 71 M.J. at 88 (citation omitted). "Holding an inelastic attitude toward the appropriate punishment to adjudge if the accused is convicted is grounds for an actual bias challenge under R.C.M. 912(f)(1)(N)." *Hennis*, 79 M.J. at 385 (citation omitted). "However, a mere predisposition to adjudge some punishment upon conviction is not, standing alone, sufficient to disqualify a member. Rather, the test is whether the member's attitude is of such a nature that he will not yield to the evidence presented and the judge's instructions." *Id.* (quoting *United States v. McGowan*, 7 M.J. 205, 206 (C.M.A. 1979)).

### 3. Analysis

Appellant contends that, in light of the liberal grant mandate, the military judge should have granted the Defense's challenge for cause because Col SM "articulated a disqualifying view regarding the burden of proof" and because "the death penalty was his starting position" as a punishment for premeditated murder. We address each contention in turn. However, as an initial matter, we note the military judge explained his reasoning for denying the challenge on the record and gave a clear signal he applied the correct law, to include referring to the CAAF's then-recent decision in *Akbar* and expressly acknowledging the liberal grant mandate. Accordingly, the military judge's decision is entitled to deference, albeit less deference than under the abuse of discretion standard.

Appellant's argument with respect to the burden of proof is derived from Col SM answering "yes" to the questionnaire inquiry as to whether he believed an accused person "should try to prove his or her innocence," with the explanation, "[i]f there is information that could prove your innocence I would use it for that purpose." We agree with the military judge that this imagining of oneself in the position of an accused person was a "human" and "normal" response by a layperson to the question. Col SM also consistently explained that he understood the burden of proof beyond a reasonable doubt rested with the Government, and he would not hold it against Appellant if the Defense did not put on evidence. We are not persuaded by Appellant's efforts to portray Col SM's statements that he "thought" he could follow the military judge's instructions as equivocal. In light of Col SM's consistent indications that he understood and could apply the correct burden of proof, we do not find his initial reaction that he would want to prove his innocence to be disqualifying.

Col SM's statements regarding his views on the death penalty present a closer question. Appellant's characterization that Col SM's "starting position" was that death was the appropriate punishment for premeditated murder is a fair summary of Col SM's explanation of his views. However, the CAAF has recently reiterated that a mere predisposition toward a particular punishment is not necessarily disqualifying, if the member is able to follow the military judge's instructions and give meaningful consideration to all the evidence and

circumstances. *See Hennis*, 79 M.J. at 385.[13] Even in light of the liberal grant mandate, a military judge is not required to remove a member who is likely to favor a particular punishment, including the death penalty, because such an attitude is not in itself disqualifying. "An inflexible member is disqualified; a tough member is not." *United States v. Schlamer*, 52 M.J. 80, 93 (C.A.A.F. 1999) (citation omitted).

Although in the abstract Col SM may have been predisposed to believe the death penalty was an appropriate punishment for the offense of premeditated murder, he also indicated he could follow the military judge's instructions to consider extenuating and mitigating circumstances and the full range of sentencing alternatives, and indicated the death penalty was not necessarily the only appropriate punishment. The military judge carefully assessed Col SM's responses and demeanor, and applied the correct law. Affording the military judge's determination the deference to which it is due, we conclude that his finding of fact that Col SM would follow instructions was not clearly erroneous; that the military judge did not abuse his discretion in denying the challenge for actual bias; and that Col SM's presence on the panel would not have caused members of the public familiar with the military justice system to perceive the court-martial as less than fair and impartial. *See Hennis*, 79 M.J. at 387.

## E. Exclusion of Evidence of TF's "Swinging Lifestyle"

### 1. Additional Background

In the course of the GBI investigation of TF's death, SA JS spoke with TF's friend and co-worker, TS. Among other information, TS told SA JS that TF had described participating in a "swinging lifestyle" with Appellant after TF and Appellant began their relationship. Specifically, TF told TS that TF and Appellant would attend parties where they exchanged sexual partners with other couples. According to TF, the husband in one such couple was a military member. TF told TS that she stopped "swinging" after she learned she was pregnant. One of TF's cousins provided similar information to investigators.

Before trial, the Government moved to exclude evidence that TF engaged in "swinging" behavior. The Government contended this evidence had "no logical nexus to any fact of consequence in [the] court-martial," and was therefore

---

[13] In *Hennis*, the United States Court of Appeals for the Armed Forces (CAAF) addressed denied challenges for cause against two members who agreed with the statement, "life in prison is not really punishment for premeditated murder of children," during general voir dire. 79 M.J. at 385. In light of the members' responses during individual voir dire that they could consider other punishments besides death, as well as the military judge's determination that the members were not unalterably in favor of the death penalty and a member of the public would not conclude they were biased, the CAAF found no error. *Id.* at 386–87.

irrelevant. The Government argued the "only purpose" of such evidence would be to distract the court members and tarnish the victim. The Defense opposed the Government's motion and proposed the evidence was relevant in three ways: to show "the existence of others with potential motives to harm" TF; to challenge the sufficiency of the investigation, because the GBI did not follow up on this information; and to provide context to evidence the Government sought to introduce of a conversation in which Appellant requested that TF abort the pregnancy.

After receiving argument from counsel, in an oral ruling later followed up in writing, the military judge granted the Government's motion. He noted the Defense's rationale of giving context to the conversation about abortion was moot because the military judge had excluded evidence of that conversation. With regard to the other rationales, the military judge noted the Defense, as the proponent of the evidence, had produced no information as to the identity of any other individual purportedly involved in the "swinging" activities, leaving "mere[ ] suppositions and assertions" as to who they might be. The military judge found "the swinging evidence, as currently demonstrated to the court [wa]s irrelevant." He further found that any minimal relevance was "substantially outweighed by the dangers of confusion of the issues and wasting time," and the evidence should therefore also be excluded under Mil. R. Evid. 403.

### 2. Law

"A military judge's decisions to admit or exclude evidence are reviewed for an abuse of discretion." *United States v. Eslinger*, 70 M.J. 193, 197 (C.A.A.F. 2011) (citation omitted). "An abuse of discretion occurs when a military judge either erroneously applies the law or clearly errs in making his or her findings of fact." *United States v. Donaldson*, 58 M.J. 477, 482 (C.A.A.F. 2003) (citing *United States v. Humpherys*, 57 M.J. 83, 90 (C.A.A.F. 2002)). "The abuse of discretion standard is a strict one, calling for more than a mere difference of opinion. The challenged action must be 'arbitrary, fanciful, clearly unreasonable,' or 'clearly erroneous.'" *United States v. McElhaney*, 54 M.J. 120, 130 (C.A.A.F. 2000) (quoting *United States v. Miller*, 46 M.J. 63, 65 (C.A.A.F. 1997); *United States v. Travers*, 25 M.J. 61, 62 (C.M.A. 1987)).

"Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Mil. R. Evid. 401. Relevant evidence is generally admissible, unless another provision of law provides otherwise; irrelevant evidence is not admissible. Mil. R. Evid. 402.

The military judge may exclude relevant evidence that is otherwise admissible if its probative value is substantially outweighed by a countervailing danger, including *inter alia* unfair prejudice, confusion of the issues, or waste of

time. Mil. R. Evid. 403. "A military judge enjoys 'wide discretion' in applying Mil. R. Evid. 403." *United States v. Harris*, 46 M.J. 221, 225 (C.A.A.F. 1997) (quoting *United States v. Rust*, 41 M.J. 472, 478 (C.A.A.F. 1995)). "When a military judge conducts a proper balancing test under Mil. R. Evid. 403, the ruling will not be overturned unless there is a 'clear abuse of discretion.'" *United States v. Manns*, 54 M.J. 164, 166 (C.A.A.F. 2000) (quoting *United States v. Ruppel*, 49 M.J. 247, 250 (C.A.A.F. 1998)).

Where a military judge commits an error regarding the admissibility of evidence that is not of constitutional dimensions, we assess whether the error substantially influenced the verdict in light of "(1) the strength of the Government's case, (2) the strength of the defense case, (3) the materiality of the evidence in question, and (4) the quality of the evidence in question." *United States v. McAllister*, 64 M.J. 248, 250 (C.A.A.F. 2007) (citations omitted). However, if the military judge commits a constitutional error by depriving the accused of his right to present a defense, the test for prejudice is whether the error was harmless beyond a reasonable doubt. *Id.* at 251 (citations omitted). A constitutional error is harmless beyond a reasonable doubt when the error did not contribute to the verdict. *United States v. Chisum*, 77 M.J. 176, 179 (C.A.A.F. 2018) (quoting *Mitchell v. Esparza*, 540 U.S. 12, 17–18 (2003)).

### 3. Analysis

On appeal, Appellant contends the military judge abused his discretion by excluding evidence of TF's "swinging" activities for two reasons. First, he argues this evidence was relevant because it "refutes" the Government's contention that Appellant was the only person with a motive to kill TF. For example, Appellant suggests that the unnamed military member who TF reportedly told TS about would have a motive to kill her to keep his sexual activities a secret, or, having learned of TF's pregnancy, to eliminate an unwanted child. Second, Appellant contends the ruling prevented the Defense from fully confronting SA JS and challenging the thoroughness of the GBI investigation.

We conclude the military judge did not abuse his discretion under either theory. With respect to a motive to kill TF, we note again that no information identifying a particular individual was presented to the military judge. Moreover, according to TS, TF said she stopped "swinging" once she knew she was pregnant, months before TF was killed. In addition, there is no evidence TF ever suggested that anyone other than Appellant was the father—which, as the post-mortem DNA test indicated, was in fact the case. Relevance is a "low threshold," *United States v. Roberts*, 69 M.J. 23, 27 (C.A.A.F. 2010), but even in the context of a capital prosecution the proffered evidence must have some tendency beyond speculation to make a consequential fact more or less probable. *Cf. United States v. Hennis*, 79 M.J. 370, 380–82 (C.A.A.F. 2020) (finding military judge did not err by preventing defense from calling three witnesses

in support of theory another individual committed charged offenses where that theory was "just [a]ppellant's speculation"). That TF participated in "swinging" behavior, months before she was killed, without more, in the absence of information that any of those unnamed partners were even aware of her pregnancy, creates no logical inference that any of them—whether military or civilian— would have a motive to murder TF. We find the military judge's conclusion that the evidence was irrelevant for this purpose was not arbitrary, fanciful, clearly unreasonable, or clearly erroneous. *See McElhaney*, 54 M.J. at 130 (citations omitted).

We find the military judge's conclusion that the evidence was not relevant to impeach SA JS or assail the investigation was similarly within the bounds of his sound discretion. In his written ruling, the military judge summarized some of the evidence that caused the GBI to quickly focus its investigation on Appellant. In light of this evidence, it was reasonable for the GBI to do so rather than devote time and resources to attempt to track down an unknown number of unidentified individuals who had no known credible motive to murder TF. In short, in light of the other evidence in the case, the "swinging" evidence would not have materially impeached SA JS as a witness or cast doubt upon the investigation as a whole.

Furthermore, assuming *arguendo* the "swinging" evidence had some minimal probative value, the military judge did not abuse his discretion by finding that value was substantially outweighed by the dangers of confusing the issues and wasting the court-martial's time, and therefore should be excluded under Mil. R. Evid. 403. The military judge's balancing of these considerations is articulated in his written ruling, albeit not extensively, and his determination is therefore entitled to deference. "The overriding concern of [Mil. R. Evid.] 403 'is that evidence will be used in a way that distorts rather than aids accurate fact finding.'" *United States v. Stephens*, 67 M.J. 233, 236 (C.A.A.F. 2009) (quoting 1 Stephen A. Saltzburg et al., *Military Rules of Evidence Manual* § 403.02[4], at 4–27 (6th ed. 2006)). In this case, the military judge had a legitimate concern that whatever minimal probative value the evidence had was substantially overshadowed by the danger that "inject[ing] salacious conduct" of the victim would, in addition to wasting time, diminish the court members' sympathy and distort their perception of her.

Finally, even if we assume for purposes of argument that the military judge erred in excluding this evidence, the error did not prejudice Appellant. The parties disagree as to whether such an error would be of constitutional dimension, i.e., whether it would amount to interference with Appellant's right to present a defense. *Cf. United States v. Stever*, 603 F.3d 747, 756–57 (9th Cir. 2010) (identifying factors to evaluate whether erroneous exclusion of evidence

amounts to constitutional violation). However, even if we assume without deciding the exclusion was a constitutional error, we find the error was harmless beyond a reasonable doubt. The significance of Appellant's speculations about past "swinging" activities with unidentified partners is vanishingly small compared to the weight of evidence incriminating Appellant that the Government introduced at trial, discussed at greater length above in relation to the legal and factual sufficiency of the evidence. For similar reasons, Appellant's efforts to impeach the adequacy of the investigation with this information would not have affected the outcome of his court-martial.

## F. Military Judge's Failure to Reconsider Evidence of TF's "Swinging Lifestyle"

### 1. Additional Background

Assistant trial counsel's opening statement to the court members included the following:

> Throughout the course of the investigation, the [GBI] interviewed many people including Ms. [IV], the woman who rented the car for the accused. After she was interviewed by the [GBI], the accused came over to her house. She confronted him. She asked, "What's going on? Who is this woman that was murdered?" The accused said it wasn't his baby and she had a policy. Members, during the search of the accused's home on August 29th, 2013, authorities found [TF's] one million dollar life insurance policy in the desk drawer in his bedroom.

The Government's opening statement was followed by the Defense's opening statement and the testimony of the Government's first witness. After the first witness's testimony, the military judge noted that he and the counsel had an R.C.M. 802 session at which the Defense indicated they believed the Government's opening statement opened the door "to some evidence that I had kept out, for lack of a better word, lifestyle choices that somebody might have made." Senior defense counsel identified assistant trial counsel's statement that Appellant "went over to [IV's] house and said words to the effect of, 'It wasn't my baby,' . . . ." as having opened the door. The military judge responded:

> Yeah. Appreciate it. Here's -- I know you know the issue. Opening statements are statements. They're not evidence. And so, if the evidence doesn't come out during the trial, you're welcome to comment on it in closing. If the evidence comes out during the trial, you're welcome to readdress but I am not going to rule on the admissibility any different than I already have on evidence

> at this point because I told the members that opening state-
> ments are just that, what counsel think is going to come out dur-
> ing the course of the testimony.

Senior defense counsel then raised a different issue, and there was no fur-
ther discussion of whether the Government's opening statement had opened
the door to previously excluded evidence.

**2. Law and Analysis**

A military judge's decision to exclude or admit evidence is reviewed for an
abuse of discretion. *Eslinger*, 70 M.J. at 197 (citation omitted).

Appellant contends the military judge abused his discretion by ruling the
Government's opening statement did not open the door to evidence the military
judge previously excluded regarding TF's participation in "swinging" activities,
as discussed above. Specifically, Appellant contends the military judge errone-
ously believed an opening statement cannot open the door because it is not
evidence. He cites several decisions by federal circuit courts holding that the
defense's assertions in its opening may open the door to evidence related to the
accused's intent or evidence that bolsters the testimony of a prosecution wit-
ness, *see United States v. Chavez*, 229 F.3d 946, 952–53 (10th Cir. 2000); *United
States v. Croft*, 124 F.3d 1109, 1120 (9th Cir. 1997); *United States v. Moore*, 98
F.3d 347, 350 (8th Cir. 1996); *United States v. Knowles*, 66 F.3d 1146, 1161
(11th Cir. 1995); *United States v. Smith*, 778 F.2d 925, 928 (2d Cir. 1985); as
well as two decisions of the United States Court of Military Appeals implying
similar reasoning. *See United States v. Houser*, 36 M.J. 392, 400 (C.M.A. 1993);
*United States v. Franklin*, 35 M.J. 311, 317 (C.M.A. 1992).

In response, the Government contends the military judge did not "foreclose"
reconsideration of this issue, but merely deferred it until after presentation of
evidence. The Government contends this deferment was a reasonable exercise
of the military judge's discretion because the issue was not yet ripe, and it did
not prejudice Appellant because the Defense could have requested reconsider-
ation again after the evidence of Appellant's statement denying paternity came
out in the course of the trial, as it did through IV's testimony.

Our superior court's position on this point is difficult to discern precisely.
As Appellant notes, the general rule among the federal circuits appears to be
that opening statement may open the door to responsive evidence, at least in
some circumstances. *See United States v. Turner*, 39 M.J. 259, 266 (C.M.A.
1994) (Crawford, J., concurring) (citations omitted) ("All the circuits agree that
the opening statement opens the door."). *Houser* and *Franklin* suggest the
same, although in each case the court noted the evidence the appellant com-
plained of on appeal was also admissible for another reason. *See Houser*, 36

M.J. at 400 (explaining the defense's aggressive cross-examination of the victim as well as its opening raised questions of counterintuitive victim behavior); *Franklin*, 35 M.J. at 317 (explaining premeditation was an element of the offense as well as being raised as an issue in the defense's opening statement). However, the majority opinion in *Turner*, decided after *Houser* and *Franklin*, pointedly noted that an opening statement is not evidence, and suggested the proper way for counsel to address assertions in the opposition's opening statement that are not borne out by the evidence is to comment on them in closing argument. *Turner*, 39 M.J. at 262–63. The *Turner* majority declined to hold that a "passing comment" in the defense's opening statement opened the door to evidence regarding the accused's invocation of his Fourth Amendment[14] and Fifth Amendment[15] rights, instead finding any error was harmless. *Id.* at 262–64.[16]

Similar to the majority in *Turner*, we find we need not decide whether assistant trial counsel's passing reference to Appellant's denial of paternity opened the door to the previously excluded evidence. Assuming *arguendo* the door was opened, we find any error by the military judge was harmless beyond a reasonable doubt[17] for two reasons. The first reason is the one the Government alludes to: the military judge's decision did not prevent the Defense from seeking reconsideration of the "swinging" evidence after IV testified to Appellant's denial of paternity, which she did. The military judge clearly indicated the Defense could raise the issue at such a time. The second reason is one we explained above in relation to the preceding issue: whatever slight relevance the "swinging" evidence had, either in raising a possible motive for other perpetrators, impugning the thoroughness of the investigation, or in providing context to Appellant's denial of paternity, was insignificant compared to the weight of the evidence of Appellant's guilt. Any error by the military judge in

---

[14] U.S. CONST. amend. IV.

[15] U.S. CONST. amend. V.

[16] We also note that in every case cited by Appellant, the issue raised is whether the *defense's* opening statement opened the door to additional *prosecution* evidence. The situation in the instant case appears to be anomalous in federal appellate case law. There are several logical reasons why this would be so, including the order of presentation of evidence and the burden of proof, among others. However, we discern no persuasive reason why different rules regarding the effect of opening statements should apply to the prosecution and defense.

[17] As in our analysis of the preceding issue, we assume without deciding that the constitutional test of harmlessness beyond a reasonable doubt is the appropriate standard. *See McAllister*, 64 M.J. at 250 (citations omitted); *Stever*, 603 F.3d at 756–57.

this respect did not contribute to the verdict. *See Chisum*, 77 M.J. at 179 (citation omitted).

## G. Ineffective Assistance of Counsel: Failure to Request Reconsideration of Ruling on "Swinging" Evidence

### 1. Law

The Sixth Amendment[18] guarantees an accused the right to effective assistance of counsel. *United States v. Gilley*, 56 M.J. 113, 124 (C.A.A.F. 2001). In assessing the effectiveness of counsel, we apply the standard in *Strickland v. Washington*, 466 U.S. 668, 687 (1984), and begin with the presumption of competent representation. *See Gilley*, 56 M.J. at 124 (citations omitted). We will not second-guess reasonable strategic or tactical decisions by trial defense counsel. *United States v. Mazza*, 67 M.J. 470, 475 (C.A.A.F. 2009) (citation omitted). We review allegations of ineffective assistance de novo. *Akbar*, 74 M.J. at 379 (citation omitted).

We utilize the following three-part test to determine whether the presumption of competence has been overcome: (1) are appellant's allegations true, and if so, "is there a reasonable explanation for counsel's actions;" (2) if the allegations are true, did defense counsel's level of advocacy "fall measurably below the performance . . . [ordinarily expected] of fallible lawyers;" and (3) if defense counsel were ineffective, is there "a reasonable probability that, absent the errors," there would have been a different result? *United States v. Gooch*, 69 M.J. 353, 362 (C.A.A.F. 2011) (alteration and omission in original) (quoting *United States v. Polk*, 32 M.J. 150, 153 (C.M.A. 1991)). The burden is on the appellant to demonstrate both deficient performance and prejudice. *United States v. Datavs*, 71 M.J. 420, 424 (C.A.A.F. 2012) (citation omitted).

### 2. Additional Background and Analysis

After the military judge ruled the Government's opening statement had not opened the door to the previously excluded evidence of TF's "swinging" behavior as described above, the Defense did not again request reconsideration after the Government introduced evidence. Appellant now contends his trial defense counsel were ineffective for failing to do so. Appellant argues the Government opened the door during its case-in-chief in at least two ways: by eliciting IV's testimony regarding Appellant's statement denying paternity of TF's unborn child, and by introducing evidence that human hairs were found in TF's bed that were not attributable to TF or Appellant. Appellant avers trial defense counsel's failure deprived the Defense of evidence someone other than Appellant may have had a motive to murder TF.

---

[18] U.S. CONST. amend. VI.

At the Government's request, this court ordered and received sworn declarations from Appellant's three trial defense counsel responsive to Appellant's claims of ineffective assistance.[19] The three declarations were generally consistent as to why the Defense did not again seek reconsideration of the "swinging" evidence, and offered multiple explanations. First, trial defense counsel believed they had adequately preserved the issue of the "swinging" evidence for appellate review through their initial motion in limine. Second, they did not believe any of the evidence adduced would have caused the military judge to change his ruling.

Third, while the Defense initially sought to preserve the ability to introduce the "swinging" evidence, trial defense counsel had always viewed the evidence as a dangerous double-edged sword and were skeptical the evidence would ultimately be helpful. Although it might have reinforced the idea that someone else with an intimate relationship with TF might have had a motive to commit the murder, it also posed significant risks for the Defense. By challenging the sufficiency of the investigation, the Defense risked SA JS recounting all of the evidence that caused the GBI to focus its investigation on Appellant. This included the risk that the Defense would itself open the door to otherwise inadmissible evidence, including SA JS's knowledge of other offenses Appellant had allegedly previously committed which were initially charged together with the murder of TF and killing of her unborn child, as well as evidence Appellant had requested TF have an abortion.[20] In addition, evidence that Appellant had involved TF in "swinging" activities—"pressured" her to do so, according to some potential witnesses—tended to reinforce the Government's portrayal that Appellant cynically manipulated TF "for his own gain and amusement," and would hurt rather than help his case by making the life insurance scheme appear more plausible. Similarly, trial defense counsel were concerned that the

---

[19] In *United States v. Jessie*, the CAAF explained the general rule that the Courts of Criminal Appeals (CCAs) "may not consider anything outside of the 'entire record' when reviewing a sentence under Article 66(c), UCMJ[, 10 U.S.C. § 866(c)]." 79 M.J. 437, 441 (C.A.A.F. 2020) (quoting *United States v. Fagnan*, 30 C.M.R. 192 (C.M.A. 1961)) (additional citation omitted). However, the CAAF recognized that "some [of its] precedents have allowed the CCAs to supplement the record when deciding issues that are raised by materials in the record," specifically with affidavits or hearings ordered pursuant to *United States v. DuBay*, 37 C.M.R. 411 (C.M.A. 1967) (per curiam). *Jessie*, 79 M.J. at 442. In *Jessie*, the CAAF declined to disturb this line of precedent. *Id.* at 444. Accordingly, we understand *Jessie* to permit our review of the trial defense counsel declarations. *See id.* at 442 (citation omitted) (noting the CAAF has allowed the CCAs "to accept affidavits or order a *DuBay* hearing when necessary for resolving claims of ineffective assistance of trial defense counsel").

[20] In separate trials held prior to the instant court-martial, Appellant had been acquitted of most of these alleged offenses.

"swinging" evidence would further tarnish Appellant in the eyes of the court members and hurt the Defense during sentencing. Finally, trial defense counsel were concerned that at least some of the court members would react to the evidence in a similar manner to the military judge—"believing it was an underhanded attempt to smear the murder victim."

We conclude Appellant has failed to demonstrate either deficient performance or prejudice. Although not all of trial defense counsel's specific rationales for not re-requesting reconsideration are equally convincing, in general we agree the concern that the "swinging" evidence would do more harm than good for the Defense was reasonable. We recognize that securing the ability to present "swinging" evidence through reconsideration of the initial exclusion would not obligate the Defense to actually introduce such evidence. However, the lack of practical value to the Defense reasonably explains the decision not to seek further reconsideration. Relatedly, from the perspective of trial defense counsel at the time, the value of the exclusion of the evidence as an appellate issue may have outweighed the net value of introducing such evidence at trial. As explained above, Appellant has not prevailed on that issue at this court; but we evaluate trial defense counsel's decisions based upon their reasonableness at the time rather than their ultimate success. *See Akbar*, 74 M.J. at 379 (citation omitted).

We emphasize again how tenuous the logical link is between an unidentified "swinging" partner from several months before TF's death to a credible motive to commit the murder. Our analysis of trial defense counsel's performance must take into consideration the feebleness of the inference upon which Appellant's argument relies.

Finally, for the reasons stated in our analysis of the preceding issues, even if trial defense counsel's performance had fallen measurably below the standard of performance, Appellant was not prejudiced by the failure to again request reconsideration. Whatever minimal value the "swinging" evidence had for the Defense's case would not have affected the outcome in light of the overpowering weight of the evidence of Appellant's guilt presented by the Government. Accordingly, Appellant cannot prevail on this ineffective assistance claim.

## H. Motion to Suppress Search of Appellant's Home

### 1. Additional Background

At 1840 on 29 August 2013, the lead GBI investigator, SA JS, signed an affidavit requesting a "no-knock" search warrant for Appellant's residence. The affidavit described the investigative steps SA JS had taken since he arrived at the crime scene at approximately 0630 that morning, including *inter alia* interviewing CF and several other witnesses. Among other information, SA JS

related that TF had been shot and killed on her bed in the residence she shared with CF; that CF had seen Appellant dressed in dark clothing in the house around the time of TF's death, recognizing him from the many digital photos TF had shown CF; that the neighbor, DJ, had heard three gunshots and a car speeding away; that TF's friend and cousin, MC, said Appellant did not want the baby; and that SA JS had learned from Special Agent AA of the AFOSI that the Air Force was aware of two prior alleged criminal incidents involving Appellant, including an incident in which Appellant allegedly fired a weapon at an ex-girlfriend. SA JS requested authorization to search Appellant's residence for: firearms; computers, cellular telephones, and related electronic devices and equipment and the data within them; receipts and other "documents of evidentiary value;" portable "Global Positioning Satellite devices;" dark clothing; and a car and two motorcycles believed to belong to Appellant.

At 1915 on 29 August 2013, a Superior Court of Houston County judge issued a "no-knock" search warrant for the described property. SA JS and other law enforcement agents executed the warrant at 2115 on 29 August 2013. As a result of the search, the GBI seized numerous items of apparent evidentiary value.

The Defense moved to suppress the evidence seized pursuant to the 29 August 2013 search warrant. The Defense alleged numerous omissions, inaccuracies, and misleading statements in SA JS's affidavit. It contended the only actual evidence tending to indicate Appellant committed the crime was CF's identification, which was insufficient to support probable cause because CF had never met Appellant before, because of the "well-established unreliability of eyewitness identifications," and because of the particular circumstances under which this identification was made. The Defense further argued that "virtually nothing" in the affidavit tended to establish evidence of the crime would actually be found in Appellant's home, and that the warrant was overbroad. Finally, the Defense argued that the good faith exception would not apply because SA JS knew his affidavit was "bare bones" and "filled with irrelevancies and misleading and incomplete assertions." The Government opposed the motion to suppress, contending there was probable cause for the warrant and that, in the alternative, the good faith exception would apply.

The military judge received evidence and heard argument on the suppression motion. Notably, the Government called SA JS to testify. On cross-examination, SA JS admitted he unintentionally included two inaccurate statements in his affidavit. First, the affidavit stated Appellant "may have in his possession a shotgun, AR-15 [rifle], and a 9 mm Berretta [pistol]." However, when SA JS later reviewed his notes he realized Special Agent AA had actually informed him those weapons had previously been confiscated. Second, the affidavit stated Appellant had pleaded guilty to a misdemeanor for the prior

shooting incident and received a year of probation. SA JS testified it was later clarified to him that Appellant had not pleaded guilty, but had entered a pretrial diversion program.

The military judge denied the motion to suppress in a written ruling. The military judge found SA JS's testimony was credible, and that the two errors SA JS acknowledged in the affidavit were unintentional. The military judge found the judge had probable cause to issue the search warrant. He cited, *inter alia*, CF's identification of Appellant and description of the clothes Appellant was wearing; CF's description of the car Appellant drove; evidence of electronic communications between Appellant and the victim, TF; witness descriptions of the romantic relationship between Appellant and TF; and SA JS's identification of "at least a partial motive," specifically evidence that Appellant did not want the unborn child of which he was the identified father. The military judge further explained the evidence indicated Appellant had the opportunity to return to his residence after the crime to change clothes before reporting for duty later in the day. Viewing the evidence "in a commonsense manner" and giving the issuing judge appropriate deference, the military judge found the judge's decision to issue the warrant "was well within reason." Finally, the military judge indicated that had he found probable cause lacking, he nevertheless would have denied the motion based on the good faith exception.

**2. Law**

We review a military judge's ruling on a motion to suppress for an abuse of discretion, viewing the evidence in the light most favorable to the prevailing party. *United States v. Eppes*, 77 M.J. 339, 344 (C.A.A.F. 2018) (citations omitted). A military judge abuses his discretion when: (1) his findings of fact are clearly erroneous; (2) he applies incorrect legal principles; or (3) his "application of the correct legal principles to the facts is clearly unreasonable." *United States v. Ellis*, 68 M.J. 341, 344 (C.A.A.F. 2010) (citing *United States v. Mackie*, 66 M.J. 198, 199 (C.A.A.F. 2008)). "The abuse of discretion standard is a strict one, calling for more than a mere difference of opinion. The challenged action must be arbitrary, fanciful, clearly unreasonable, or clearly erroneous." *United States v. Solomon*, 72 M.J. 176, 179 (C.A.A.F. 2013) (citation omitted).

The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated; and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized.

U.S. CONST. amend. IV. The Military Rules of Evidence effectuate the Fourth Amendment with respect to courts-martial. Under Mil. R. Evid. 315(f)(1), a search authorization "must be based upon probable cause." Probable cause exists "when there is a reasonable belief that the person, property, or evidence sought is located in the place . . . to be searched." Mil. R. Evid. 315(f)(2). "Probable cause requires more than bare suspicion, but something less than a preponderance of the evidence." *United States v. Leedy*, 65 M.J. 208, 213 (C.A.A.F. 2007). The burden of proof rests with the Government to demonstrate evidence was lawfully seized or that the good faith exception applies. Mil. R. Evid. 315(e)(1).

"Reasonable minds frequently may differ on the question whether a particular affidavit establishes probable cause, and we have thus concluded that the preference for warrants is most appropriately effectuated by according great deference to a magistrate's determination." *United States v. Leon*, 468 U.S. 897, 914 (1984) (internal quotation marks and citation omitted). Accordingly, searches conducted pursuant to a warrant or authorization based on probable cause are presumptively reasonable. *United States v. Hoffmann*, 75 M.J. 120, 123–24 (C.A.A.F. 2016) (citation omitted). We assess whether "the authorizing official had a 'substantial basis' for finding probable cause." *Id*. at 125 (citation omitted). "A substantial basis exists 'when, based on the totality of the circumstances, a common-sense judgment would lead to the conclusion that there is a fair probability that evidence of a crime will be found at the identified location.'" *United States v. Nieto*, 76 M.J. 101, 105 (C.A.A.F. 2017) (quoting *United States v. Rogers*, 67 M.J. 162, 165 (C.A.A.F. 2009)). "[W]here a magistrate had a substantial basis to find probable cause, a military judge would not abuse his discretion in denying a motion to suppress." *Leedy*, 65 M.J. at 213. "Close calls will be resolved in favor of sustaining the magistrate's decision." *United States v. Monroe*, 52 M.J. 326, 331 (C.A.A.F. 2000) (citation omitted).

When the magistrate is presented with inaccurate information in support of a request for a warrant or search authorization, we will sever that information and determine whether the remaining information supports a finding of probable cause. *United States v. Cowgill*, 68 M.J. 388, 391 (C.A.A.F. 2010) (citing *United States v. Gallo*, 55 M.J. 418, 421 (C.A.A.F. 2001)) (additional citation omitted). Similarly, when information is omitted with an intent to mislead the magistrate or with reckless disregard for the truth, we assess whether the hypothetical inclusion of the omitted material would prevent a finding of probable cause. *United States v. Mason*, 59 M.J. 416, 422 (C.A.A.F. 2004) (citation omitted).

One exception to the ordinary rule of exclusion is the so-called "good faith" exception under which evidence obtained as a result of an unlawful search or seizure need not be suppressed if it was obtained pursuant to the good faith

execution of a search authorization. Mil. R. Evid. 311(c)(3) sets forth three requirements for this exception:

> (1) the search or seizure executed was based on an authorization issued by a competent authority;

> (2) "the individual issuing the authorization . . . had a substantial basis for determining the existence of probable cause;" and

> (3) the person seeking and executing the authorization "reasonably and with good faith relied on the issuance of the authorization."

The second requirement is met if the person executing the search "had an objectively reasonable belief that the magistrate had a 'substantial basis' for determining the existence of probable cause." *United States v. Perkins*, 78 M.J. 381, 387 (C.A.A.F. 2019) (quoting *United States v. Carter*, 54 M.J. 414, 422 (C.A.A.F. 2001)).

### 3. Analysis

On appeal, Appellant essentially reiterates two general arguments the Defense made in its motion. First, he asserts SA JS's affidavit was "riddled with misrepresentations" and did not support a finding of probable cause. Second, he asserts the affidavit failed to establish a nexus between TF's murder and the presence of evidence at Appellant's residence. We find neither argument persuasive and briefly address each.

### a. Alleged "Deliberate or Reckless Falsehoods and Omissions"

Appellant asserts SA JS omitted evidence that diminished the reliability of CF's identification of Appellant. He cites SA JS's motion testimony that the first deputy on the scene, WS, briefed him that CF had provided "differing stories" regarding the identity of who killed TF. However, after this abbreviated initial transfer of information, SA JS interviewed CF himself later in the day after gathering additional information, and CF unequivocally identified Appellant. We are not persuaded SA JS's failure to include his initial, possibly garbled, exchange with WS in the affidavit as evincing an intent to mislead or reckless disregard for the truth. Appellant also criticizes SA JS for not "sufficiently detail[ing]" the fact that CF had not previously met Appellant in person. However, the affidavit described how CF recognized Appellant from photos and that to CF's knowledge Appellant had never been to CF's and TF's residence before, which implied CF had not seen Appellant before and was not misleading. Appellant further notes SA JS did not mention brain surgery that CF had undergone approximately a year and a half earlier, but we are not persuaded that omission was reckless given CF's evident ability to see and recognize Appellant, to communicate, and to answer questions when interviewed.

Appellant also contends SA JS's affidavit misrepresented the nature of Appellant's relationship with TF by exaggerating its apparent volatility, with references to demands that she abort the pregnancy, alleged threats Appellant made to TF, and Appellant's alleged history of violence toward an ex-girlfriend. Appellant contends SA JS had uncovered no evidence Appellant had previously been violent toward TF and failed to include that TF was planning to move in with Appellant. We find these omissions only marginally relevant to the question of probable cause, and their omission was neither reckless nor misleading.

Appellant asserts the affidavit's erroneous statement that Appellant may have access to a shotgun, rifle, and 9 mm pistol was indisputably significant in light of TF's death by shooting and the prior allegation that Appellant had shot at an ex-girlfriend, and was "a major factor in the issuance of the warrant." The military judge found this error was unintentional, and that conclusion is not clearly erroneous. Where an affidavit contains errors, we sever that information and assess whether the remaining information supports a finding of probable cause. In this case, excising SA JS's error with respect to Appellant's potential access to specific firearms, as well as his admitted error regarding Appellant's pretrial diversion as opposed to a misdemeanor conviction, we find the remaining information amply supports a finding of probable cause. Even if we also assume *arguendo* that the omitted information Appellant complains of as described above was included, regardless of our finding the omissions were neither intentionally nor recklessly misleading, the issuing judge would still have had a substantial basis to find probable cause.

### b. Allegedly Deficient Nexus

Appellant contends SA JS's affidavit contained no indication that Appellant either came from or returned to his residence on the night of the murder. Appellant asserts the affidavit relied only on a "generalized profile" of how a person might behave and a "hope" that evidence would be discovered at Appellant's residence. We are not persuaded. In general, a common sense approach to reviewing the affidavit would provide a substantial basis to believe evidence relevant to the crime would be discovered at Appellant's residence, given not only CF's identification but also Appellant's long-term romantic involvement with TF, as well as Appellant's presumed need to prepare to carry out the crime, to return home to change clothes, to park his vehicle, and to generally carry on with his life, among other considerations.

Appellant contends there was no probable cause, at that point, to believe Appellant owned or had access to a .22 caliber firearm such as the one used to kill TF. However, there *was* probable cause to believe that TF was killed with a .22 caliber firearm and that Appellant was the assailant. Appellant contends there was no evidence Appellant still possessed the murder weapon or that it

was at his residence. Although probable cause requires more than bare suspicion, it does not require proof by a preponderance of the evidence that the evidence will be present. The possibility that Appellant hid or disposed of the murder weapon in some unknown location did not render his residence an unreasonable place to look for it. Again, we find the issuing judge had a substantial basis to find probable cause.

With respect to Appellant's vehicles, he contends CF's failure to identify the color of the car Appellant fled in "fatally undercut[ ] any nexus between [Appellant]'s vehicle and the crime scene." We disagree. CF described Appellant driving away in a four-door sedan, possibly a Chevrolet Cruze. Appellant was believed to own a vehicle of the same general type—a compact four-door sedan. Given Appellant's presumed need to return to his residence, and the fact that he was seen fleeing the murder scene in a vehicle of the same general type as the one he owned, the affidavit provided a more than sufficient nexus to search for Appellant's vehicle.

The link between Appellant's two motorcycles and the crime is less obvious. However, the inclusion of the motorcycles in the warrant did not materially advance the investigation or impact Appellant's trial. Accordingly, there was no evidence from the motorcycles to suppress, and assuming *arguendo* the military judge abused his discretion by finding probable cause existed with respect to the motorcycles, the error was harmless beyond a reasonable doubt. *See United States v. Mott*, 72 M.J. 319, 332 (C.A.A.F. 2013) (citation omitted) ("Constitutional errors are reviewed for harmlessness beyond a reasonable doubt.").

Appellant's remaining nexus arguments with regard to digital devices, receipts, clothing, and other evidence included in the warrant are unconvincing and require no specific analysis.

### c. Conclusion with Regard to Denial of the Motion to Suppress

As described above, we find the issuing judge generally had a substantial basis to find probable cause existed for the warrant; assuming *arguendo* the absence of a nexus to the motorcycles, their inclusion was harmless. Accordingly, the military judge did not abuse his discretion in denying the motion. Assuming *arguendo* the military judge erred with respect to the existence of probable cause, we further find SA JS relied in good faith on a facially valid warrant issued by a competent authority, and that suppression would not be warranted. *See Perkins*, 78 M.J. at 387.

## I. Admission of IRS Deficiency Notice

### 1. Additional Background

During the 29 August 2013 search of Appellant's residence, agents found the IRS notice of deficiency dated 10 June 2013 that Appellant owed the Government $10,802.17 in the same room where they found Appellant's copy of TF's MetLife insurance policy designating Appellant the sole beneficiary.

On 25 January 2016, the Defense filed a pretrial motion in limine to preclude the Government from offering evidence of the IRS notice. The Defense argued the IRS deficiency was a "routine affair" that did not represent the kind of dire or exigent circumstance that would overcome the general inadmissibility of evidence of impecuniosity as proof of motive. *See generally United States v. Johnson*, 62 M.J. 31 (C.A.A.F. 2005). The Government opposed the motion, arguing that the IRS deficiency was admissible as proof of motive, and to support the specific aggravating factor of monetary gain with regard to the death penalty. After receiving oral argument on the motion, the military judge granted the Defense's motion in limine "[a]t this point."

On 18 November 2016, the Government submitted a motion for reconsideration, which the Defense opposed. The military judge heard additional oral argument on 10 December 2016; on 2 January 2017 he advised the parties that he declined to reconsider his initial ruling.

At trial, the Government called SA JC, a GBI agent who took numerous photographs during the search of Appellant's residence. The Government offered a number of photographs through SA JC, but it did not offer any photographs of the IRS notice during its direct examination. During cross-examination, the Defense offered through SA JC four photographs comprising Defense Exhibit C, which depicted a desk in Appellant's bedroom. Trial defense counsel cross-examined SA JC regarding the photographs to the effect that the MetLife insurance policy was found in a bottom file drawer, potentially underneath a number of other documents, in a location marked by a GBI evidence marker labeled "V."

When trial defense counsel completed her cross-examination, trial counsel requested a hearing pursuant to Article 39(a), UCMJ, 10 U.S.C. § 839(a). Trial counsel argued the Defense had opened the door to admitting evidence of the IRS notice. Trial counsel explained that the photograph depicting an evidence marker labeled "V" also depicted evidence marker "W," which marked the location where the IRS notice was found, opened and uncovered, on top of the desk. Trial counsel explained:

> [T]he concern here is that defense is making the suggestion that
> the life insurance policy was in the bottom of the drawer and
> wasn't important to [Appellant]. And then they put in a photo

> that has both the life insurance policy and the IRS deficiency, that's clearly laying on the top of his desk drawer, in the amount of $10,000.00 -- approximately $10,000.00 which I would assume it is important to [Appellant]. So, we believe this opens the door to the IRS deficiency if they're insinuating that the life insurance is not important to him and that they put in the photograph of.

Senior trial defense counsel objected that the same rationales for excluding the IRS notice still existed, that the situation remained analogous to *Johnson*, and the door had not been opened.

After a short recess, the military judge overruled the Defense's objection and advised he would let the Government "put on information about where the IRS debt notice was found." Senior trial defense counsel further argued it appeared the IRS notice might have been moved from its original location before the photograph with evidence marker "W" was taken. In response, the military judge asked SA JC if she remembered where the IRS notice was found. SA JC responded that she "could not say with 100 percent certainty" where it was originally found, but "for the most part when [she] took the pictures, it was where they found it." The military judge maintained his ruling, agreeing with trial counsel that evidence regarding the original location of the IRS notice went to its weight rather than admissibility.

On redirect examination, SA JC testified that evidence marker "W" in Defense Exhibit C marked the location of a treasury deficiency in the amount of approximately $10,000.00.

The military judge instructed the court members on the use of evidence of the IRS deficiency in findings as follows: "You may consider evidence the accused may have been in debt to the IRS for the limited purpose of its tendency, if any, to demonstrate motive of the accused to commit the alleged offenses and to rebut the issue of alibi raised by the accused."

The Government referred to the IRS deficiency multiple times during its closing argument on findings and twice during its sentencing argument.

**2. Law**

"A military judge's decisions to admit or exclude evidence are reviewed for an abuse of discretion." *Eslinger*, 70 M.J. at 197 (citation omitted).

"The mere lack of money, without more, as proof of motive, has little tendency to prove that a person committed a crime." *Johnson*, 62 M.J. at 34. "However, where the moving party can demonstrate a specific relevant link to the offense in question, financial evidence may be relevant to establish motive." *Id*. at 35.

"The context in which evidence is offered is often determinative of its admissibility." *United States v. Saferite*, 59 M.J. 270, 274 (C.A.A.F. 2004). "[W]here a party opens the door, principles of fairness warrant the opportunity for the opposing party to respond, provided the response is fair and is predicated on a proper testimonial foundation." *Eslinger*, 70 M.J. at 198 (citation omitted). "[T]he legal function of rebuttal evidence . . . 'is . . . to explain, repel, counteract or disprove the evidence introduced by the opposing party.'" *Saferite*, 59 M.J. at 274 (quoting *United States v. Banks*, 36 M.J. 150, 166 (C.M.A. 1992)). "The scope of rebuttal is defined by evidence introduced by the other party." *Banks*, 36 M.J. at 166 (citations omitted).

"Rebuttal evidence, like all other evidence, may be excluded pursuant to [Mil. R. Evid.] 403 if its probative value is substantially outweighed by the danger of unfair prejudice." *Saferite*, 59 M.J. at 274 (citation omitted). "When a military judge conducts a proper balancing test under Mil. R. Evid. 403, the ruling will not be overturned unless there is a 'clear abuse of discretion.'" *Manns*, 54 M.J. at 166 (quoting *Ruppel*, 49 M.J. at 250). However, we afford "military judges less deference if they fail to articulate their balancing analysis on the record, and no deference if they fail to conduct the Rule 403 balancing." *Id.* (citation omitted).

### 3. Analysis

Appellant identifies three "significant problems" with the military judge's decision to permit the Government to introduce testimony regarding the IRS notice in response to the Defense's introduction of Defense Exhibit C. First, Appellant contends the Defense did not open any doors, but was responding to potentially misleading evidence offered by the Government. Second, Appellant contends evidence of the IRS notice did not actually rebut the Defense's evidence regarding the location of the insurance policy. Third, Appellant asserts the military judge's weight-versus-admissibility analysis was flawed because the Government could not offer "definitive evidence" the notice was actually found on top of the desk, where it was photographed.

Before we address Appellant's arguments, we address the Government's initial argument in response: that we should uphold the admission of the IRS notice because the military judge should have admitted it in the first instance as evidence of Appellant's motive. The Government cites the CAAF's decision in *United States v. Perkins* for the principle that an appellate court may uphold a trial judge's ruling based upon a theory not relied upon at trial. 78 M.J. 381, 386 n.8 (C.A.A.F. 2019). We do not question the validity of the principle; however, the Government's reliance on it here is inapt. The military judge twice rejected this very theory advanced by the Government in response to the Defense's motion in limine. Essentially, the Government invites us to find the military judge abused his discretion in his initial ruling; we decline to do so.

*See United States v. Parker*, 62 M.J. 459, 464 (C.A.A.F. 2006) (citation omitted) ("When a party does not appeal a ruling, the ruling of the lower court normally becomes the law of the case.").

However, we are not persuaded by Appellant's arguments either, and we find the military judge did not abuse his discretion. Appellant's first argument is that the Defense was merely responding to the Government's "potentially misleading evidence" that the MetLife insurance policy was found in Appellant's desk drawer, which might imply it was an important document to him. Appellant contends the Defense was counteracting this implication through evidence that the policy may have been "buried" underneath a pile of other documents, implying it was *not* important to him. However, this argument tends to confirm the Government's argument, and the military judge's understanding, that the purpose of Defense Exhibit C and related cross-examination of SA JC was in fact to downplay Appellant's financial motive to commit the offenses. In addition, the relevant question is not whether the Defense was responding to the Government's evidence, but whether the evidence introduced by the Defense invited a fair response from the Government. The Defense's own exhibit, offered to show the insurance policy had been buried and was presumably unimportant, also depicted where the IRS notice was found, open and in a prominent spot atop the desk, implying through similar reasoning that the notice was significant to Appellant. This purpose elevated the relevance of the IRS notice beyond mere impecuniosity.

Appellant's second argument is that the IRS notice was not proper rebuttal, because whether he thought the notice was important does not rebut the point the Defense sought to make—challenging the Government's implication that finding the insurance policy in Appellant's desk drawer meant the policy was important to him. We find the military judge did not plainly err in finding it was rebuttal. The Defense had attacked the significance of Appellant's monetary motive to commit the offenses. The Government responded with evidence tending to indicate Appellant did have a significant monetary motive. Moreover, the Government's rebuttal employed a logical corollary of the Defense's own rationale: if being buried under other papers in a desk drawer suggested a document was not important or of current significance, being prominently displayed atop the desk suggested the document was important or of current significance. Furthermore, there was a logical connection between the IRS notice and the insurance policy that served to rebut the Defense's implication that the insurance policy was not significant; evidence that Appellant was presently concerned about his sizeable IRS debt made his potential access to the proceeds of a $1 million life insurance policy more significant.

With regard to Appellant's third argument, we are not persuaded the military judge erred in concluding the possibility the IRS notice had been moved

went to its weight rather than its admissibility. First, the Government was not required to "definitively" prove the notice had not been moved. Second, we do not agree "the Government was unable to provide *any* evidence" Appellant placed the IRS notice in the location where it was photographed. As SA JC told the military judge and testified, although she could not be "100 percent" certain, in general items were marked and photographed where they were found during the search.

Finally, we note the military judge did not state that he had performed a balancing test pursuant to Mil. R. Evid. 403 before deciding to permit the Government to introduce evidence of the IRS notice. Accordingly, we perform our own balancing de novo. *See Manns*, 54 M.J. at 166. We conclude the evidence was properly admitted in light of Mil. R. Evid. 403. The evidence was relevant to counteract the Defense's attack on Appellant's monetary motive to commit the offenses. Its introduction required only a few simple questions to SA JC during her redirect examination, with the aid of Defense Exhibit C. The evidence addressed theories and themes—specifically Appellant's motives—that were already directly in issue in the case. Accordingly, we find the dangers of unfair prejudice, confusing the issues, misleading the members, undue delay, and cumulativeness were minimal, and did not substantially outweigh the probative value. *See* Mil. R. Evid. 403.

## J. Admission of Post-Mortem Paternity Test

### 1. Additional Background

Before trial, the Defense moved to exclude evidence of the post-mortem DNA analysis that indicated Appellant was the father of the unborn child to a 99.9999 percent degree of certainty. The Defense argued the evidence was irrelevant, and therefore inadmissible under Mil. R. Evid. 401 and Mil. R. Evid. 402. The Defense anticipated the Government might propose one of Appellant's motives in killing TF was to eliminate an unwanted child; however, the Defense reasoned that a *post-mortem* test indicated nothing as to whether Appellant knew *at the time of death* that he was the father. In other words, "[Appellant's] knowledge or belief in the paternity of the baby is not made more or less probable by any result of the test." Alternatively, the Defense contended the evidence should be excluded under Mil. R. Evid. 403 because any probative value was substantially outweighed by the danger of confusion and unfair prejudice, because the DNA evidence: (1) would mislead the members into thinking Appellant knew he was the father, and thereby confuse the issue of motive; and (2) would cause the members to punish Appellant more severely "for killing his own biological child rather than focusing on the actual evidence of his awareness of paternity."

The Government opposed the defense motion. The Government's written response largely focused on the scientific reliability of the DNA testing, but suggested there were "several reasons" why the evidence could be relevant, including *inter alia* "the theory that [Appellant] committed the crime because he did not want to father the child."

After receiving argument on the motion, the military judge held the evidence was admissible. He explained, "[t]he fact that the accused is the father of the child is relevant in a criminal case involving the murder of the mother and unborn child." The military judge opined the Defense's position that the DNA test "had no relation to the crime" because it was "post-crime," "simply makes no sense." He found the DNA test was relevant to corroborate other evidence Appellant knew TF was pregnant and that the child was his. With regard to Mil. R. Evid. 403, the military judge found the evidence was not confusing or needlessly cumulative; rather, it was "directly related to the named victim, evidence of intent in the case, and evidence of motive in the case." Accordingly, at trial the Government introduced testimony regarding the results of the DNA testing and the likelihood of Appellant's paternity.

**2. Law**

We review a military judge's decision to admit or exclude evidence for an abuse of discretion. *United States v. Bowen*, 76 M.J. 83, 87 (C.A.A.F. 2017) (citation omitted). "An abuse of discretion occurs when a military judge either erroneously applies the law or clearly errs in making his or her findings of fact." *Donaldson*, 58 M.J. at 482 (citing *Humpherys*, 57 M.J. at 90). "The abuse of discretion standard is a strict one, calling for more than a mere difference of opinion. The challenged action must be 'arbitrary, fanciful, clearly unreasonable,' or 'clearly erroneous.'" *McElhaney*, 54 M.J. at 130 (quoting *Miller*, 46 M.J. at 65; *Travers*, 25 M.J. at 62).

"The relevance standard is a low threshold." *United States v. White*, 69 M.J. 236, 239 (C.A.A.F. 2010) (citation omitted). "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Mil. R. Evid. 401. Relevant evidence is generally admissible, unless otherwise provided by the Constitution, statute, Military Rules of Evidence, or the *Manual for Courts-Martial*. Mil. R. Evid. 402.

The military judge may exclude relevant evidence that is otherwise admissible if its probative value is substantially outweighed by a countervailing danger, including *inter alia* unfair prejudice, confusion of the issues, or needless presentation of cumulative evidence. Mil. R. Evid. 403. "A military judge enjoys 'wide discretion' in applying Mil. R. Evid. 403." *Harris*, 46 M.J. at 225 (quoting *Rust*, 41 M.J. at 478). "Where a military judge properly conducts the balancing

test under Mil. R. Evid. 403, we will not overturn his decision unless there is a clear abuse of discretion." *Ruppel*, 49 M.J. at 251 (citation omitted).

### 3. Analysis

We conclude the military judge did not abuse his discretion in admitting the DNA evidence of Appellant's paternity. We agree with the military judge that the test results were relevant regardless of the fact that the test was performed after the offenses. The relevance does not hinge on Appellant's knowledge of the test results; rather, the relevance is that confirmation Appellant was actually the father corroborated other evidence indicating Appellant believed he was the father, and that TF held him out to be the father, before TF was killed. Evidence of Appellant's belief that he was the father in turn supported the Government's theories regarding Appellant's intent and motives—for example, "to dispose of the daughter he did not want," as trial counsel subsequently argued. Accordingly, we find the probative value of the test results with respect to Appellant's intent and motives was sufficient to meet the low threshold for relevancy.

We further find the military judge did not abuse his wide discretion in applying Mil. R. Evid. 403. The evidence, which the Defense did not contest on scientific grounds, was concise and clear in its implications. The Defense remained free to argue Appellant did not have scientific proof of his paternity before the deaths occurred. We are not persuaded the risks of confusion, unfair prejudice, or any other countervailing concern substantially outweighed the probative value of the evidence.

### K. Admission of Appellant's Letter from Jail to TB

#### 1. Additional Background

##### a. The Letter and its Suppression

After his arrest on 31 August 2013, Appellant was confined in the Tift County Jail. While confined in isolation there, between 31 August 2013 and 14 September 2014 Appellant wrote a number of letters to his friends and family members which he mailed through the prison mail system. The jail's inmate handbook advised inmates that "[m]ail correspondence of a general nature" was subject to being opened, inspected, and read for material that might be threatening to the safety or security of the facility. However, during his time in the isolation section of the jail, Appellant did not have access to the paper or electronic copy of the handbook.

Beginning on or about 5 September 2013, a jail employee made and retained copies of Appellant's letters before resealing the letters and mailing them. This was not the jail's typical procedure. One such letter that was copied

was from Appellant to TB, Appellant's alibi witness who testified she slept at Appellant's house the night TF was killed. The letter stated in part:

> Last thing before I respond to your letters. I need to know something about what you told the police, but they read my letters. So when answering just say, "to answer your question, Yes I did" or "No I didn't." Did you tell the police where the rental car was parked?? (And if they question you again don't talk to them at all) (Tear the last paragraph off this letter and burn or flush it)

The record is unclear as to whether TB received the original letter.

Before trial, the Defense moved to suppress all letters seized by jail officials when Appellant was in pretrial confinement. On 29 October 2015, the military judge granted the motion to suppress. He explained the Government had failed to meet its burden of proof, and that the "wholesale photocopying of an inmate's mail in contravention of the jail's written policy, in reliance on a single individual . . . implementing the wide-ranging search, without demonstrated authority, or a regulation or rule allowing him to do so, [wa]s arbitrary," and therefore an illegal search and seizure in violation of the Fourth Amendment.

### b. The Letter's Introduction as Rebuttal Evidence

At trial, the Defense's cross-examination of several Government witnesses led the military judge to admit the portion of Appellant's suppressed letter to TB as rebuttal evidence. Trial defense counsel's questions tended to suggest a possible innocent use for the rental car; that Appellant was not concerned about being associated with the car; that the car might have been damaged after it was returned; and that TB had not attempted to conceal from investigators her knowledge of Appellant returning the car. The cross-examinations are summarized below.

The Government called IV who testified, *inter alia*, about renting a car at Appellant's request on 28 August 2013. On cross-examination, IV testified that she knew the Outcast Motorcycle Club had a clubhouse in Atlanta, Georgia, which was two hours away from Warner Robins.

The Government also called AW, the branch manager for the rental agency where IV rented the car. On cross-examination, AW acknowledged that the rental agency employees did not initially notice the ricochet mark on the window or damage to the molding when the car was returned the morning of 29 August 2013. She also acknowledged the agency had security cameras that were in plain view and not hidden; the apparent implication was that Appellant would have seen them and known he was being recorded when he returned the car, yet did so anyway.

The Government also called TB, who testified Appellant was with her when she fell asleep at his residence on the night of 28 August 2013, and he was there when she awoke the following morning at 0515. TB testified that she got out of bed at approximately 0540 and departed with Appellant, who she dropped off at the rental car which was parked down a side street. TB testified she did not know what the rental car was for. After Appellant returned the rental car, TB picked him up and they went to breakfast together. In response to questioning by trial defense counsel on cross-examination, TB testified to her belief that Appellant did not leave the bed after TB fell asleep on the night of 28 August 2013, based on her usual sleeping habits with him. In addition, TB testified that she told a GBI agent about helping Appellant return the rental car during her initial GBI interview. On re-direct, senior trial counsel had TB clarify that she did not initially mention the rental car when she was questioned about what she did that morning. On further cross-examination, TB clarified that she told the agent about returning the rental car when he specifically asked her whether she took Appellant anywhere before they went to breakfast.

After TB, the Government called JM, Appellant's neighbor. JM testified that in the early morning of the day that the police searched Appellant's house, he remembered seeing a small, four-door sedan parked on the street close to JM's driveway. On cross-examination, senior trial defense counsel attacked an asserted discrepancy between JM's testimony as to where he saw the car, and where he had previously told investigators he saw the car. The apparent implication was that JM's testimony—suggesting Appellant wanted to keep the rental car away from his house—was unreliable.

After JM's testimony, the Government asserted to the military judge that the Defense had opened the door to the portion of Appellant's letter to TB quoted above. Senior trial counsel cited the cross-examinations of IV, AW, TB, and JM as, in varying ways, raising the inference that Appellant was not trying to conceal the rental car and it might have been used for an innocent purpose. Quoting *United States v. Haney*, senior trial counsel argued Appellant "may not use his constitutional rights as a 'shield' to 'prevent the Government from contradicting the untruths and reasonable inferences that the fact finders could logically draw from the defense cross-examination.'" 64 M.J. 101, 116 (C.A.A.F. 2006) (quoting *Gilley*, 56 M.J. at 125 (Crawford, C.J., concurring in part)). In response, trial defense counsel argued the Defense had not opened the door, that the Government had raised these matters, and that the timing of the letter—approximately one month after TB was interviewed by the GBI—made it irrelevant.

The military judge allowed the Government to introduce the portion of the letter. He agreed with the Government that the letter "shows something nefarious about the rental car." The military judge explained:

> [H]ere I have a paragraph from a letter that absolutely provides some light as to what's going on with that rental car. And you can't benefit from it. And the cross-examination of [TB] that you did, the cross-examination of [AW], and the discussion of this Atlanta clubhouse, I think we all know what that's for. Maybe it's 98 miles to the Atlanta clubhouse and back as well. I have no idea. I assume we're going to see some evidence on it. I don't know. But I know those inferences are out there and the government gets to rebut them.

The relevant portion of the letter was admitted as Prosecution Exhibit 121, which senior trial counsel additionally read to the court members. The military judge later instructed the court members: "You may consider evidence found in Prosecution Exhibit 121 for the limited purpose of its tendency, if any, to show consciousness of guilt on behalf of the accused, and to rebut the issue of alibi raised by the accused."

**2. Law**

"A military judge's decisions to admit or exclude evidence are reviewed for an abuse of discretion." *Eslinger*, 70 M.J. at 197 (citation omitted).

"The context in which evidence is offered is often determinative of its admissibility." *Saferite*, 59 M.J. at 274. "[W]here a party opens the door, principles of fairness warrant the opportunity for the opposing party to respond, provided the response is fair and is predicated on a proper testimonial foundation." *Eslinger*, 70 M.J. at 198 (citation omitted). "[T]he legal function of rebuttal evidence . . . 'is . . . to explain, repel, counteract or disprove the evidence introduced by the opposing party.'" *Saferite*, 59 M.J. at 274 (quoting *Banks*, 36 M.J. at 166). "The scope of rebuttal is defined by evidence introduced by the other party." *Banks*, 36 M.J. at 166 (citations omitted).

"Rebuttal evidence, like all other evidence, may be excluded pursuant to [Mil. R. Evid.] 403 if its probative value is substantially outweighed by the danger of unfair prejudice." *Saferite*, 59 M.J. at 274 (citation omitted). "When a military judge conducts a proper balancing test under Mil. R. Evid. 403, the ruling will not be overturned unless there is a 'clear abuse of discretion.'" *Manns*, 54 M.J. at 166 (quoting *Ruppel*, 49 M.J. at 250). However, we afford "military judges less deference if they fail to articulate their balancing analysis on the record, and no deference if they fail to conduct the Rule 403 balancing." *Id.* (citation omitted).

### 3. Analysis

On appeal, Appellant essentially reiterates trial defense counsel's argument that the Defense did not open the door because the Government "already put into play" the matters it asserted the Defense introduced. In response, the Government argues the Defense's cross-examination did open the door to previously inadmissible evidence. The Government cites several precedents from our superior court to the effect that the defense may open the door to otherwise inadmissible evidence, and that an accused may not use his constitutional rights to prevent the Government from contradicting untruths. *See Eslinger*, 70 M.J. at 198; *Gilley*, 56 M.J. at 120; *United States v. Trimper*, 28 M.J. 460, 466–67 (C.M.A. 1989).

However, the parties have not specifically addressed the application of the exclusionary rule to evidence suppressed for violation of the Fourth Amendment where such evidence subsequently becomes relevant to rebut evidence adduced through defense cross-examination of prosecution witnesses. Similarly, neither the parties nor the military judge addressed this aspect at trial. The military judge appears to have assumed that evidence suppressed for violation of the accused's constitutional rights is on an equal footing with other previously excluded evidence in terms of its availability for rebuttal. We are not so sure.

None of the cases the Government relies on involved the use of evidence initially suppressed for violation of the Fourth Amendment to rebut general cross-examination of prosecution witnesses. *See Eslinger*, 70 M.J. at 196–98 (involving opinion testimony in sentencing); *Gilley*, 56 M.J. at 120–22 (involving references to appellant's request for counsel); *Trimper*, 28 M.J. at 466–67 (involving use of privately obtained urinalysis result to impeach accused's testimony that he had never used cocaine). Our review of the pertinent law has not disclosed such precedent either.

Other authority suggests that evidence derived from constitutionally infirm search and seizure is not available for such purposes. For example, similar to the holding in *Trimper*, Mil. R. Evid. 311(c) provides that "[e]vidence that was obtained as a result of an unlawful search or seizure may be used to impeach by contradiction the in-court testimony of the accused." The provision of such a specific exception for the use of illegally obtained evidence implies such evidence is not *generally* available to rebut or impeach defense evidence. Furthermore, in *James v. Illinois* the United States Supreme Court explained that its precedents permitted the use of evidence obtained in violation of a defendant's Fourth and Fifth Amendment rights to impeach the defendant's own testimony, but declined to extend the exception to the impeachment of other defense witnesses. 493 U.S. 307, 311–14 (1990) (citing *United States v. Havens*, 446 U.S. 620 (1980); *Harris v. New York*, 401 U.S. 222 (1971); *Oregon v. Hass*,

420 U.S. 714 (1975); *Walder v. United States*, 347 U.S. 62 (1954)). In this case, the military judge did not admit the excerpt of Appellant's suppressed letter to TB to impeach the testimony of Appellant or any other defense witness, but merely to rebut the inferences created by trial defense counsel's cross-examination of the Government's own witnesses. Accordingly, for purposes of our analysis we assume without deciding the military judge erred.

However, we find Appellant is not entitled to relief because any error was harmless beyond a reasonable doubt. *See Mott*, 72 M.J. at 332 (citation omitted). It is true that the excerpt of the letter was relevant to counteract the cross-examination testimony related to the rental car that the Defense elicited, and that trial counsel referred to this evidence in one portion of his argument on findings. However, the letter merely reinforced the significance of the rental car which was already apparent from other evidence, notwithstanding the cross-examination. Appellant rented the car through IV, for no apparent reason other than to avoid association with it. He parked it away from his house, where it would not be seen by witnesses or on his security cameras. The Defense's primary theory was alibi based on TB's testimony that Appellant spent the night of the murder at his own house, but this left no innocent explanation for how the car was driven 217 miles before it was returned—the passing reference to the Atlanta clubhouse was the feeblest of gestures in that direction. Moreover, after the car was returned the GBI found a ricochet mark on the window consistent with a .38 caliber round, as fired from CF's pistol.

Furthermore, the rental car was not even the most compelling evidence of Appellant's guilt. CF saw Appellant flee the scene of the murder. Ballistics evidence indicated the fatal bullets were fired from the Walther P-22 Appellant possessed. Coupled with all of the other incriminating forensic and other evidence, and the thorough undermining of TB's alibi testimony, the evidence of Appellant's guilt was overwhelming. "'[T]he weight of the evidence supporting the conviction[s][ ]'. . . may so clearly favor the government that the appellant cannot demonstrate prejudice." *United States v. Sewell*, 76 M.J. 14, 18 (C.A.A.F. 2017) (second alteration in original) (quoting *United States v. Fletcher*, 62 M.J. 175, 184 (C.A.A.F. 2005)) (additional citation omitted). This is such a case. Accordingly, we find Appellant is not entitled to relief.

**L. Findings Instructions**

**1. Law**

Where an appellant properly preserves his objections, we review the adequacy of the military judge's instructions de novo. *United States v. Dearing*, 63 M.J. 478, 482 (C.A.A.F. 2006) (citations omitted). "[A] military judge has wide discretion in choosing the instructions to give but has a duty to provide an

accurate, complete, and intelligible statement of the law." *United States v. Behenna*, 71 M.J. 228, 232 (C.A.A.F. 2012) (citations omitted). The test for prejudice for a nonconstitutional error in findings instructions is whether the error had a "substantial influence" on the findings. *United States v. Gibson*, 58 M.J. 1, 7 (C.A.A.F. 2003).

"[T]he military judge . . . is required to tailor the instructions to the particular facts and issues in a case." *United States v. Baker*, 57 M.J. 330, 333 (C.A.A.F. 2002) (citations omitted). Absent evidence to the contrary, we presume the court members followed the military judge's instructions. *United States v. Stewart*, 71 M.J. 38, 42 (C.A.A.F. 2012) (citation omitted).

### 2. Additional Background and Analysis

Appellant contends the military judge's instructions to the court members were erroneous in five respects. The Defense preserved its objections to these instructions by raising them to the military judge at trial. We address each contention in turn.

#### a. Instruction Regarding Alibi Defense

The military judge instructed the court members as follows with regard to Appellant's alibi defense:

> The evidence *may have raised* the defense of alibi in relation to the offenses of premeditated murder and the intentional killing of an unborn child and the lesser included offense.

> "Alibi" means the accused could not have committed the offenses charged or any lesser included offense because the accused was at another place when the offenses occurred. Alibi is a complete defense to the offenses that are charged. You should consider all evidence that you believe is relevant on the issue of alibi.

> The burden is on the prosecution to establish the guilt of the accused. If you are convinced beyond a reasonable doubt the accused was present at the time and place of the alleged offense, the defense of alibi does not exist.

(Emphasis added.)

The military judge deviated slightly from the standard alibi instruction from the *Military Judges' Benchbook*, Dept. of the Army Pamphlet 27-9 at 1018 (10 Sep. 2014) (*Benchbook*), which begins: "The evidence *has raised* the defense of alibi . . . ." (Emphasis added). Appellant contends this modification was erroneous because it tacitly indicated the military judge doubted the testimony of TB, Appellant's alibi witness. Appellant further contends this was an error of constitutional magnitude because it "diluted" his right to have the court

members fully consider his alibi defense, and the error was not harmless beyond a reasonable doubt. *See United States v. Brooks*, 25 M.J. 175, 180 (C.M.A. 1987) (finding failure to give alibi instruction was an error of constitutional magnitude).

We disagree. As an initial matter, the instant case is not comparable to *Brooks*, where the military judge erroneously failed to give an alibi instruction where that defense was raised by the evidence. *Id.* at 179–80. In Appellant's case, the military judge did explain the alibi defense and instructed the members to consider whether it applied in light of the evidence before them. This was not interference with Appellant's right to present a defense equivalent to the constitutional error that occurred in *Brooks*.

Turning to Appellant's specific objection, we find no error in the military judge's instruction that the evidence "may have raised" the defense of alibi. The *Benchbook* instructions are not mandatory, and "the military judge . . . is required to tailor the instructions to the particular facts and issues in a case." *Baker*, 57 M.J. at 333 (citations omitted). As given, the instruction accurately characterized the evidence. There was no direct evidence that Appellant was at his residence at the time of the murder. Even if one takes TB's testimony as to when she fell asleep and when she awoke at face value, the evidence indicated Appellant would have had time to travel from his home to TF's residence, kill TF, and return all while TB was asleep, notwithstanding TB's opinion that she would have awoken if Appellant had left the bed. Moreover, the court members did not have the standard *Benchbook* instruction with which to compare the military judge's instruction, and from which to infer the military judge's opinion of TB's credibility.

Appellant does not assert the military judge's explanation of the alibi defense was substantively erroneous. The military judge appropriately oriented the court members to the possible existence of an alibi defense and directed the court members to consider the evidence in that light. He thereby discharged his responsibility to provide an accurate, complete, and intelligible explanation of the applicable law. *Behenna*, 71 M.J. at 232 (citation omitted). Furthermore, even if we assume *arguendo* the military judge should have instructed the members that the evidence "has raised" rather than "may have raised" the alibi defense, the deviation had no substantial influence on the findings. Court members are presumed to follow the military judge's instructions, and the alibi instructions given would have led the court members to consider whether the evidence indicated Appellant was not present when TF was killed.

### b. Instruction Regarding Accomplice Testimony

The military judge instructed the court members as follows with regard to the testimony of accomplices:

> A witness is an accomplice if he or she was criminally involved in an offense with which the accused is charged. The purpose of this advice is to call to your attention to a factor specifically affecting [TB]'s testimony, that is, a motive to falsify her testimony in whole or in part, because of an obvious self-interest under the circumstances.
>
> For example, an accomplice may be motivated to falsify testimony in whole or in part because of his own self-interest in avoiding future prosecution. In deciding the believability of [TB], you should consider all the evidence you believe is relevant on this issue.
>
> Whether [TB], who testified as a witness in this case, was an accomplice is a question for you to decide. If [TB] shared the criminal intent or purpose of the accused, if any, or aided, encouraged, or in any other way criminally associated or involved herself with the offense with which the accused is charged, she would be an accomplice.
>
> As I indicated previously, it is your function to determine the credibility of all the witnesses, and the weight, if any, you will accord the testimony of each witness. Although you should consider the testimony of an accomplice with caution, you may convict the accused based solely upon the testimony of an accomplice, as long as that testimony was not self-contradictory, uncertain, or improbable.

Appellant notes the military judge provided the standard accomplice instruction from the *Benchbook* without significant modification. *See Benchbook* at 1096. However, Appellant contends the standard instruction was confusing and inadequate under the circumstances of this case. Appellant contends the instruction that an accused may be convicted based solely on the testimony of an accomplice, where TB—although called by the Government—was actually Appellant's alibi witness, implied either that TB provided incriminating evidence, or that the members should convict Appellant if they disbelieved TB, or both. According to Appellant, under any of these scenarios the military judge's instruction was erroneous and substantially prejudicial.

Although we agree the final paragraph of the instruction was somewhat awkward under the circumstances of this case, we find no error. Appellant does not allege, and we do not find, that anything in the instruction was an inaccurate statement of law. Additionally, in light of the military judge's unchallenged instructions on the elements of the offenses and repeated admonitions

that the burden of proof rested with the Government, we find no cause for concern that the accomplice instruction would cause the members to weigh the evidence erroneously. To the extent the final portion of the instruction was not particularly applicable in Appellant's case, we presume the court members would have simply not applied it, rather than applied it erroneously and contrary to the military judge's other instructions. *See Stewart*, 71 M.J. at 42 (citation omitted).

### c. Instruction Regarding Evidence of IRS Deficiency

As explained above in our analysis of Appellant's specific assignment of error, the military judge admitted evidence of Appellant's notice of deficiency from the IRS in the amount of $10,802.17 as rebuttal to the photographs in Defense Exhibit C. The military judge provided the following instruction with regard to the IRS deficiency notice:

> You may consider evidence the accused may have been in debt to the IRS for the limited purpose of its tendency, if any, to demonstrate motive of the accused to commit the alleged offenses and to rebut the issue of alibi raised by the accused.

Appellant contends this instruction was erroneous because the deficiency evidence was not admitted to rebut the issue of alibi. Because court members are presumed to follow the military judge's instructions, Appellant contends he was prejudiced because the instruction led the court members to consider the evidence for an improper purpose. In response, the Government argues the instruction was not erroneous because the conditional language "may consider" and "if any" did not require the members to use the evidence to rebut the alibi defense. The Government further argues that the deficiency was evidence of Appellant's financial motive to commit the murder, and therefore relevant under the low standard of Mil. R. Evid. 401 to rebut the alibi defense because of its tendency to indicate Appellant did commit the offense.

It is difficult to assess whether the military judge's instruction was erroneous because the military judge did not clearly explain at the time for what purpose he was admitting the IRS deficiency evidence. Rebuttal evidence serves to "explain, repel, counteract or disprove" evidence introduced by the opposing party. *Saferite*, 59 M.J. at 274 (citation omitted). As the Government argues, the IRS deficiency has some very general tendency to counteract or disprove the alibi defense by demonstrating a motive for Appellant to commit the murder, and thereby making it more likely Appellant did so. However, this is arguably true of every piece of relevant and material inculpatory evidence. Trial counsel's argument that Defense Exhibit C had opened the door did not mention the alibi defense and instead focused on the Defense's effort to minimize the evidence of Appellant's financial motive. If the military judge admitted the

deficiency evidence solely as rebuttal evidence related to motive, then Appellant's argument has some force. However, the military judge, having found the Defense opened the door to the deficiency evidence by putting in visual evidence of the deficiency notice itself, might have concluded the deficiency was relevant and useable for other purposes as well. His decision to instruct the court members that they could consider the evidence for its tendency, if any, to rebut the alibi defense—over the Defense's objection—suggests that he did so.

Accordingly, for the purpose of analysis, we assume without holding that the military judge erred and resolve the issue on the question of prejudice. Assuming the instruction was erroneous, it had no substantial effect on the findings. Evidence of the IRS deficiency notice was properly before the members in any event as evidence of Appellant's financial motive. In light of the abundance of incriminating evidence placing Appellant at the scene of TF's murder, coupled with the significant flaws in TB's credibility and other weaknesses in Appellant's alibi defense, addressed in more detail above in relation to legal and factual sufficiency, the incremental effect of the military judge permitting the court members to consider the IRS deficiency for its tendency to rebut Appellant's alibi, if any, was negligible.

### d. Instruction Regarding Appellant's Letter from Jail to TB

As described above, the military judge initially excluded the letter Appellant wrote to TB from confinement in September 2013, but subsequently found the Defense had opened the door to admission of a portion of it. The military judge provided the following instruction with regard to the letter:

> You may consider evidence found in Prosecution Exhibit 121, that's the letter from September of 2013. You may consider evidence found in Prosecution Exhibit 121 for the limited purpose of its tendency, if any, to show consciousness of guilt on behalf of the accused, and to rebut the issue of alibi raised by the accused.

Appellant contends the portion of the instruction that invites the members to consider how the letter rebuts Appellant's alibi defense is erroneous. He asserts that even if one assumes the letter amounts to evidence of his consciousness of guilt, without more, it does not impeach TB's credibility or, by extension, Appellant's alibi defense. However, in our consideration of the admission of the letter as rebuttal evidence, *supra*, we explained that any error in its admission was harmless beyond a reasonable doubt. For similar reasons, we find the military judge's instruction regarding the letter was also harmless beyond a reasonable doubt. *See Mott*, 72 M.J. at 332 (citation omitted).

### *e. Instruction Regarding the Motorcycle Club and "Property"*

The military judge provided the following instruction with regard to evidence of the Outcast Motorcycle Club:

> You may consider evidence related to the issue of the Outcast Motorcycle Club to include the description of and definition of property for the limited purpose of its tendency, if any, to show the accused's opportunity, the accused's plan and to rebut the issue of alibi raised by the accused and to rebut the testimony of [TB].

Although Appellant concedes that TB's credibility in general was "certainly a factor" for the court members to consider, he contends this instruction was erroneous because "it did not actually rebut any of [TB's] testimony." Again, we disagree.

Rebuttal evidence is evidence that "explain[s], repel[s], counteract[s] or disprove[s] the evidence introduced by the opposing party." *Saferite*, 59 M.J. at 274 (citation omitted). The evidence was not required to literally contradict TB's testimony in order to rebut it. Evidence of Appellant's and TB's mutual affiliation with Outcast, and of TB's status as "property" of an Outcast member, were relevant to illustrate her potential bias and thereby counteract and rebut her alibi testimony.

## M. Trial Counsel's Sentencing Argument

### 1. Additional Background

After the members returned a verdict of guilty, including a unanimous verdict as to premeditated murder, the military judge permitted counsel for each side to give an opening statement with respect to sentencing. During the Government's opening statement, senior trial counsel explained the four "decisional points" or "gates" the Government must pass in order for the court members to impose the death penalty: a unanimous vote that Appellant was guilty of premeditated murder; a unanimous vote that the Government had demonstrated a qualifying aggravating factor beyond a reasonable doubt; a unanimous vote that the extenuating and mitigating factors are substantially outweighed by the aggravating circumstances; and a unanimous vote to impose the death penalty.

The Defense's sentencing case was short. Trial defense counsel introduced approximately 30 documents related to Appellant's duty performance and military and civilian educational achievements, three letters to Appellant from his son, ten pages of photographs, a one-page unsworn "Personal Statement" signed by Appellant, and an approximately 20-minute Defense-produced video

containing portions of interviews with Appellant, members of Appellant's immediate family including his son, and former educators of Appellant, as well as portions of several recorded phone conversations between Appellant and his son during Appellant's pretrial confinement. The Defense did not call any witnesses or introduce any character letters. Appellant's personal statement primarily focused on his relationship with his son. Appellant's written personal statement and video-recorded interview did not acknowledge his guilt of the offenses, express any remorse, apologize to TF's family or friends, or mention TF or her unborn child.

After the presentation of evidence and other sentencing matters, counsel for both parties delivered sentencing arguments. Senior trial counsel's argument included the following statements:

> We talked yesterday about the four gates. Gate One has already been met in the unanimous verdict for premeditated murder. Gate Two, unanimous vote for the existence of the aggravating factor beyond a reasonable doubt. Members, I submit to you again that this should be easy for you. The aggravating factor in this case is that the murder was committed for the purpose of getting money or a thing of value. And ask yourselves this, has any other reason for this murder been presented to you? Was there any other purpose to that act that morning?

Senior trial counsel then discussed the $1 million MetLife insurance policy, the notice of deficiency from the IRS, and Appellant's statement to IV on the day of the murder that there was "a policy."

Senior trial counsel then proceeded to address the "third gate." He addressed potential mitigating and extenuating factors identified in the military judge's instructions and argued why they should not sway the members' decision. With regard to the duration of Appellant's pretrial confinement, senior trial counsel argued:

> And what is it you've not been presented with? Any evidence that that 1,264 days has had any impact on him. No evidence that he's been rehabilitated during that time. That he's entered into any programs there. That he's done anything while in confinement to change his behavior or change his outlook and mindset on the world. Nothing.

Senior trial counsel then addressed the Defense's sentencing evidence:

> And you do have before you, the military judge will instruct you to consider the Defense Exhibits in this case. . . . The defense presented to you yesterday a 20 minute mitigation case. And you're allowed to consider that to ultimately determine how

much weight to give that. And really, does that provide much mitigation? I would submit to you that that case is more aggravating than it is mitigating. It's more aggravating than it is mitigating.

Because it shows you that there is no excuse for these actions. There is nothing. There is nothing in his background. There is nothing in his life that would explain this. That would give you some reason to say, "Okay, we can latch on to that. This is why he committed this evil act. This is why he strayed." But he grew up in a loving family.

That [sic] also didn't present in that mitigation package any letters, any sentencing letters from anyone. Now, [Appellant], in his video, talked about being part of an All Star team. These were the best individuals on this team. Where are the letters from anyone on that team that talks about that performance? You were presented with nothing.

The Defense did not object to any of these statements at the time they were made. However, the military judge sustained a defense objection later in the argument when senior trial counsel implied a death sentence might not ever be carried out.

As the Government's argument continued, one of the court members became ill, and as a result the military judge put the court-martial in recess for two days. During the recess the Defense moved to remove the death penalty as a possible sentence due to prosecutorial misconduct during senior trial counsel's sentencing argument. Specifically, the Defense contended senior trial counsel "improperly argu[ed] a lack of evidence from the [D]efense" with regard to facts the Government was required to prove to satisfy the second and third "gates;" conveyed the false impression that Appellant could have participated in rehabilitative programs during his pretrial confinement; improperly argued the mitigating factors could actually be weighed as aggravating factors; and "us[ed] common sense as a pretext to introduce constitutionally impermissible inferences that a sentence of death would be delayed if it was ever carried out." The Defense argued that instructions were an insufficient remedy, and that removal of the death penalty as a possible punishment was an appropriate remedy because the errors "all relate[ ] to findings that are only relevant to determine if death is a possible punishment." In the alternative, the Defense requested the military judge declare a mistrial. In response, the Government argued senior trial counsel correctly described the capital sentencing procedure, made fair comments on the evidence, and did not attempt to shift the Government's burden.

When the court-martial resumed, the military judge discussed the defense motion with counsel. The military judge denied the Defense's request to remove the death penalty or to declare a mistrial. However, before senior trial counsel resumed his sentencing argument, the military judge provided the following additional instructions to the court members:

> [I]f you look at that second gate, the existence of an aggravating factor, the burden for that is on the prosecution to prove that beyond a reasonable doubt, like you heard before when you were deliberating before on findings. Same standard. I'll instruct you on it again. They have to prove beyond a reasonable doubt that the aggravating factor exists. And that is on them.

> If you go down to that next gate, you got the mitigating factors, it's extenuating [sic] and mitigation are substantially outweighed by the aggravating circumstances, to include the aggravating factors. So, if you get through the aggravating factor and you're down into that third step, you're going to get a list of extenuation of mitigation. And you're seeing that list as the prosecutor goes through their argument. You're going to get a list of things that you must consider as extenuating and mitigating. However, the weight that you give each of those is within your discretion. You have to consider it but, again, you're going to have to figure out the weight because you're going to go through this, if you get to this third gate, this balancing of aggravating circumstances and extenuation and mitigating factors. So, it's entirely appropriate for the prosecution to talk to you about it and discuss with you why they don't believe it's worth significant weight, but ultimately the weight you give these circumstances is within your discretion.

> [ ] But you do have to consider them.

**2. Law**

Improper argument is a question of law that we review de novo. *United States v. Pabelona*, 76 M.J. 9, 11 (C.A.A.F. 2017) (quoting *United States v. Frey*, 73 M.J. 245, 248 (C.A.A.F. 2014)). The "test for improper argument is whether the argument was erroneous and whether the argument materially prejudiced the appellant's substantial rights." *Id.* (quoting *Frey*, 73 M.J. at 248). When there is no objection at trial, we review the propriety of trial counsel's argument for plain error. *United States v. Halpin*, 71 M.J. 477, 479 (C.A.A.F. 2013) (citation omitted). To prevail under a plain error analysis, the appellant must

show "(1) there was an error; (2) it was plain or obvious; and (3) the error materially prejudiced a substantial right." *United States v. Erickson*, 65 M.J. 221, 223 (C.A.A.F. 2007) (citations omitted).

"Improper argument is one facet of prosecutorial misconduct." *Sewell*, 76 M.J. at 18 (citation omitted). "Prosecutorial misconduct occurs when trial counsel 'overstep[s] the bounds of that propriety and fairness which should characterize the conduct of such an officer in the prosecution of a criminal offense.'" *United States v. Hornback*, 73 M.J. 155, 159 (C.A.A.F. 2014) (alteration in original) (quoting *Fletcher*, 62 M.J. at 179). "[T]rial counsel may 'argue the evidence of record, as well as all reasonable inferences fairly derived from such evidence.'" *Halpin*, 71 M.J. at 479 (quoting *United States v. Baer*, 53 M.J. 235, 237 (C.A.A.F. 2000)). "A prosecutorial comment must be examined in light of its context within the entire court-martial." *United States v. Carter*, 61 M.J. 30, 33 (C.A.A.F. 2005) (citation omitted).

We need not determine whether a trial counsel's comments were in fact improper if we determine that the error, if any, did not materially prejudice the appellant's substantial rights. *See Halpin*, 71 M.J. at 479–80. "[I]n the context of an allegedly improper sentencing argument, we consider whether 'trial counsel's comments, taken as a whole, were so damaging that we cannot be confident' that [the appellant] was sentenced 'on the basis of the evidence alone.'" *Id*. at 480 (alteration in original) (quoting *Erickson*, 65 M.J. at 224) (internal quotation marks omitted).

### 3. Analysis

On appeal, Appellant contends this court should set aside his sentence because senior trial counsel's argument "exceeded the bounds of fair comment in several ways." Appellant specifically cites three aspects of the Government's argument: that the Defense failed to provide a motive for TF's murder other than that Appellant did it to obtain money or something of value; that the Defense failed to introduce any witness statements in support of Appellant; and the "false impression" that Appellant had access to rehabilitative programs during his pretrial confinement. In response, the Government contends senior trial counsel's arguments were fair comments on the evidence that did not improperly shift the burden, and in the alternative that these comments did not materially prejudice Appellant.

We find it unnecessary to affirmatively determine whether any of senior trial counsel's statements that Appellant cites were in fact improper, and instead resolve the assignment of error on the absence of prejudice. However, we do find it appropriate to sound a note of caution. To an extent, we agree with the Government that the substance of senior trial counsel's remarks were comments on the state of the evidence. However, his decision to repeatedly frame

his rhetorical questions as whether the court members had been "presented" with evidence of one type or another was a step into dangerous territory. The implication was that the Defense was permitted to, yet failed to produce such evidence. Appellant notes this court has previously (and descriptively) warned: "Whenever trial counsel chooses to argue that an accused has not 'shown' the sentencing authority something, counsel treads backwards into a mine field in over-sized galoshes while wearing a blindfold." *United States v. Feddersen*, No. ACM 39072, 2017 CCA LEXIS 567, at *9 (A.F. Ct. Crim. App. 21 Aug. 2017) (unpub. op.). Caution is particularly appropriate in the context of a capital sentencing proceeding, where the Government bears special burdens of proof.

Nevertheless, assuming *arguendo* senior trial counsel erred, we find Appellant was not prejudiced by the errors. Several factors lead to this conclusion.

First, we find the severity of the alleged misconduct was low. *See Halpin*, 71 M.J. at 480 (citing *Fletcher*, 62 M.J. at 184). The statements Appellant cites were brief comments in a sentencing argument that lasted over an hour. In general, senior trial counsel correctly articulated the applicable capital sentencing procedures and the Government's burden of proof.

Second, the military judge gave additional instructions in the midst of the Government's argument to ensure the court members were not confused about the Government's burden or the sentencing procedures. *See id.* (citing *Fletcher*, 62 M.J. at 184).

Third, the alleged errors primarily related to whether the Government had met the requirements for the imposition of the death penalty, and the court-martial did not sentence Appellant to death. The Defense's motion at trial acknowledged as much in seeking, as a primary remedy, to have the death penalty removed as a sentencing option.

Fourth, the court members' sentencing options were limited. If the court members did not impose the death penalty, Appellant faced a mandatory minimum term of confinement for life; the only other confinement option was confinement for life without the possibility of parole. We are entirely confident the alleged errors played no role in the imposition of Appellant's dishonorable discharge, reduction in rank, forfeiture of pay and allowances, and reprimand, nor in the imposition of confinement for life without, rather than with, the possibility of parole.

Fifth, the Defense's sentencing case was comparatively weak, and the Government's sentencing case was comparatively strong, including testimony from several friends and relatives of the victim. The preeminent question during sentencing was whether or not the court members would impose the death penalty. They did not.

Accordingly, we are confident Appellant was sentenced on the basis of the evidence alone, and that senior trial counsel's allegedly improper comments did not affect the outcome of the sentencing proceeding.

## N. Post-Trial Delay

### 1. Additional Background[21]

Appellant was sentenced on 22 February 2017. The court reporters completed transcribing the proceedings on 30 May 2017, and the wing legal office received the military judge's authentication of the record on 23 June 2017. The wing legal office completed assembling the eight copies of the record on 25 September 2017, and the convening authority's legal office received its copy two days later. The record consists of 44 volumes, including 4,317 pages of transcript and a total of 681 Prosecution, Defense, and Appellate Exhibits comprising several thousand pages in addition to numerous discs of recordings and digital information. The convening authority's staff judge advocate (SJA) signed the SJAR on 8 November 2017 after members of the SJA's staff reviewed the entire record and identified more than 20 corrections. The record was served on Appellant on 15 November 2017. The Defense submitted clemency matters on 25 November 2017, including 114 assertions of legal error; one of the alleged errors was violation of Appellant's right to speedy post-trial review. The SJA signed the SJAR addendum on 19 December 2017,[22] and the convening authority took action on 20 December 2017, 301 days after sentencing.

The record was docketed with this court on 10 January 2018, 21 days after action. Thereafter, the Defense requested and was granted 20 enlargements of time (EOTs) in which to file Appellant's assignments of error. Appellant was initially represented by Captain (CAPT) Mizer, who continued his representation despite being involuntarily mobilized in May 2018 to serve as defense

---

[21] This additional background is based in part on information contained in the record of trial, including a memorandum attached to the SJAR signed by the wing staff judge advocate (SJA) which details the progress of the post-trial process until delivery of the record to the convening authority's SJA. In addition, we have considered a sworn declaration from Captain TS, a member of the convening authority's SJA's staff, which was submitted by the Government and describes the post-trial process after the record was received by the convening authority's SJA. We understand that we are permitted to consider matters from outside the record of trial when necessary to resolve issues raised by materials in the record of trial. *See Jessie*, 79 M.J. at 442–44.

[22] With respect to post-trial delay, the SJA opined that the time taken to assemble, ship, and review the record was reasonable given the size of the record of trial.

counsel for military commissions. CAPT Mizer was joined in November 2018 by Major (later Mr.) Bruegger. Lieutenant Colonel (Lt Col) Ortiz also served as an appellate defense counsel for Appellant between 16 May 2019 and 30 September 2019. CAPT Mizer withdrew as Appellant's counsel in February 2020 after he was mobilized a second time, and ultimately Mr. Bruegger alone filed Appellant's assignments of error on 1 June 2020.[23] The Government filed its answer brief on 31 July 2020 after this court granted it one 30-day EOT. The Defense filed Appellant's reply brief on 18 August 2020.

**2. Law**

"We review de novo claims that an appellant has been denied the due process right to a speedy post-trial review and appeal." *United States v. Moreno*, 63 M.J. 129, 135 (C.A.A.F. 2006) (citations omitted). In *Moreno*, the CAAF established a presumption of facially unreasonable delay where the convening authority does not take action within 120 days of sentencing, where the record of trial is not docketed with the Court of Criminal Appeals within 30 days of the convening authority's action, and where the court does not issue its decision within 18 months of docketing. *Id.* at 142. Where there is such a facially unreasonable delay, we consider the four non-exclusive factors identified in *Barker v. Wingo*, 407 U.S. 514, 530 (1972), to assess whether Appellant's due process right to timely post-trial and appellate review has been violated: "(1) the length of the delay; (2) the reasons for the delay; (3) the appellant's assertion of the right to timely review and appeal; and (4) prejudice." *Moreno*, 63 M.J. at 135 (citing *United States v. Jones*, 61 M.J. 80, 83 (C.A.A.F. 2005); *Toohey v. United States*, 60 M.J. 100, 102 (C.A.A.F. 2004) (per curiam)). "No single factor is required for finding a due process violation and the absence of a given factor will not prevent such a finding." *Id.* at 136 (citing *Barker*, 407 U.S. at 533).

However, where there is no qualifying prejudice from the delay, there is no due process violation unless the delay is so egregious as to "adversely affect the public's perception of the fairness and integrity of the military justice system." *United States v. Toohey*, 63 M.J. 353, 362 (C.A.A.F. 2006). In *Moreno*, the CAAF identified three interests protected by an appellant's due process right to timely post-trial review: (1) preventing oppressive incarceration; (2) minimizing anxiety and concern; and (3) avoiding impairment of the appellant's grounds for appeal and ability to present a defense at a rehearing. 63 M.J. at 138–39 (citations omitted).

---

[23] The history of Appellant's representation on appeal is addressed in more detail in relation to the next assignment of error, *infra*.

### 3. Analysis

Two periods of delay were facially unreasonable under *Moreno*: the delay between sentencing and action, and the delay between docketing and the issuance of this court's opinion. Accordingly, we consider each period of delay in light of the *Barker* factors.

#### a. Sentence to Action Delay

##### i) Length of Delay

The 301 days that elapsed between sentencing and action substantially exceeded *Moreno's* 120-day threshold for a facially unreasonable post-trial delay. We find this factor favors Appellant.

##### ii) Reasons for Delay

We find the reasons for the delay favor the Government. The record of this capital murder trial is unusually large, as described above. Moreover, although the court reporters began transcribing the preliminary motions hearings well in advance of the trial, the bulk of the transcript was from the approximately six-week period between 9 January 2017 and 22 February 2017 when the trial occurred. The Government involved multiple court reporters in transcribing the proceedings in order to speed the process. Under the circumstances, we find completion of the transcript by 30 May 2017 and receiving the military judge's authentication by 23 June 2017 were not unreasonable. Similarly, we find the time taken to accurately create and assemble eight copies of the 44-volume, 681-exhibit record was not unreasonable.

Nor do we find the processing of the case at the office of the convening authority's SJA to be unreasonably dilatory. In most cases, 42 days to review the record and prepare and sign the SJAR would be unreasonable. However, the size of the record in this case warranted a significant amount of time for review. Similarly, 24 days to prepare the SJAR addendum after receiving clemency matters was not unreasonable given that the SJA responded to 114 alleged legal errors, albeit in cursory fashion for the vast majority of them.

In short, although the delay was *facially* unreasonable, the unusual size and complexity of the record justified the time taken to thoroughly and accurately process the case.

##### iii) Demand for Speedy Post-Trial Review

Appellant, through counsel, asserted his right to speedy post-trial review on the record immediately after the sentence was announced. The Defense reasserted Appellant's right to speedy post-trial review in his clemency submission. Accordingly the Government concedes, and we find, this factor favors Appellant.

### iv) Prejudice

We do not find Appellant suffered prejudice to any of the three interests the CAAF identified in *Moreno* as a result of the delay between sentencing and action. Where, as in this case, the appellant has not prevailed on the substantive grounds of his appeal, there is no oppressive incarceration. *Id.* at 139. Similarly, where Appellant's substantive appeal fails, his ability to present a defense at a rehearing is not impaired. *See id.* at 140. Moreover, we cannot perceive, and Appellant does not articulate, how the substantive grounds for his appeal have been impaired.

With respect to anxiety and concern, the CAAF has explained "the appropriate test for the military justice system is to require an appellant to show particularized anxiety or concern that is distinguishable from the normal anxiety experienced by prisoners awaiting an appellate decision." *Id.* at 140. Appellant cites the fact that CAPT Mizer ultimately withdrew from representing Appellant due to being involuntarily mobilized a second time, after Appellant approved numerous EOTs in order to retain CAPT Mizer as his lead counsel. We are not persuaded. First, as we discuss in more detail below in relation to the next assignment of error, an appellant before a Court of Criminal Appeals does not have the right to select his detailed appellate counsel. *See* 10 U.S.C. § 870; *compare* 10 U.S.C. § 838(b)(3)(B); *see also United States v. Patterson*, 46 C.M.R. 157, 161–62 (C.M.A. 1973); *United States v. Jennings*, 42 M.J. 764, 766 (C.G. Ct. Crim. App. 1995) ("[A]ppellate defense counsel is detailed by the Judge Advocate General, or his designee, pursuant to Article 70, UCMJ and the appellant has no right to request a particular individual to represent him."). In other words, during the period of post-trial delay Appellant had no entitlement to have CAPT Mizer detailed to represent him on appeal, and no right to request him if he was not. Second, CAPT Mizer's ultimate unavailability was not caused by, and did not exist during, the post-trial delay preceding the convening authority's action, but occurred due to subsequent events. Accordingly, we are not persuaded Appellant's anxiety and concern during the post-trial process was distinguishable from that of other appellants serving confinement pursuant to their adjudged sentences.

### v) Conclusion with Regard to Sentence to Action Delay

Having weighed the applicable factors, we find the 301-day delay between sentencing and action was not a violation of Appellant's due process rights. In the absence of prejudice cognizable under *Moreno*, under the circumstances we find the delay was not so egregious as to "adversely affect the public's perception of the fairness and integrity of the military justice system." *Toohey*, 63 M.J. at 362. Moreover, assuming *arguendo* that Appellant's later anxiety and concern regarding CAPT Mizer is attributable to the post-trial delay, and weighing that factor in Appellant's favor, we would still find no due process

violation because the reasons for the delay is the decisive factor in this case. The delay, although *facially* unreasonable, was justified by the size and complexity of the record, and the need to address Appellant's multitude of alleged legal errors. Where the Government's actions are not *actually* unreasonable, under the particular circumstances of this case, in the absence of oppressive incarceration or prejudice to Appellant's ability to defend himself at a retrial or on appeal, we do not find a violation of his constitutional rights.

Furthermore, recognizing our authority under Article 66(c), UCMJ, 10 U.S.C. § 866(c), we have also considered whether relief for excessive post-trial delay is appropriate in this case even in the absence of a due process violation. *See United States v. Tardif*, 57 M.J. 219, 225 (C.A.A.F. 2002). After considering the factors enumerated in *United States v. Gay*, 74 M.J. 736, 742 (A.F. Ct. Crim. App. 2015), *aff'd*, 75 M.J. 264 (C.A.A.F. 2016), we conclude no such relief is warranted.

### b. Appellate Delay

### i) Length of Delay

The approximately 41 months that elapsed between docketing and issuance of this court's opinion substantially exceeded *Moreno's* 18-month standard for facially unreasonable delay. We find the length of the delay favors Appellant.

### ii) Reasons for Delay

The reasons for the delay strongly favor the Government. The vast majority of the delay is attributable to the 20 EOTs this court granted at the Defense's request, often over the Government's objection. Appellant contends these EOTs were driven by CAPT Mizer's unavailability due to his involuntary mobilization, and therefore responsibility for the delay should be attributed to the party responsible for CAPT Mizer's unavailability—the Government. We disagree.

Appellant was not entitled to select or even request a specific detailed appellate defense counsel. We do not discount the significance of the attorney-client relationship once it is formed. However, whether the Government improperly interfered with Appellant's attorney-client relationships is a separate issue which we consider below; for reasons we explain there, we conclude in this case there was good cause for CAPT Mizer's withdrawal from representation and no indication of a Government purpose to sever that relationship. With respect to the delay, with Appellant's concurrence the Defense sought to delay filing his assignments of error, and this court consistently granted the EOTs in order to accommodate the Defense. Appellant complains he "will never receive the benefit of his bargain," but we are not aware of any "bargain"—only a desire that CAPT Mizer would eventually be available to work on his appeal.

The period of delay that is attributable to the Government was justified. The Government received one 30-day EOT in which to file its 239-page answer brief. This was entirely reasonable given the size and complexity of the record and the number of issues Appellant has raised. We note that six different government appellate counsel have signed the Government's answer brief, suggesting the Government dedicated considerable effort to prepare its brief as expeditiously as possible.

In addition, the length of time attributable to this court's review is also reasonable. We have already commented on the extraordinary size of the record. In addition, Appellant has raised 26 distinct issues which we have carefully considered. This court is releasing its opinion approximately 12 months after receiving Appellant's assignments of error and 10 months after receiving the Government's answer. Under the circumstances, the court has not unreasonably delayed its review of the case.

### iii) Demand for Speedy Appellate Review

Because Appellant repeatedly invoked his right to speedy post-trial processing, we find this factor weighs in his favor. However, its significance with respect to the delay in appellate review is greatly diminished by the Defense's 20 motions for EOT specifically requesting delay.

### iv) Prejudice

As noted above, because Appellant has not prevailed on his appeal, he has suffered no oppressive incarceration or prejudice to his ability to defend himself at a rehearing, nor do we perceive any impairment to the substantive grounds for his appeal. With regard to particularized anxiety or concern, such concern is not attributable to the delays which the Defense itself requested, but to the unavailability of CAPT Mizer to prepare his case, which is a distinct matter. We do not find particularized anxiety or concern related to the periods of delay after June 2020, at which point CAPT Mizer had already withdrawn, which are attributable to the Government and to the court.

### v) Conclusion with Regard to Appellate Delay

Having weighed the applicable factors, we find the approximately 41-month delay between docketing and issuance of the court's opinion did not violate Appellant's due process rights. Under the circumstances, the most decisive factor is the reason for the delay, specifically the 20 Defense-requested EOTs which delayed the filing of Appellant's assignments of error until 1 June 2020. Although we find no cognizable prejudice, even if we assume *arguendo* Appellant experienced some particularized anxiety and concern from the delay regarding CAPT Mizer's unavailability to work on his appeal, we would still find no due process violation.

In addition, we have considered whether relief for excessive post-trial delay is appropriate in the absence of a due process violation; we conclude it is not. *See Tardif*, 57 M.J. at 225; *Gay*, 74 M.J. at 742.

## O. Interference with Appellant's Attorney-Client Relationships

### 1. Additional Background

Appellant's record of trial was docketed with this court on 10 January 2018. As noted above, the record of trial consisted of 44 volumes, including 4,317 pages of transcript and a total of 681 prosecution, defense, and appellate exhibits.

Prior to his trial, Appellant requested CAPT Mizer be appointed as his trial defense counsel based upon CAPT Mizer's experience with capital litigation. CAPT Mizer was a civilian Air Force attorney assigned to the Appellate Defense Division, as well as a reserve judge advocate in the United States Navy.[24] This request, however, was denied, and Appellant was represented at trial by other detailed military defense counsel.

On appeal, Appellant was initially represented by CAPT Mizer. Over government opposition, this court granted the Defense's first motion for a 60-day enlargement of time (EOT) in which to file Appellant's assignments of error until 9 May 2018. On 9 May 2018, CAPT Mizer submitted a second motion for EOT, this time requesting an enlargement of 180 days. CAPT Mizer explained that on 30 March 2018 the Secretary of Defense had approved CAPT Mizer's involuntary activation for a period of two years beginning 14 May 2018 in order to serve as defense counsel to the Chief Defense Counsel for Military Commissions in the case of *United States v. Al-Nashiri*. CAPT Mizer indicated he believed he might still be able to complete his review of Appellant's case by the summer of 2019, as he had originally anticipated. The Government opposed the EOT. In accordance with Rule 23.3(m)(3) of this court's Rules of Practice and Procedure, this court granted an enlargement of 30 days until 8 June 2018. A.F. CT. CRIM. APP. R. 23(m)(3) (amended 19 May 2017).

CAPT Mizer submitted six more 30-day motions for EOT, which this court granted, extending the Defense's filing deadline until 6 December 2018. Over the course of three status conferences held during that period, CAPT Mizer indicated that *United States v. Al-Nashiri* was his first priority and, other than communicating with Appellant, he had made minimal progress in reviewing Appellant's record.

---

[24] For consistency and clarity, throughout the opinion we refer to CAPT Mizer using his Navy grade.

In November 2018, Major (Maj) Bruegger was assigned as an additional appellate defense counsel for Appellant. Maj Bruegger submitted the Defense's ninth motion for EOT, which indicated that CAPT Mizer would remain on the case and "still project[ed] to complete briefing on this case by summer of 2019 depending on his litigation of other assigned matters." However, CAPT Mizer was actively involved in *Al-Nashiri* and continued to prepare briefs for other Air Force appellants as well. The court granted the EOT until 5 January 2019 over the Government's opposition. This was followed by tenth and eleventh motions for EOT, which this court also granted.

On 4 February 2019, the Defense moved to "dismiss this case without prejudice" on the grounds of actual and apparent bias of the military judge.[25] The Government opposed the motion. This court denied the motion without prejudice to Appellant's ability to raise the issue in his assignments of error; this court also denied a subsequent motion to reconsider its ruling.

A motion for a twelfth EOT on 27 February 2019 resulted in another status conference. The Defense reported CAPT Mizer's work at the military commissions had expanded beyond *Al-Nashiri*, a development which could result in delays beyond the previously anticipated summer 2019 completion date; nevertheless, Appellant wanted to retain CAPT Mizer as counsel and agreed to the delay. In addition, by this point Maj Bruegger had separated from the Air Force, but he remained assigned to the Appellate Defense Division (JAJA) as a civilian Air Force attorney and continued to represent Appellant. Like CAPT Mizer, now-Mr. Bruegger continued to work on other cases; he estimated he would complete his review of Appellant's record in May 2019. This court granted the twelfth EOT, as well as the Defense's thirteenth EOT requested the following month. By that time, Mr. Bruegger reported he had reviewed 750 pages of the 4,317-page transcript.

On 5 April 2019, citing this court's "broad powers" to "ensure the timely progress of cases reviewed under Article 66[, UCMJ]," *United States v. Roach*, 66 M.J. 410, 418 (C.A.A.F. 2008) (citation omitted), in light of appellate defense counsel's limited progress in reviewing the record, this court ordered counsel for both parties to show good cause as to why this court should not request The Judge Advocate General (TJAG) to direct the assignment of additional or substitute appellate defense counsel. In response, the Government requested this court inform Appellant of his rights to counsel, determine whether Appellant desired to continue to be represented by CAPT Mizer and/or Mr. Bruegger, and then request TJAG assign additional or substitute counsel in accordance with Appellant's wishes. The Defense responded that Appellant was aware of the

---

[25] The basis for this motion was substantially the same as for Appellant's assignment of error relating to the military judge's alleged bias, addressed *supra*.

delays and wanted to continue to be represented by CAPT Mizer and Mr. Bruegger, and opposed the appointment of substitute or additional appellate defense counsel. On 3 May 2019, this court issued an order requesting TJAG appoint additional counsel to represent Appellant.

The Government subsequently informed the court that Lt Col Ortiz had been detailed as an additional appellate defense counsel for Appellant on 16 May 2019.[26] Lt Col Ortiz was a reserve Air Force judge advocate previously assigned to JAJA on extended Military Personnel Appropriation (MPA) active duty orders which were scheduled to end on 30 September 2019. Lt Col Ortiz filed a written notice of appearance on behalf of Appellant on 1 July 2019. However, like CAPT Mizer and Mr. Bruegger, Lt Col Ortiz was also assigned to other cases which, in addition to other roles within JAJA, consumed the lion's share of his time and attention.

At the Defense's request, this court granted motions for a fifteenth, sixteenth, seventeenth, and eighteenth EOT after more status conferences and over government opposition. At status conferences, appellate defense counsel related that CAPT Mizer's activation was scheduled to end in early March 2020. The Defense affirmed Appellant wanted CAPT Mizer to continue to represent him, agreed to the requested EOTs, and understood the EOT requests would extend into 2020. The Defense anticipated it might be able to submit Appellant's assignments of error in April 2020.

JAJA requested to have Lt Col Ortiz's MPA orders extended beyond 30 September 2019, but they were not. On 19 September 2019, the Defense submitted to this court a petition for extraordinary relief in the nature of a writ of prohibition, essentially seeking to have this court require the Government to extend Lt Col Ortiz's MPA orders. This court denied the petition on 4 October 2019. *In re Wilson*, Misc. Dkt. No. 2019-05, 2019 CCA LEXIS 390 (A.F. Ct. Crim. App. 4 Oct. 2019) (order).[27] At the time Lt Col Ortiz's active duty orders ended on 30 September 2019 he had read approximately 1,500 pages of the 4,317-page transcript.

On 1 October 2019, this court granted a nineteenth EOT until 30 April 2020 and stated further EOT requests would "not be granted absent extraordinary circumstances." In addition, this court ordered the Defense to provide the court with monthly written updates on each appellate defense counsel's progress in reviewing the record. As of the 4 December 2019 update, Mr. Bruegger had

---

[26] Evidently, Lt Col Ortiz had been detailed by the chief of JAJA.

[27] The CAAF denied Appellant's writ-appeal petition on this matter on 22 November 2019. *Wilson v. JAG of the Air Force*, 79 M.J. 322 (C.A.A.F. 2019).

reviewed the entire record of trial. However, as of 6 January 2020, CAPT Mizer had still not completed his review of the transcript.

On 21 February 2020, CAPT Mizer moved to withdraw as Appellant's counsel. CAPT Mizer explained that although he had expected to be demobilized and return to duty at JAJA in early March 2020, the military judge in *Al-Nashiri* had denied CAPT Mizer's motion to withdraw as counsel in that case over the defendant's objection. Thereafter, the United States Navy ordered CAPT Mizer's indefinite recall to active duty and required him to report to the Military Commissions Defense Organization on 2 March 2020. CAPT Mizer "respectfully submit[ted] that his indefinite recall to active duty constitute[d] good cause to sever his attorney-client relationship with the Appellant," in spite of Appellant's opposition. The Government also requested this court grant the motion to withdraw. This court granted the motion on 17 March 2020.

On 23 April 2020, Mr. Bruegger moved for a twentieth EOT, citing in part obstacles in communicating with Appellant due to the COVID-19 pandemic. This court granted the EOT, and Mr. Bruegger ultimately filed Appellant's 26 assignments of error on 1 June 2020, signing the brief as Appellant's sole appellate defense counsel.

**2. Law**

"We review issues affecting the severance of an attorney-client relationship de novo." *United States v. Barnes*, 63 M.J. 563, 565 (A.F. Ct. Crim. App. 2006) (citation omitted).

"The attorney-client relationship may be broken over defense objection when there is 'good cause' to sever it. . . . Such determinations are necessarily fact specific." *Id.* (citations omitted). "Although separation from active duty normally terminates representation, highly contextual circumstances may warrant an exception from this general guidance in a particular case." *United States v. Hutchins*, 69 M.J. 282, 290–91 (C.A.A.F. 2011).

Sixth Amendment rights to counsel are strictly trial rights; "[t]he Sixth Amendment does not include any right to appeal." *Martinez v. Court of Appeals*, 528 U.S. 152, 160 (2000). The right to appeal in criminal cases "is purely a creature of statute." *Id.* (quoting *Abney v. United States*, 431 U.S. 651, 656 (1977)). An appellant before a Court of Criminal Appeals has the right to be represented by detailed counsel, but does not have the right to select his detailed appellate counsel. *See* 10 U.S.C. § 870; *compare* 10 U.S.C. § 838(b)(3)(B) (providing that an accused may be represented at a general or special court-martial "by military counsel of his own selection if that counsel is reasonably available"); *see also Jennings*, 42 M.J. at 766.

### 3. Analysis

Appellant contends the Government improperly severed his attorney-client relationships with both Lt Col Ortiz and CAPT Mizer, and thereby prejudicially infringed his right to appellate counsel. We address each contention in turn. As an initial matter, we note the question is not whether the Government improperly interfered with Appellant's *choice* of counsel; Appellant had no enforceable right to request a specific detailed counsel under Article 70, UCMJ. The question is whether there was good cause for the termination of two of Appellant's existing attorney-client relationships, an inquiry which is necessarily fact-specific.

#### a. Lt Col Ortiz

Appellant contends the Government improperly terminated his attorney-client relationship with Lt Col Ortiz when it failed to extend his active duty MPA orders. He cites *United States v. Spriggs* for the principle that "[a]lthough there may be a 'financial, logistical, [or] . . . administrative burden' associated with providing representation by the military counsel with whom an accused has formed an attorney-client relationship, 'it is the duty and obligation of the Government to shoulder that burden where possible.'" 52 M.J. 235, 240 (C.A.A.F. 2000) (quoting *United States v. Eason*, 45 C.M.R. 109, 114 (C.M.A. 1972)). Appellant argues the Government shirked its obligation to maintain his relationship with Lt Col Ortiz because it could have continued his active duty status, but it simply chose to allocate the limited pool of MPA days to other priorities.

We are not persuaded. The point of departure for our analysis is that "separation from active duty normally terminates representation . . . ." *Hutchins*, 69 M.J. at 290–91. *Spriggs* does not hold to the contrary. The context for the CAAF's quotation of *Eason* in *Spriggs* was not the trial defense counsel's separation from active duty, but the transfer of the appellant and the proceedings from Vietnam, where the attorney-client relationship was formed, to the United States, which caused the defense counsel to be absent from the trial. *Eason*, 45 C.M.R. at 109–11. In contrast, the instant case does not involve the relatively routine "[s]light expense or inconvenience" of traveling a military defense counsel from one location to another to participate in a trial. *Id*. at 114. Appellant contends The Judge Advocate General's (JAG) Corps was required to reprioritize its MPA allocations and, in effect, its missions in order to enable Lt Col Ortiz's continued participation as a third detailed appellate defense counsel, which is a different matter entirely.

Moreover, through no apparent fault of his own, Lt Col Ortiz was always a problematic choice as an additional counsel for Appellant. At the time of his detailing, it was known his MPA orders lasted only until 30 September 2019,

and that there was no guarantee they would be extended. Moreover, Lt Col Ortiz already had a number of other clients whose appeals he continued to prepare after he was detailed to Appellant's case. Given the size of the record and the minimal progress CAPT Mizer and Mr. Bruegger had been able to make, it was obvious Appellant's assignments of error would not be prepared before Lt Col Ortiz's MPA orders expired. As events transpired, Lt Col Ortiz read only 1,500 pages of transcript in the four-and-a-half months he was detailed to Appellant's case, for an estimated average of less than 20 pages per duty day. Whatever considerations led JAJA to detail Lt Col Ortiz, rather than any of several active duty appellate defense counsel, to Appellant's case, we are not inclined to require that decision to wag the proverbial dog of JAG Corps-wide MPA allocations.

Other considerations in this fact-specific inquiry weigh against Appellant's argument. Appellant does not allege, and we find no indication, that Lt Col Ortiz's orders were not extended for the purpose of interfering with Appellant's attorney-client relationship. Moreover, after Lt Col Ortiz's MPA orders expired, Appellant continued to be represented by two experienced appellate defense counsel whose representation of Appellant substantially antedated Lt Col Ortiz's involvement. In addition, we note that before Lt Col Ortiz was detailed, Appellant through CAPT Mizer and Mr. Bruegger opposed the appointment of any additional counsel to represent Appellant. In light of the limited progress Lt Col Ortiz had made in Appellant's case, his departure after 30 September 2019 did not materially prejudice the preparation of the appeal.

Accordingly, we find the expiration of Lt Col Ortiz's MPA orders on 30 September 2019 constituted good cause for the termination of his attorney-client relationship with Appellant.

### b. CAPT Mizer

Appellant contends the Government "actively removed" CAPT Mizer as Appellant's counsel without good cause by mobilizing him to participate as defense counsel in the Military Commissions, most notably the defense of *Al-Nashiri*. Appellant concedes "the Government's interest in prosecuting an alleged terrorist is significant," but contends that protecting his right to challenge his convictions and sentence is also significant. Appellant argues CAPT Mizer's role was particularly important because he was the lead appellate defense counsel, and the only counsel with capital murder litigation experience.

Ultimately, CAPT Mizer himself moved to withdraw from the case, citing his reactivation for active duty in March 2020 as good cause for the motion. However, we recognize this motion, opposed by Appellant himself, was driven by decisions the Government made that rendered CAPT Mizer's continued par-

ticipation impractical. Accordingly, we have assessed whether good cause existed for the involuntary termination of the attorney-client relationship. Having again made a fact-specific inquiry of the circumstances, we conclude there was good cause.

We note that the Government's activation of CAPT Mizer in May 2018 and again in March 2020 was due to the specific requirement for CAPT Mizer's participation as defense counsel in *Al-Nashiri*. CAPT Mizer had previously established an attorney-client relationship with Al-Nashiri. On 17 November 2017, the military judge in *Al-Nashiri*[28] denied a defense motion to abate the proceedings in that case, but refused to sever CAPT Mizer's attorney-client relationship with the accused and ordered the Government to provide "weekly updates on the status of the Convening Authority's efforts to recall [CAPT] Mizer to serve as learned counsel in this case." CAPT Mizer's activation was evidently necessary in order to continue the prosecution of *Al-Nashiri* in accordance with the military judge's order. Similarly, as CAPT Mizer related in his 21 February 2020 motion to withdraw, the military judge in *Al-Nashiri* denied CAPT Mizer's motion to withdraw as counsel in that case over the accused's objection. Furthermore, the military judge indicated the commission would "favorably consider any request to cancel pending sessions so long as CAPT Mizer's participation is foreclosed by the failure of the Department of Defense to definitively resolve his continuing military status." Again, CAPT Mizer's specific participation and activation were evidently necessary in order to continue the case.

In contrast to CAPT Mizer's role as learned counsel in the capital prosecution of *Al-Nashiri*, learned appellate counsel was not uniquely required in Appellant's case. Article 70, UCMJ, entitled Appellant to competent representation by a qualified counsel, and he received that from Mr. Bruegger. Appellant was not entitled to retain CAPT Mizer where good cause existed to terminate CAPT Mizer's representation. Good cause may have existed to terminate that representation upon CAPT Mizer's initial activation beginning in May 2018. We recognize CAPT Mizer endeavored to continue representing Appellant and a number of his other JAJA clients during his activation. This court accommodated that effort and Appellant's desire to retain CAPT Mizer's representation by granting many extensions of time, often after holding status conferences and usually over the Government's objection. CAPT Mizer initially hoped to be able to file Appellant's assignments of error in the summer of 2019 notwithstanding his activation; later, he estimated he could do it by the end of April 2020 after he returned to JAJA in early March 2020. Ultimately, in light of his

---

[28] At the time, the military judge in *Al-Nashiri* was the same military judge who presided at Appellant's court-martial.

reactivation, it became apparent that CAPT Mizer simply could not effectively serve as Appellant's counsel. It is notable that, so far as the record discloses, in approximately two years as Appellant's counsel, CAPT Mizer never completed reviewing the trial transcript, much less the entire record.

Appellant contends he was prejudiced by the extraordinary delay in this court's review of his case, which he attributes to the Government's interference with his representation by CAPT Mizer. Appellant's entitlement to relief for post-trial and appellate delay is a separate issue addressed above; the causes and effects of the delay are appropriately considered there. However, Appellant further contends that as a result of the Government's actions, at the time his brief was filed he was represented by only one counsel. Yet one counsel is all Appellant is entitled to. More importantly, we note Mr. Bruegger was added to the defense team in November 2018, and had more than 18 months to thoroughly familiarize himself with Appellant's case before filing the assignments of error on 1 June 2020. This court has granted an extraordinary number of EOTs in order to ensure the Defense had adequate time to prepare the appeal. Appellant's brief is robust and well-prepared, as the length of this opinion attests, and includes ten issues Appellant personally asserts pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982). Moreover, Appellant has not indicated any issue or matter that his counsel lacked the time to adequately prepare in the assignments of error and the reply to the Government's answer.

Accordingly, we find that CAPT Mizer's reactivation for active duty in March 2020 to serve as defense counsel in *Al-Nashiri* constituted good cause for his withdrawal from Appellant's case.

## P. Appellant's IMDC Request for Mr. BM

### 1. Additional Background

On 3 November 2016, Appellant requested that CAPT Mizer be appointed as his trial defense counsel. The request cited CAPT Mizer's experience as appellate defense counsel in three capital courts-martial, and as detailed military defense counsel in two capital military commissions prosecutions. Appellant's request acknowledged that at the time of the request CAPT Mizer was an Air Force civilian attorney assigned to JAJA, and therefore his appointment as an IMDC was specifically prohibited by R.C.M. 506(b)(1)(D).[29] However, Appellant's request expressed the hope that the convening authority would find the

---

[29] At the time, as described in relation to Appellant's assignment of error regarding interference with his appellate representation, *supra*, CAPT Mizer was also a reserve judge advocate in the United States Navy.

Eighth Amendment barred application of this rule in the context of a capital prosecution.[30] The convening authority denied the request on 16 November 2016, citing R.C.M. 506(b)(1)(D).

On 18 November 2016, the Defense submitted a motion requesting the military judge require CAPT Mizer's appointment as Appellant's trial defense counsel. The Defense contended R.C.M. 506(b)(1)(D) was "void" because it conflicted with Article 38, UCMJ, 10 U.S.C. § 838, and "violate[d] a capital accused's rights to counsel in violation of the Fifth, Sixth, and Eighth Amendments." However, the Defense acknowledged the CAAF had previously rejected claims that learned counsel were required in military capital cases, and that the military judge had denied a separate prior motion for the appointment of learned counsel.[31] The Government opposed the motion.

The military judge denied the defense motion in a written ruling dated 20 December 2016. The military judge found the convening authority did not abuse his discretion in denying the IMDC request. The military judge further found no support for the Defense's claim that R.C.M. 506(b)(1)(D) conflicted with Article 38, UCMJ, and found the rule was consistent with the statute.

**2. Law**

"We will examine the denial of the requested counsel and its review for an abuse of discretion." *United States v. Anderson*, 36 M.J. 963, 973 (A.F.C.M.R. 1993), *aff'd*, 39 M.J. 431 (C.M.A. 1994) (citing *United States v. Quinones*, 50 C.M.R. 476, 480 (C.M.A. 1975)) (additional citations omitted).[32]

---

[30] *See United States v. Loving*, 62 M.J. 235, 236 (C.A.A.F. 2005) ("'Death is different' is a fundamental principle of Eighth Amendment law.") (citing *Ring v. Arizona*, 536 U.S. 584, 605–06 (2002); *United States v. Curtis*, 32 M.J. 252, 255 (C.M.A. 1991)).

[31] *See Akbar*, 74 M.J. at 399 (citing *United States v. Gray*, 51 M.J. 1, 54 (C.A.A.F. 1999); *United States v. Curtis*, 44 M.J. 106, 127 (C.A.A.F. 1996); *United States v. Loving*, 41 M.J. 213, 300 (C.A.A.F. 1994)).

[32] Appellant cites *Spriggs* for the proposition that "[t]he ruling of a military judge on an IMC request . . . is a mixed question of fact and law," which appellate courts review de novo and for clear error, respectively. 52 M.J. at 244. However, in *Spriggs* the CAAF did not purport to overrule its recent decision in *United States v. Calhoun* where the CAAF stated that it "review[ed] decisions pertaining to requests for counsel for abuse of discretion." 49 M.J. 485, 487 (C.A.A.F. 1998) (citing *Anderson*, 36 M.J. at 973). We further note that *Spriggs* specifically involved a factual issue as to whether an attorney-client relationship had been formed, and that our review has disclosed no subsequent decision of the CAAF or this court that reviewed a military judge's ruling on an IMDC request as a mixed question of law and fact. *Cf. United States v. Richards*, No. ACM 38346, 2016 CCA LEXIS 285, at *172 (A.F. Ct. Crim. App. 2 May 2016) (unpub.

Article 38(b), UCMJ, provides that an accused at a general or special court-martial has the right to be represented by civilian counsel provided by the accused, by detailed military counsel, or "by military counsel of his own selection if that counsel is reasonably available (as determined under regulations prescribed under paragraph (7))." 10 U.S.C. §§ 838(b)(1), (2), (3)(A), (3)(B). Article 38(b)(7) provides, in pertinent part:

> The Secretary concerned shall, by regulation, define "reasonably available" for the purpose of paragraph (3)(B) and establish procedures for determining whether the military counsel selected by an accused under that paragraph is reasonably available. . . . To the maximum extent practicable, such regulations shall establish uniform policies among the armed forces while recognizing the differences in the circumstances and needs of the various armed forces. . . .

10 U.S.C. § 838(b)(7).

R.C.M. 506(b)(1) also requires the "Secretary concerned" to define "reasonably available" for purposes of an accused's request to be represented by a particular military counsel. However, the rule goes on to state that certain categories of individuals "are not reasonably available to serve as individual military counsel because of the nature of their duties or positions," to include appellate defense counsel and appellate government counsel. R.C.M. 506(b)(1), (b)(1)(D).

Air Force Instruction (AFI) 51-201, *Administration of Military Justice* (6 Jun. 2013, as amended by AFGM 2016-01, 3 Aug. 2016), provided at ¶ 5.4.3 that a requested counsel is "'reasonably available' if not considered unavailable by the terms of the [*Manual for Courts-Martial*] or this instruction, and the appropriate approval authority determines the requested counsel can perform the duties of IMDC without unreasonable expense or detriment to the United States and without unreasonable delay in the proceedings."

**3. Analysis**

On appeal, Appellant essentially relies upon the same arguments he made at trial. He asks this court to find his request for CAPT Mizer was improperly denied and to set aside the findings and sentence. We decline to do so.

---

op.), *aff'd*, 76 M.J. 365 (C.A.A.F. 2017) ("We examine the denial of requested counsel and the military judge's review of such denial for an abuse of discretion.") (citing *Anderson*, 36 M.J. at 973)). We conclude our application of an abuse of discretion standard is consistent with the weight of authority.

We find no abuse of discretion by the convening authority or the military judge. The plain terms of R.C.M. 506(b)(1)(D) mandated denial of the IMDC request. We find the military judge did not abuse his discretion in concluding the promulgation of R.C.M. 506(b)(1)(D) was not an unlawful exercise of the President's rule-making authority. *See* 10 U.S.C. § 836; *United States v. Wilson*, 76 M.J. 4, 6 (C.A.A.F. 2017). The rule is not in conflict with the statute; in fact, R.C.M. 506(b)(1) echoes the statutory requirement that the service Secretaries define the term "reasonably available." The Secretary of the Air Force has done so in part by adopting the standards of the *Manual for Courts-Martial*, including the categorical exclusions set forth in R.C.M. 506. Appellant has cited no decision by the CAAF, this court, or any other court finding the categorical exclusions in R.C.M. 506(b)(1) to be invalid, and we have found none.

With regard to Appellant's contention that the Constitution requires a different analysis in capital cases, the military judge noted and the Defense conceded the CAAF has held a capital accused does not have a right to learned counsel. *See Akbar*, 74 M.J. at 399 (citations omitted). Accordingly, it was reasonable for the military judge to conclude there was no constitutional imperative to override the plain language of R.C.M. 506 to secure CAPT Mizer's participation in Appellant's trial. Therefore, we deny the requested relief.

## Q. TF's Hearsay Statement Regarding Her Purchase of a Firearm for Appellant

### 1. Additional Background

In the course of the investigation of TF's death, investigators spoke with TF's coworker and friend, TS. TS told investigators about a conversation during which TF said Appellant had asked TF to buy a gun for Appellant. TF explained to TS that Appellant needed the weapon for protection because the police had confiscated his other firearms after an incident in the summer of 2012. TF told TS that TF and Appellant had gone to a pawn shop and TF bought a handgun with cash Appellant had given her. TS recalled TF had commented on how easy it was to buy the gun.

Before trial, the Defense moved to exclude these statements as inadmissible hearsay. The Government initially countered that these statements were admissible as a statement offered against the party who wrongfully caused the declarant's unavailability under Mil. R. Evid. 804(b)(6), and under the residual hearsay exception, Mil. R. Evid. 807. However, in a hearing on the motion, trial counsel additionally argued the statements were admissible as statements by an unavailable declarant that were against the declarant's interests under Mil. R. Evid. 804(b)(3). Trial counsel noted that in order to purchase the weapon, TF had been required to sign an ATF Form 4473, *Firearms Transaction Rec-*

*ord*, that warned her (1) that she could not buy the firearm if she was "acquiring the firearm(s) on behalf of another person" and was not the "actual buyer;" (2) that falsely claiming she was the "actual buyer" was "punishable as a felony under Federal law;" and (3) that making a false oral or written statement "with respect to this transaction" was also "punishable as a felony under federal law."[33] TF "certified" that she understood that such false claims were federal crimes by signing below these warnings. In response, at the motion hearing trial defense counsel noted TS's additional statement that TF told TS that two or three weeks later, after an argument, TF asked Appellant to give the gun back to her; Appellant refused, and TF told him to "just keep" it. Trial defense counsel argued this indicated TF believed she had a possessory interest in the gun, and had believed she was being truthful when she indicated she was the "actual buyer."

The military judge ruled these statements by TF to TS were admissible. In a written ruling, he explained TF was unavailable because she was dead, and the statements were against her penal interests. In regard to the latter, the military judge found the ATF Form 4473 "particularly relevant."[34] The military judge additionally found that if the statements were not statements against interest admissible under Mil. R. Evid. 804(b)(3), they would be admissible under the Mil. R. Evid. 807 residual hearsay exception in light of various circumstantial guarantees of trustworthiness and corroborating evidence.

At trial, TS testified regarding this conversation with TF. Similar to her statement to investigators, TS testified TF told her Appellant asked her to buy the gun with money he gave her because he needed it for protection because "[t]he cops took his guns." TS did not recall the exact date, but it was before TF was known to be pregnant. TS testified that when she heard this, she warned TF "to be careful because you got your career and he could do something with that gun and mess you up." In response, TF said, "Yeah, you know but," and changed the subject.

---

[33] Investigators had obtained a copy of the form TF signed and the Government introduced it at trial as a prosecution exhibit.

[34] The military judge also found the "corroborating circumstances clearly indicated the circumstances indicated the trustworthiness of the statement," citing *United States v. Benton*, 57 M.J. 24, 30 (C.A.A.F. 2002). However, this additional requirement applies only when a hearsay statement "tend[ing] to expose the declarant to criminal liability . . . is *offered to exculpate the accused*," as was the situation in *Benton* but not in the instant case. Mil. R. Evid. 804(b)(3)(B) (emphasis added); *see Benton*, 57 M.J. at 30. The military judge's finding of additional indicia of trustworthiness, although unnecessary for admissibility under Mil. R. Evid. 804(b)(3)(A), does not, of course, vitiate the admissibility of the statements.

### 2. Law

The military judge's decision to admit or exclude hearsay evidence is reviewed for an abuse of discretion. *United States v. Hyder*, 47 M.J. 46, 48 (C.A.A.F. 1997) (citation omitted).

A statement against the declarant's interest is an exception to the general prohibition on the admissibility of hearsay evidence, where:

> a reasonable person in the declarant's position would have made [the statement] only if the person believed it to be true because, when made, it was so contrary to the declarant's proprietary or pecuniary interest or had so great a tendency to invalidate the declarant's claim against someone else or to expose the declarant to civil or criminal liability.

Mil. R. Evid. 804(b)(3)(A); *see also* Mil. R. Evid. 801, 802. This exception "is founded on the commonsense notion that reasonable people, even reasonable people who are not especially honest, tend not to make self-inculpatory statements unless they believe them to be true." *Williamson v. United States*, 512 U.S. 594, 599 (1994). "The criterion . . . [is] whether the declarant would himself have perceived at the time that his statement was against his penal interest." *United States v. Greer*, 33 M.J. 426, 430 (C.M.A. 1991) (citations omitted). "[W]hether a statement is self-inculpatory or not can only be determined by viewing it in context." *Williamson*, 512 U.S. at 603.

Mil. R. Evid. 807 provides that a hearsay statement not otherwise admissible under Mil. R. Evid. 803 or Mil. R. Evid. 804 may nevertheless be admissible if the statement: (1) "has equivalent circumstantial guarantees of trustworthiness;" (2) "is offered as evidence of a material fact;" (3) "is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts;" and (4) admission "will best serve the purposes of these rules and the interests of justice."

### 3. Analysis

We find the military judge did not abuse his discretion in admitting TS's testimony regarding TF's statements about buying a handgun for Appellant. The military judge could reasonably find the predicates for application of Mil. R. Evid. 804(b)(3)(A) existed. First, the deceased declarant, TF, was obviously unavailable at the time of trial. Second, viewed in context, the military judge could reasonably conclude TF knew the statements were against her penal interest. When TF made the statements to TS, she had been presented and signed a form warning her that buying a firearm for another person and falsely representing that she was the actual buyer of the firearm were federal offenses. Yet, as she told TS, she bought the handgun at Appellant's request, with money he provided, to give to him because he needed it for "protection." Accordingly,

the military judge's ruling was not "arbitrary, fanciful, clearly unreasonable, or clearly erroneous." *McElhaney*, 54 M.J. at 130 (internal quotation marks and citations omitted).

Assuming for purposes of argument that TF's statements about purchasing the gun for Appellant were not qualifying statements against interest, we find the military judge's determination that the statements would be admissible under Mil. R. Evid. 807 was also not an abuse of discretion. There were abundant circumstantial guarantees of trustworthiness that TF had purchased a gun for Appellant, including *inter alia* evidence that police had seized Appellant's firearms in the summer of 2012; the signed ATF Form 4473 dated 9 November 2012; and the recovery from Appellant's residence of the box in which the gun was sold. Evidence of how Appellant came into possession of the presumed murder weapon was evidence of a material fact. No equivalent evidence was reasonably available to the Government, in light of the fact that TF was deceased. Finally, we perceive no reason why admitting the statements would not serve the purposes of the Military Rules of Evidence and the interests of justice. *See* Mil. R. Evid. 807.

**R. Ineffective Assistance of Counsel: Failure to Request Expert in Geology**

**1. Additional Background**

During the investigation, the GBI collected a soil sample from the boots seized at Appellant's residence and sent the sample to the United States Army Criminal Investigation Laboratory (USACIL) for comparison with a soil sample from TF's residence. On 25 July 2014, 2 September 2014, and 1 October 2014, the Defense requested that the convening authority appoint a confidential expert consultant in the field of forensic geology. On 17 November 2014, the convening authority denied the request.

On 2 December 2014, the Defense submitted a motion to the military judge to compel the appointment of an expert forensic geologist. As of that date, the Defense had not received or been informed of the results of the soil analysis. The Government opposed the motion on 11 December 2014. The Government explained USACIL had generated two reports which "provided no conclusive evidence in support of the charges or exculpatory evidence for [Appellant]." The Government averred that as of 11 December 2014, the Defense had been provided the results of the soil sample analysis. The Government explained that it did not intend to present any evidence related to soil analyses, and therefore the Defense could not demonstrate the requested expert was necessary.

The military judge received brief oral argument on the motion on 15 December 2014. The Government reiterated that it did not intend to introduce evidence of soil analysis. The Defense maintained its request for the expert

consultant, contending that interviewing the analyst who performed the testing on a non-confidential basis was not an adequate substitute. On 16 December 2014, the military judge denied the motion to compel in an oral ruling that he subsequently reduced to writing. He explained that other investigative support provided to the Defense, coupled with access to the geologist who had performed the analysis, were adequate at that point in time. However, he stated the Defense could renew its motion if it felt the geologist was not providing "fair" answers, or if the Defense found it needed an expert to testify at trial.

The original trial defense counsel were replaced by three different military counsel, Lt Col CG, Lt Col SK, and Maj CS. The question of a confidential defense expert in geology resurfaced at a hearing on 10 January 2017, after the Defense had learned the Government had changed its position and now intended to put on evidence regarding the soil testing. The military judge noted the Defense had not renewed its request for an expert geologist. The military judge advised trial defense counsel, "if you believe you need expert assistance, probably not too late to start working through that. I would suggest talking to Dr. [KM, the Government's expert witness,] and seeing if you could get there with or without her. And then let me know, okay?" Trial defense counsel did not renew the Defense's motion to compel the production of a confidential expert in geology.

At trial, Dr. KM testified regarding the results of the soil analysis. She explained that soil from the crime scene could not be excluded as the source of the soil removed from the boots seized from Appellant's residence. She further testified that the soil from the boots was excluded from originating in the front yard of Appellant's residence, but could not be excluded as having originated in Appellant's back yard. On cross-examination, Dr. KM acknowledged she did not know how common the color of soil removed from the boots was in that region of Georgia, or in the state of Georgia as a whole, or in the United States.

At the Government's request, this court ordered and received sworn declarations from Lt Col CG, Lt Col SK, and Maj CS, Appellant's trial defense counsel. The declarations were generally consistent; all three counsel agreed that after interviewing Dr. KM, they believed the Government's soil analysis evidence was weak, and the Defense did not require expert assistance in order to address it. Lt Col CG further noted the Defense "had numerous experts, i.e., firearms, gunshot residue 'GSR' analysis, trace fiber analysis, neuro-science, eyewitness identification, DNA, investigator, mitigation specialist, social historian, etc. . . . An additional expert on the team would have diverted our attention, out of proportion to the limited probative value of the geology evidence."

### 2. Law

We review allegations of ineffective assistance de novo. *Akbar*, 74 M.J. at 379 (citation omitted). However, "our scrutiny of a trial defense counsel's performance is 'highly deferential,' and we make 'every effort . . . to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate conduct from counsel's perspective at the time." *Id.* (quoting *Strickland*, 466 U.S. at 689). We utilize the following three-part test to determine whether the presumption of competence has been overcome: (1) are appellant's allegations true, and if so, "is there a reasonable explanation for counsel's actions;" (2) if the allegations are true, did defense counsel's level of advocacy "fall measurably below the performance . . . [ordinarily expected] of fallible lawyers;" and (3) if defense counsel was ineffective, is there "a reasonable probability that, absent the errors," there would have been a different result? *Gooch*, 69 M.J. at 362 (C.A.A.F. 2011) (alteration and omission in original) (quoting *Polk*, 32 M.J. at 153). The burden is on the appellant to demonstrate both deficient performance and prejudice. *Datavs*, 71 M.J. at 424 (citation omitted).

### 3. Analysis

On appeal, Appellant faults his trial defense counsel for failing to renew the defense motion to compel production of a confidential forensic geologist after learning the Government did intend to introduce the soil analysis results. Appellant contends that because of this failure, the Defense was unable to "challenge the science" behind the soil testing. As a result, he contends, the Government was able to present "unrefuted evidence" that the soil sample from the boots were a "potential match" to soil from the crime scene.

We conclude Appellant has failed to meet his burden to demonstrate either deficient performance or prejudice. Although it is true that trial defense counsel failed to renew the motion to compel production of a confidential expert geologist, there is a reasonable explanation. Specifically, we agree with trial defense counsel's assessment that the Government's soil evidence was weak, which echoed the Government's own initial assessment that the testing was "inconclusive." Nor were the limitations of this evidence difficult to grasp or explain. Trial defense counsel's cross-examination of Dr. KM with respect to soil analysis was concise but effective in identifying its limited significance. Accordingly, we find it was reasonable and well within the standard of performance to be expected of defense counsel to forego requesting such an expert, particularly in light of the numerous other experts and specialists assigned to assist the Defense on more complex and impactful matters.

In addition, we conclude that, in multiple respects, Appellant has failed to demonstrate prejudice. Appellant suggests the Government was able to present the soil analysis because the Defense did not have its own expert; yet he fails to explain how such an expert would have enabled the Defense to "challenge the science" or otherwise prevent the evidence from being introduced exactly as it was. In addition, on its own terms, the evidence was not very persuasive with regard to Appellant's guilt. Dr. KM could testify only that the soil from the boots could not be excluded as having come from TF's residence; but it also could not be excluded as having originated in Appellant's own back yard, or presumably from many other locations across the region, state, or country. Furthermore, juxtaposed with all of the inculpatory evidence in the case, including *inter alia* eyewitness testimony, the rental car, ballistics evidence, GSR analysis, fiber analysis, a wealth of circumstantial evidence, motive, and opportunity, the significance of the soil analysis becomes vanishingly small. Thus, Appellant has not shown the appointment of a forensic geologist would have materially affected the evidence introduced at trial, or that the preclusion of the Government's soil analysis evidence would have led to a reasonable probability of a more favorable result.

## S. Denial of Motion for Mistrial Due to Discovery Violation

### 1. Additional Background

At trial, the Government called CJ, a GBI employee who testified as an expert in firearms and tool mark examination and identification. CJ testified regarding several aspects of the investigation related to firearms, including her examination of the apparent bullet ricochet mark on the rental car window. CJ testified that according to her measurements the mark was consistent with having been made by a bullet fired from CF's .38 caliber pistol.

During his cross-examination of CJ, trial defense counsel indicated he had several slides created from CJ's report on the car window that he intended to use as a demonstrative aid. Trial counsel had not previously seen these slides and requested an Article 39(a), UCMJ, session, which the military judge granted. During that session, trial defense counsel attempted to pre-admit the slides as a defense exhibit. However, CJ's responses revealed the Defense had not received the final version of the report which included the data upon which CJ had based her analysis.

CJ testified that although the measurements she made supported her analysis, she initially recorded the wrong data in the report. She explained that she later annotated her report with the corrected data. However, when the GBI provided the report to the Government for disclosure to the Defense in discovery, a GBI employee mistakenly provided the non-annotated version of the report. As a result, the version of the report the Defense received contained data

that appeared to contradict CJ's conclusions. Trial defense counsel intended to confront CJ with this data during its cross-examination, and the Defense did not question CJ about the apparent discrepancy during its pretrial interviews with CJ. Consequently, counsel for both parties and the military judge learned of the apparent discovery violation for the first time after CJ's cross-examination had begun.

The Defense moved for a mistrial. Senior trial defense counsel argued the Defense had relied on the non-annotated report, which had affected the Defense's opening statement and how the Defense had cross-examined government witnesses who testified before CJ. After the military judge received argument and discussed the situation with counsel, he recessed the court-martial early for the day in order for the parties to prepare written briefs on the Defense's mistrial motion.

The military judge received and reviewed the parties' briefs overnight and marked them as appellate exhibits when the court-martial resumed in the morning. The Government put on additional testimony from CJ as well as the GBI crime laboratory manager, who explained how a report could be mistakenly printed without annotations. The military judge also received additional argument from counsel. The Defense maintained that a mistrial was the only appropriate remedy for the discovery violation. The Government acknowledged the annotated report should have been provided, but argued the appropriate remedy was additional time for the Defense to prepare and to adjust its case.

The military judge denied the Defense's mistrial motion in an oral ruling he subsequently supplemented in writing. The military judge noted that both parties agreed there had been a discovery violation. However, the military judge found that the erroneously withheld information correcting the report was not constitutionally required, because it was neither substantively exculpatory nor impeachment of CJ's testimony, but rather corroborating evidence of Appellant's guilt. *See United States v. Bagley*, 473 U.S. 667, 674–76 (1985). The military judge further found the Defense had demonstrated "minimal to non-existent" prejudice. The military judge explained the Defense's primary theory was alibi rather than focusing on forensic evidence. He observed that references to the window in the Defense's opening were "minimal" and non-specific, and were not contradicted by the evidence. He further noted that although the Government had introduced much forensic evidence before CJ's testimony, none of it related to the apparent bullet mark on the rental car window. The Defense would still be able to point out that CJ initially made an error in her report, albeit one that was discovered during a peer review process. The Defense would still be able to argue alibi and to argue that human errors are possible in forensic testing. The military judge found the Defense was in the same position it was in before CJ's cross-examination; the Defense merely had

to settle for a less-dramatic impeachment of CJ's testimony than it had hoped for. The military judge concluded that a mistrial was not warranted, and that the Defense did not consider any other remedy—such as a continuance or re-calling witnesses—to be helpful.

### 2. Law

"A military judge has discretion to 'declare a mistrial when such action is manifestly necessary in the interest of justice because of circumstances arising during the proceedings which cast substantial doubt upon the fairness of the proceedings.'" *United States v. Coleman*, 72 M.J. 184, 186 (C.A.A.F. 2013) (quoting R.C.M. 915(a)). Mistrial is "'a drastic remedy' which should be used only when necessary 'to prevent a miscarriage of justice.'" *United States v. Harris*, 51 M.J. 191, 196 (C.A.A.F. 1999) (quoting *United States v. Garces*, 32 M.J. 345, 349 (C.M.A. 1991)). "Because of the extraordinary nature of a mistrial, military judges should explore the option of taking other remedial action, such as giving curative instructions." *United States v. Ashby*, 68 M.J. 108, 122 (C.A.A.F. 2009) (citations omitted). "We will not reverse a military judge's determination on a mistrial absent clear evidence of an abuse of discretion." *Id.* (citation omitted).

"[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87 (1963). The United States Supreme Court has extended *Brady*, clarifying "that the duty to disclose such evidence is applicable even though there has been no request by the accused . . . and that the duty encompasses impeachment evidence as well as exculpatory evidence." *Strickler v. Greene*, 527 U.S. 263, 280 (1999) (citations omitted); *see United States v. Claxton*, 76 M.J. 356, 359 (C.A.A.F. 2017).

"A military accused also has the right to obtain favorable evidence under Article 46, UCMJ . . . as implemented by R.C.M. 701–703." *Coleman*, 72 M.J. at 186–87 (footnotes omitted). Article 46, UCMJ, and these implementing rules provide a military accused statutory discovery rights greater than those afforded by the United States Constitution. *See id.* at 187 (citing *United States v. Roberts*, 59 M.J. 323, 327 (C.A.A.F. 2004) (additional citation omitted). With respect to discovery, R.C.M. 701(a)(2)(A) requires the Government, upon defense request, to permit the inspection of, *inter alia*, any documents "within the possession, custody, or control of military authorities, and which are material to the preparation of the defense . . . ."

### 3. Analysis

Appellant contends the military judge abused his discretion in denying the Defense's mistrial motion. Citing *United States v. Eshalomi*, 23 M.J. 12, 28

(C.M.A. 1986), Appellant contends the nondisclosure gave the Defense a false impression that the Government's evidence was incorrect, which distorted its preparation of the case and "cast a cloud of unfairness over the proceedings." Appellant also contends the military judge erroneously found the Defense failed to show how the nondisclosure had impacted its case. Furthermore, assuming *arguendo* that declaration of a mistrial was not necessary, Appellant contends the military judge erroneously believed that he could not fashion alternative remedies, such as striking CJ's testimony, because the Defense did not request it.

We do not find "clear evidence" the military judge abused his discretion by denying the mistrial motion. *Ashby*, 68 M.J. at 122. We agree with the military judge and parties that the nondisclosure of the annotated report was an error. However, the significance of the nondisclosure must be understood in context. The erroneous nondisclosure was of annotations to a single page of one report. There is no allegation or evidence of bad faith on the Government's part. We agree with the military judge that the undisclosed information, although material to the preparation of the defense, was not *Brady* material because it was neither exculpatory nor impeaching; it was additional inculpatory evidence that supported CJ's testimony.

The Defense made a strategic decision not to explore the apparent discrepancy with CJ before trial. The Defense had its own expert consultant and access to the damaged window. Rather than investigate the apparent discrepancy between the data in the report and CJ's conclusions, trial defense counsel made the "strategically defensible" decision—in the military judge's words—to wait until CJ's cross-examination in hopes of dramatically impeaching her conclusions. However, the Defense was never entitled to a dramatic in-trial impeachment, because the reality was CJ's measurements and analysis were not incorrect; she had simply made a clerical error in creating the report, which was identified during the GBI crime laboratory's peer review process. The Defense arrived at that understanding later than they would have had the annotated report been properly disclosed, but the military judge did not abuse his discretion in concluding the Defense was in substantially the same position it would have been had the discovery error not occurred. The Defense could still impeach the reliability of CJ's testimony to a lesser degree by exposing the error she made in preparing her report, but the dramatic moment trial defense counsel evidently hoped for was never to be in any event.

Moreover, we agree with the military judge that the significance of CJ's measurements of the apparent ricochet mark on the car window must be viewed in the context of the entire trial. Even discounting CJ's testimony regarding the window entirely would not undo the other powerful ballistics evidence, CF's identification of Appellant, the evidence of Appellant's motive, and

other incriminating evidence, as well as the Government's effective impeachment of the Defense's sole alibi witness, TB. In light of the total volume of the evidence and scope of the trial, the military judge did not clearly abuse his discretion in finding the nondisclosure of these annotations from one page of one report manifestly required a mistrial to prevent a miscarriage of justice.

Instead, the military judge offered the Defense other remedies, including additional time to prepare its case, and to have the Government recall prior witnesses for additional cross-examination. Trial defense counsel declined these offers and did not request any alternative remedies. Specifically with respect to the Defense's opening statement, trial defense counsel made a brief passing reference that the members should pay attention to evidence about the mark on the car window without referring to CJ directly or indirectly. The military judge did not abuse his discretion in concluding this comment did not require an instruction or other alternative corrective action, and the Defense did not request any. We are not persuaded that the military judge abused his discretion by not taking alternative corrective actions the Defense either affirmatively rejected or did not request.

## T. Trial Counsel's Findings Argument

### 1. Additional Background

During the Defense's opening statement, the area defense counsel told the court members: "I would like to talk with you about the defense's case which is very simple. It is that [Appellant] had an alibi. . . ."

Trial counsel's closing argument on findings included the following comments regarding the Defense's alibi witness, TB:

> We called her to the stand knowing very well she was the only alibi witness of the accused. . . .
>
> . . . .
>
> Now, members, in opening statement, defense said this case was simple. And again, defense has no burden. The burden is always with the government. But they said this case is simple, that [Appellant] had an alibi. That he was in Byron, Georgia all night long and the government could not prove [Appellant] was in Dawson, Georgia. The only evidence that you have that the accused was in Byron, Georgia is the property girl, [TB].
>
> . . . .
>
> This case is simple. Pretty straight forward. There's a whole lot of evidence. And 41 witnesses later it's clear. But what's not

clear and what it's not, what this case is not, is it's not [Appel-lant] having an alibi. [Appellant] was at [TF's residence] at three a.m. for about 38 minutes. To do the deed. To get her out of his life.

During rebuttal argument, trial counsel made the following statements:

There's no proof about the rental car. That he didn't take it some-where else. That that rental car didn't go somewhere -- what ev-idence do you have before you in this case that that rental car went anywhere else? None.

. . . .

And his alibi witness. His alibi witness. He's asking his alibi wit-ness about the rental car. Again, how many times do I have to say it? He's telling his alibi witness not to talk to police. She's his only alibi for the murder. And it's supposed to be used for some other purpose? Some other purpose with some other evi-dence that you don't know?

. . . .

[I]n every single case -- and this is what [SA JS] testified to -- do they do every single thing there is to do in every single case and hindsight is twenty/twenty? Absolutely. And that's what de-fense's job is. To pick. To pick. To poke holes. Absolutely.

The burden is always with the government but defense is doing their job. Did they reach out and get that phone? No, they didn't get that phone number. They had all the evidence that -- all the other evidence but did they reach out and get the 6680 phone records?[35] No, they did not. But what do we know about the 6680 and how did that effect the case at all? We know potentially there were call logs that we don't have. We know that maybe we would have known whatever -- what [transmission] tower in Shellman[, Georgia,] that actually went off of. And we would know duration. Other than that, burner phones -- which we know the duration because we had it off [TF's] phone. Other than that, what do we know from burner phones? That's why people use them. So they can't be traced.

. . . .

---

[35] Referring to the last four digits of the phone from which TF received two calls at 0221 and 0222 on the night of the murder.

> Defense also said the life insurance. [The Defense argued] [t]he fact that the life insurance was in [Appellant's] name doesn't show motive. It tells you more about the relationship that [TF's mother AT] and [TF's brother CF] had with [TF]. What evidence is there of that? What evidence? They throw out the computer. Well, the investigators had the computer. You don't think everyone has the same access to evidence? You didn't see evidence on the computer. There could be stuff out there.

The Defense did not object to any of these statements by trial counsel.

**2. Law**

"We review prosecutorial misconduct and improper argument de novo and where . . . no objection is made, we review for plain error." *United States v. Voorhees*, 79 M.J. 5, 9 (C.A.A.F. 2019) (citing *United States v. Andrews*, 77 M.J. 393, 398 (C.A.A.F. 2018)). "Plain error occurs when (1) there is error, (2) the error is plain or obvious, and (3) the error results in material prejudice to a substantial right of the accused." *Fletcher*, 62 M.J. at 179 (citation omitted). The burden of proof under a plain error review is on the appellant. *See Sewell*, 76 M.J. at 18 (citation omitted).

"Improper argument is one facet of prosecutorial misconduct." *Id.* (citation omitted). "Prosecutorial misconduct occurs when trial counsel 'overstep[s] the bounds of that propriety and fairness which should characterize the conduct of such an officer in the prosecution of a criminal offense.'" *Hornback*, 73 M.J. at 159 (alteration in original) (quoting *Fletcher*, 62 M.J. at 179). Such conduct "can be generally defined as action or inaction by a prosecutor in violation of some legal norm or standard, [for example], a constitutional provision, a statute, a Manual rule, or an applicable professional ethics canon." *Andrews*, 77 M.J. at 402 (quoting *United States v. Meek*, 44 M.J. 1, 5 (C.A.A.F. 1996)). "A prosecutorial comment must be examined in light of its context within the entire court-martial." *Carter*, 61 M.J. at 33 (citation omitted).

"The Due Process Clause of the Fifth Amendment to the Constitution requires the Government to prove a defendant's guilt beyond a reasonable doubt." *United States v. Czekala*, 42 M.J. 168, 170 (C.A.A.F. 1995) (citing *In re Winship*, 397 U.S. 358, 363–64 (1970)). For trial counsel to suggest the accused has any burden to produce evidence demonstrating his innocence is "an error of constitutional dimension." *Mason*, 59 M.J. at 424 (citation omitted).

Relief for improper argument will be granted only if the trial counsel's misconduct "actually impacted on a substantial right of an accused (i.e., resulted in prejudice)." *Fletcher*, 62 M.J. at 178 (quoting *Meek*, 44 M.J. at 5). "[P]rosecutorial misconduct by a trial counsel will require reversal when the trial coun-

sel's comments, taken as a whole, were so damaging that we cannot be confident that the members convicted the appellant on the basis of the evidence alone." *Id*. at 184. In assessing prejudice from improper argument, we balance three factors: (1) the severity of the misconduct; (2) the measures, if any, adopted to cure the misconduct; and (3) the weight of the evidence supporting the conviction. *Id*. "In the context of a constitutional error, the burden is on the Government to establish that the comments were harmless beyond a reasonable doubt." *Carter*, 61 M.J. at 35 (citation omitted).

### 3. Analysis

Appellant contends the portions of trial counsel's findings argument quoted above impermissibly shifted the burden of proof to the Defense, and as a result the findings and sentence must be set aside. We consider the portions of the cited arguments in turn.

#### a. Statements Regarding the Alibi Witness, TB

Trial counsel's argument regarding TB as Appellant's alibi witness were fair comments by a "zealous advocate of the Government" regarding the evidence before the members. *Baer*, 53 M.J. at 237 (citation omitted). "[T]he prosecution is not prohibited from offering a comment that provides a fair response to claims made by the defense." *Carter*, 61 M.J. at 33 (citation omitted). From the outset, the Defense indicated the core of its case was an alibi defense. Trial counsel could properly comment on the strength or weakness of that defense, including the fact that it largely depended on the testimony of a single witness, TB. Commenting on the weakness of Appellant's alibi defense is not the same as improperly implying Appellant was required to demonstrate his innocence. We find no error, obvious or otherwise, in this portion of the argument.

#### b. Statements Regarding Phone Records

Similarly, we find trial counsel's comments regarding the phone records were not obviously erroneous. We agree with the Government that, in context, trial counsel's comments "[d]id they reach out and get that phone? No, they didn't get that phone number," "they" referred to the investigators rather than the Defense. During the testimony of one of the GBI agents, it came out that investigators had not sought phone records related to the number that called TF twice at 0221 and 0222 on 29 August 2013, shortly before her death.[36] During the Defense's closing argument, senior trial defense counsel commented on this failure to investigate the number in order to impugn the thoroughness and reliability of the GBI's investigation. In context, trial counsel's argument was

---

[36] The Government later called a representative from the service provider who testified, *inter alia*, the phone in question was a prepaid "phone in a box," not traceable to a particular user.

not a comment on the Defense's failure to produce evidence, but a fair and rational response to the Defense regarding the limited significance of the GBI's failure to further investigate this phone number.

### c. Statements Regarding the Rental Car, Insurance Policy, and TF's Computer

Trial counsel's comments regarding the absence of evidence that the rental car was used for an innocent purpose, his rhetorical question as to "what evidence" supported the Defense's interpretation of the significance of TF's insurance policy, and his comment that "everyone" had the same access to TF's computer, call for a somewhat different analysis. In each of these instances, trial counsel's statements might fairly be understood as a comment, albeit fleeting, on the absence of evidence supporting defense arguments. Arguably, the members might have interpreted these comments as criticizing the Defense's failure to produce evidence. On the other hand, as noted above, "the prosecution is not prohibited from offering a comment that provides a fair response to claims made by the defense." *Carter*, 61 M.J. at 33 (citation omitted). Certain factors, including the fact that trial counsel was responding to specific defense arguments about the state of the evidence, the brief nature of each comment in the course of an argument and rebuttal totaling over two hours, trial counsel's repeated explicit acknowledgment that the Government bore the burden of proof, and the Defense's failure to object, suggest that any crossing of the line into impermissible argument was not "obvious."

However, we need not definitively resolve whether these instances rose to the level of plain or obvious error, because we find that in light of the three-factor test for prejudice set forth in *Fletcher*, any error was harmless beyond a reasonable doubt. 62 M.J. at 178.

For the reasons set forth above, we find the severity of any misconduct to be low. These were brief comments in trial counsel's rebuttal argument responsive to particular aspects of senior trial defense counsel's argument. The statements were a tiny fraction of trial counsel's overall argument. The general point trial counsel evidently sought to make—that the evidence supported the Government's theory and not the Defense's theories—was not improper. Moreover, the CAAF has noted that "the lack of a defense objection is 'some measure of the minimal impact of a prosecutor's improper comment.'" *Gilley*, 56 M.J. at 123 (quoting *United States v. Carpenter*, 51 M.J. 393, 396 (C.A.A.F. 1999)).

With regard to curative measures, the military judge did not specifically address or react to the unobjected comments. However, we note trial counsel repeatedly explicitly reminded the court members that the Government bore the burden of proof, which tended to mitigate any risk the comments above implied any burden on the Defense.

Finally, and most importantly, as described above with respect to legal and factual sufficiency, the weight of the evidence supporting Appellant's conviction was overwhelming. An eyewitness, CF, saw Appellant flee the scene of the murder. Other than Appellant, CF, and the victim, no one else was present. Ballistics evidence indicated the handgun TF gave Appellant was the murder weapon. There are no identified realistic alternative suspects. The Government introduced strong evidence regarding Appellant's motive, opportunity, and intent to commit the murder, as well as his consciousness of guilt. The Government effectively eviscerated the credibility of TB, the Defense's alibi witness, in multiple respects. Accordingly, we are satisfied beyond a reasonable doubt that the court members convicted Appellant on the strength of the evidence alone and not upon any impermissible implications from trial counsel's argument.

## U. Cumulative Error

The doctrine of cumulative error provides that "a number of errors, no one perhaps sufficient to merit reversal, [may] in combination necessitate" relief. *Banks*, 36 M.J. at 170–71 (quoting *United States v. Walters*, 16 C.M.R. 191, 209 (C.M.A. 1954)). However, "[a]ssertions of error without merit are not sufficient to invoke this doctrine." *United States v. Gray*, 51 M.J. 1, 61 (C.A.A.F. 1999). We have found the majority of Appellant's assertions of error to be without merit. As described above, for purposes of analysis we have assumed without deciding that five of Appellant's assertions of error may have merit: (1) that the military judge failed to consider that the Government's opening statement opened the door to evidence of TF's "swinging" behavior; (2) that the military judge permitted the Government to use Appellant's suppressed letter to TB as rebuttal evidence; (3) that the military judge's instruction that the court members could consider evidence of Appellant's IRS deficiency notice in rebuttal of his alibi defense; (4) a small portion of the Government's findings argument; and (5) small portions of the Government's sentencing argument. In each case, we found Appellant was not prejudiced by the alleged error. We have also considered the cumulative effect of these alleged errors, assuming *arguendo* that they are errors, and we conclude that in combination they had no effect on the result of Appellant's trial. Accordingly, Appellant is not entitled to relief under the cumulative error doctrine.

## III. CONCLUSION

The approved findings and sentence are correct in law and fact, and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a), 866(c). Accordingly, the findings and sentence are **AFFIRMED**.

POSCH, Senior Judge (concurring):

I join this court's resolution of the 26 issues Appellant raises on appeal and the conclusion reached by my esteemed colleagues. However, I question whether the standards for facially unreasonable delay in post-trial processing and appellate review established by our superior court in *United States v. Moreno*, 63 M.J. 129, 135 (C.A.A.F. 2006), should apply here. Although I propose different standards for cases like Appellant's, I nonetheless agree with the majority that Appellant's due process right to timely post-trial processing and appellate review were *presumptively* violated as defined by *Moreno* and as might be defined by a different standard. While the *Moreno* presumptions for facially unreasonable delay are "fully entitled to the benefit of *stare decisis*," *Flood v. Kuhn*, 407 U.S. 258, 282 (1972), it is another case the United States Supreme Court decided near the end of the Court's 1971–1972 Term, *Barker v. Wingo*, 407 U.S. 514, 530 (1972), that gives me pause to apply the *Moreno* presumptions to post-trial processing in more complex cases such as the death sentence eligible court-martial under review.

In *Moreno*, the United States Court of Appeals for the Armed Forces (CAAF) announced when a presumption of unreasonable delay will trigger the four non-exclusive factors identified in *Barker*, 407 U.S. at 530. *Moreno*, 63 M.J. at 135. These factors are used to assess whether an appellant's due process right to timely post-trial and appellate review has been violated. *Id.* In *Moreno*, our superior court's holding quantified the threshold for a presumptive due process violation that it measured in days and months when any of the following occur: (1) the convening authority takes action more than 120 days after completion of trial; (2) the record of trial is docketed by the service Court of Criminal Appeals (CCA) more than 30 days after the convening authority's action; or (3) a CCA completes appellate review and renders its decision over 18 months after the case is docketed with the court. *Id.* at 142.

For reasons made clear in the opinion of the court, the 120-day and 18-month standards that the Government manifestly failed to meet here were, in a word, unachievable. Among the reasons for the delay, the 44-volume record includes over four thousand pages of transcript and many hundreds of exhibits comprising several thousand pages. Tellingly, Appellant's clemency submission included 114 claims of legal error, including a claim of facially unreasonable delay because the Government violated the 120-day standard for timely post-trial review. Predictably, the proceedings below generated comparable proceedings on appeal whether measured by time or complexity. Even before Appellant had filed his assignments of error with this court, the Government was held to answer to not just one presumptive due process violation, but two.

To be sure, "convicted servicemembers have a due process right to timely review and appeal of courts-martial convictions." *Id.* at 136 (citing *Toohey v.*

*United States*, 60 M.J. 100, 101 (C.A.A.F. 2004); *Diaz v. Judge Advocate General of the Navy*, 59 M.J. 34, 37–38 (C.A.A.F. 2003)). And, no one can seriously quarrel about holding the Government to adhere to processing standards meant to "to deter excessive delay in the appellate process and remedy those instances in which there is unreasonable delay and due process violations." *Id.* at 142. However, while I join my colleagues in dutifully abiding by our superior court's *Moreno* holding, I do so with the reservation that, as applied here, it may stray too far from *Barker* in cases like Appellant's that are referred capital and are uncharacteristic of cases like *Moreno* under review.

The appellant in *Moreno* was tried for the offense of rape in violation of Article 120, Uniform Code of Military Justice, 10 U.S.C. § 920. *Id.* at 132. Remarkably, in that case 1,688 days elapsed between adjournment and the CCA's decision. *Id.* at 135. The CAAF found excessive the 490 days that elapsed before convening authority action, and the 925 days from when the case was docketed at the CCA and briefing was complete. *Id.* at 136–38. In looking to *Barker*, which "addressed speedy trial issues in a pretrial, *Sixth Amendment* context," the CAAF nonetheless acknowledged, by analogy, that the *Barker* opinion's "four-factor analysis has been broadly adopted for reviewing post-trial delay due process claims." *Moreno*, 63 M.J. at 135 (emphasis added).

In *Barker*, the Supreme Court could "find no constitutional basis for holding that the speedy trial right can be quantified into a specified number of days or months." 407 U.S. at 523. But, at the same time, the Court observed that "[t]he States . . . are free to prescribe a *reasonable* period consistent with constitutional standards . . . ." *Id.* (emphasis added). When a defendant's speedy trial is at issue, "[t]he length of the delay is to some extent a triggering mechanism. Until there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance." *Id.* at 530. Importantly, "the length of delay that will provoke such an inquiry is necessarily dependent upon the peculiar circumstances of the case." *Id.* at 530–31. To illustrate this point, the Court explained: "the delay that can be tolerated for an ordinary street crime is considerably less than for a serious, complex conspiracy charge." *Id.* at 531.

Continuing the analogy in *Moreno* to the pretrial speedy trial context in *Barker*, the case under review is hardly ordinary, and should generate considerable uncertainty whether the *Moreno* standard for facially unreasonable delay is "reasonable" under the circumstances. Rather than apply a fixed 120-day and 18-month standard as the "triggering mechanism," *Barker*, 407 U.S. at 530, that will prompt an examination of other factors identified in *Barker*, in cases like Appellant's that are referred capital, I would call upon our superior court to apply a 270-day and 3-year standard, respectively, before finding a presumptive violation of an appellant's due process right to timely post-trial

processing and appellate review. In such cases, I believe each to be "a reasonable period consistent with constitutional standards." *Id.* at 523. As proposed, the 270-day standard between completion of trial and convening authority action adjusts for the time it takes to accurately prepare the record of trial and to complete clemency in complex cases such as the capital-referred court-martial under review. At the same time, increasing the time for appellate review, as proposed, allows both parties to review what predictably will be a lengthy record of proceedings and for a CCA to render a decision.

Under the *Moreno* standards and the standards proposed here, I would find a presumption of facially unreasonable delay. Nonetheless, I join the opinion of the court in finding Appellant's due process right to timely post-trial and appellate review was not violated.

FOR THE COURT

CAROL K. JOYCE
Clerk of the Court